# EXHIBIT C

Naq2Cos1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          22 Cr. 281 (JPO)

 5   JOHN COSTANZO, JR.,
     MANUEL RECIO,
 6
                 Defendants.
 7
     ------------------------------x      Trial
 8
                                          New York, N.Y.
 9                                        October 26, 2023
                                          11:10 a.m.
10

11   Before:

12                    HON. J. PAUL OETKEN,

13                                        District Judge
                                           -and a Jury-
14
                          APPEARANCES
15

16   DAMIAN WILLIAMS,
          United States Attorney for the
17        Southern District of New York
     SEBASTIAN A. SWETT
18   EMILY S. DEININGER
     MATHEW ANDREWS
19        Assistant United States Attorneys

20   MUKASEY FRENCHMAN LLP
          Attorneys for Defendant Costanzo
21   MARC L. MUKASEY
     MICHAEL F. WESTFAL
22   STEPHANIE GUABA
     TORREY K. YOUNG
23
     GAINOR & DONNER
24        Attorneys for Defendant Recio
     RONALD GAINOR
25   AMBER E. DONNER
```

Naq2Cos1

1                         APPEARANCES (continued)

2

Also Present:   Dean Iannuzzelli, Paralegal Specialist (USAO)
3               Nerlande Pierre, Paralegal Specialist (USAO)
                Marie-Lou Serna, Paralegal (Gainor & Donner)
4               Sal Chan, Paralegal (Mukasey Frenchman)
                Delise Jeffrey, Special Agent, F.B.I.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Naq2Cos1

1          (Jury of twelve and three alternates impaneled and

2    sworn)

3          THE COURT:  Members of the jury, now that you have

4    been sworn in, I will briefly tell you something about your

5    duties as jurors and give you some instructions.  At the end of

6    the trial, I will give you more detailed instructions, and

7    those instructions will control your deliberations.  It will be

8    your duty to decide from the evidence what the facts are and

9    then apply the law to those facts.

10          In doing so, you must follow the law as I give it to

11   you.  You must not take anything I may say or do during the

12   trial as indicating what your verdict should be.  Do not be

13   influenced by my taking notes or by my typing something on the

14   computer.  What I write down may have nothing to do with this

15   trial or with what you need to be concerned about with the

16   trial.

17          Now, you, the jury, and I, the Court, play different

18   roles in this proceeding.  My main duties are to rule on

19   objections, oversee the trial, and at the end of the trial to

20   instruct you on the law that applies.  Your duty is to accept

21   those instructions of law and apply them to the facts as you

22   find them.

23          As members of the jury, you are the sole and exclusive

24   judges of the facts.  You pass upon the evidence; you determine

25   the credibility of the witnesses; you resolve any conflicts

Naq2Cos1

1    there may be in the testimony; you draw whatever reasonable

2    inferences that you decide to draw from the facts as you

3    determine them; and you determine the weight of the evidence.

4           To that end, do not conclude from any of my questions

5    or any of my rulings on objections or anything else I do during

6    this trial that I have any view as to the credibility of the

7    witnesses or how you should decide the case.  Any opinion I

8    might have regarding the facts is of absolutely no consequence.

9    It is your sworn duty.  You have taken your oath as jurors to

10   determine the facts.

11          Just as I have my duties as a judge and you have your

12   duties as jurors, it will be the duty of each lawyer in this

13   case to object when the other side offers testimony or other

14   evidence that the attorney believes is not properly admissible.

15   It will be my job to rule on those objections.  Therefore, why

16   an objection was made or how I rule on it is not your business.

17   You should draw no inference from the bare fact that an

18   attorney objects to any evidence.  Nor should you draw any

19   inference from the fact that I might sustain or overrule an

20   objection.

21          From time to time the lawyers and I may hold

22   conferences out of your hearing at sidebar, at the bench.

23   These conferences involve procedural and other matters and none

24   of the events relating to these conferences should enter into

25   your deliberations.

Naq2Cos1

1          To be clear, the personalities and the conduct of

2     counsel in the courtroom are not at issue.  If you form any

3     reactions of any kind to any of the lawyers in this case,

4     favorable or unfavorable, whether you approve or disapprove of

5     their behavior as advocates, those reactions should not enter

6     into your deliberations.

7          I have referred to the evidence in the case, and that

8     raises an important question:  What is evidence?  Evidence

9     consists of the sworn testimony of the witnesses, the exhibits

10    received in evidence, and the stipulations of the parties, that

11    is, the agreements of the parties about certain facts.  In

12    determining the facts, you must rely upon your own recollection

13    of the evidence.

14         What, then, is not evidence?  The following does not

15    count as evidence:  First, any testimony that I strike or

16    exclude is not evidence.  Second, any exhibit that was not

17    received in evidence.  Third, arguments by lawyers are not

18    evidence.  And the reason is simple. Advocates are not

19    witnesses.  The opening and closing arguments of each party

20    explain how they want you to analyze and think about the

21    evidence.  What the lawyers will say is intended to help you

22    understand the evidence, or the lack of evidence, when you

23    deliberate to reach your verdict.  But only the witnesses'

24    answers are to be considered evidence, not the attorneys'

25    questions.  Finally, any statements that I may make do not

Naq2Cos1

1    count as evidence.

2              You will have an opportunity to observe the witnesses.

3    It will be your job to decide how believable, or credible, each

4    witness is in his or her testimony.  It is for you, the jury,

5    and you alone——not the lawyers, not the witnesses, and not me

6    as the judge——to decide the credibility of witnesses who

7    testify and the weight that that testimony deserves.  The

8    ultimate question for you to decide in passing upon credibility

9    is did the witness tell the truth before you in this trial in

10   this courtroom?

11             This is a criminal case.  That means that the law

12   presumes each defendant to be innocent of all charges.  The

13   government has the burden of proving each defendant's guilt

14   beyond a reasonable doubt.  You must determine separately as to

15   each of the two defendants whether the government has proven

16   that defendant's guilt beyond a reasonable doubt.

17             This burden does not shift to the defendants.  In

18   other words, the defendants do not have to prove their

19   innocence.  Each defendant is presumed to be innocent of the

20   charges in the indictment.  The defendants begin the trial with

21   a clean slate.  This presumption of innocence alone is

22   sufficient to acquit each defendant unless you, as jurors, are

23   unanimously convinced beyond a reasonable doubt of that

24   defendant's guilt after a careful and impartial consideration

25   of all of the evidence in the case.  That presumption is

Naq2Cos1

1    removed if and only if you, as members of the jury, are

2    ultimately satisfied that the government has sustained its

3    burden of proving each defendant's guilt beyond a reasonable

4    doubt.

5         I also just want to caution you about certain

6    principles governing your conduct as jurors.

7         First, you may not talk to each other about this case

8    or about anyone who has anything to do with the case until the

9    end of the trial when I send the jury to the jury room to

10   deliberate.  I will instruct you at that time that you are free

11   to begin deliberating as a jury.

12        Second, you may not talk with anyone else about this

13   case or with anyone who has anything to do with it until the

14   trial has ended and you have been discharged as jurors.  Anyone

15   else includes members of your family and your friends.  You may

16   tell them that you are a juror in a criminal case, but please

17   do not tell them anything else about it until after you have

18   been discharged by me.

19        Third, do not let anyone talk to you about the case or

20   about anyone having anything to do with it.  If someone tries

21   to talk to you, please report it to me immediately through

22   Mr. Hampton or a court security officer.  This includes the

23   lawyers and the witnesses in the case.  So if you do happen to

24   run into one of the lawyers or witnesses in the hallway or in

25   the elevator, please do not speak to them.  And if they don't

Naq2Cos1

1    speak to you, it doesn't mean they are being rude, it is

2    because I am telling them not to speak to you either while the

3    trial is going on.

4            Fourth, you may not do any research or investigation

5    about the case on your own.  Do not read any news stories or

6    articles about the case or anyone who has anything to do with

7    it.  You may not use Google or the Internet or any other source

8    to research any aspect of the case or any of the people

9    involved.

10           Also do not go to visit any scenes described during

11   the trial, and that's because the case must be decided based

12   only on the evidence that is admitted during the trial.  The

13   parties have a right to that, and it's your duty to follow that

14   instruction.

15           Also, please do not use any social media or discuss

16   the trial or any of the people involved during the trial.  That

17   means no Facebook or Twitter or Snapchat or any other social

18   media sites and no blogging about the case.  The parties are

19   entitled to have you personally render a verdict in this case

20   on the basis of your independent evaluation of the evidence

21   presented here in this trial.  Speaking to others about the

22   case, including even your family, before you deliberate or

23   exposing yourself to evidence outside the courtroom would

24   compromise your service and the fairness to the parties.

25           Finally, I'm just going to give you a brief summary of

Naq2Cos1                          Opening – Mr. Andrews

1    the stages of the trial.  First, each party may make an opening

2    statement, though they are not required to.  An opening

3    statement is not evidence.  It is an outline of what that party

4    intends to prove and it is offered to help you follow the

5    evidence.

6            Next, the government will present witnesses and the

7    defendants may cross-examine them.  The defendants are not

8    required to present any witnesses or evidence but may do so if

9    they wish.

10           After that, the attorneys will make their closing

11   arguments or summations to summarize and give you their

12   interpretation of the evidence.  As with opening statements,

13   the closing arguments are not evidence.

14           After the closing summations, I will give you

15   instructions on the law and then you will retire to the jury

16   room to deliberate on your verdict.  Please do not make up your

17   mind about what the verdict should be until after I have

18   instructed you on the law at the end of the case and you have

19   gone to the jury room and you and your fellow jurors have

20   discussed the evidence.

21           Keep an open mind.  The parties deserve, and the law

22   requires, that you give them an opportunity to be heard.

23           We will now have the opening statements, beginning

24   with the government's opening statement.  Mr. Andrews.

25           MR. ANDREWS:  Thank you, your Honor.

1            Good morning.

2            JURORS:  Good morning.

3            MR. ANDREWS:  John Costanzo was making money in 2019.

4   He fixed up his Porsche, bought a new apartment, and was flying

5   around the country first class.  But the source of Costanzo's

6   new found wealth was rotten.  John Costanzo, a special agent

7   with the Drug Enforcement Administration, or DEA, was selling

8   the DEA's secrets.

9            For nearly a year, John Costanzo—this man—sold

10  confidential, inside information about the DEA's criminal

11  investigations—investigations into narcotics traffickers,

12  cartel members, money launderers, and murderers.  And this man,

13  Manuel Recio, paid Costanzo tens of thousands of dollars for

14  the DEA's secrets, confidential information like who the DEA

15  was investigating for federal crimes, who the DEA was seeking

16  to charge, and when the DEA was planning to make arrests.

17           Recio took Costanzo's inside information and then fed

18  it to defense attorneys, attorneys who represented the targets

19  of the DEA's criminal investigations, attorneys who paid Recio

20  handsomely for the DEA's secrets.

21           Recio and Costanzo put people at risk.  They put

22  investigations at risk, all to make a buck.  That's why we are

23  here.

24           So what will the evidence show?  The evidence will

25  show that Recio didn't always work for defense attorneys.

1   Instead, Recio and Costanzo used to work together at the DEA.

2   Recio was a senior supervisor and Costanzo reported to him.

3           But then, in 2018, Recio and Costanzo hatched a plan.

4   Recio would leave the DEA and Costanzo would introduce him to

5   defense attorneys.  But not just any defense attorneys;

6   attorneys who Costanzo was buddies with.  Recio would go work

7   for those attorneys and they would pay Recio handsomely for his

8   services.

9           And that's exactly what Recio did.  Recio quit the

10  DEA, started his own company, and began working as a private

11  investigator for the other side, attorneys who represented the

12  criminal targets of the DEA's investigations.  And Recio knew

13  exactly how to get these attorneys valuable information because

14  Recio knew who would sell the DEA's secrets for cold, hard

15  cash—Recio's friend and former colleague, Special Agent John

16  Costanzo.

17          So what kind of inside information did Costanzo sell

18  to Recio?  Costanzo sold Recio confidential information about

19  who the DEA was investigating for federal crimes, who the DEA

20  was seeking to charge, and when the DEA was planning to make

21  arrests.

22          The DEA prohibits agents from sharing this

23  information.  It puts people at risk.  It puts investigations

24  at risk.  You are going to learn how, after Costanzo tipped off

25  Recio about when a Dominican drug lord would be arrested, the

Naq2Cos1                    Opening - Mr. Andrews

1    drug lord fled.  But Recio and Costanzo kept on with their

2    schemes.

3           And how did Recio pay Costanzo for the DEA secrets?

4    Well, Recio couldn't just wire the money into Costanzo's

5    personal bank account.  I mean, the DEA might notice.  But

6    Recio and Costanzo were experts at investigating how criminals

7    moved their money, and they put their expertise to use by

8    disguising the bribe payments.

9           Over the course of a year, Recio paid tens of

10   thousands of dollars to companies owned by Costanzo's father

11   and one of Costanzo's friends, a police officer that Costanzo

12   had recruited to work with him at the DEA.  Costanzo and Recio

13   then created fake invoices, claiming that these payments were

14   for things like investments and investigative services.  And

15   Costanzo hid the money by failing to report a single dollar of

16   this bribe money on his tax returns.

17          And Recio and Costanzo, they didn't stop there,

18   because they also hid their communications.  They texted using

19   encrypted, unbreakable messaging applications.  They deleted

20   messages.  They used a secret phone, one given by Recio to

21   Costanzo and that only had one purpose: to call Recio and give

22   him inside information.

23          And Recio and Costanzo, they didn't work alone.  They

24   recruited well-connected criminals to assist in the scheme.

25   You are going to hear how Recio approached a man from the

Naq2Cos1                              Opening – Mr. Andrews

1    criminal underworld, a former DEA informant who had worked for

2    cartels and had committed murder.  And you are going to learn

3    how Recio asked this former DEA informant to introduce Recio to

4    the targets of the DEA's criminal investigations, men who would

5    pay Recio for Costanzo's inside information.  But what Recio

6    didn't realize was that this former informant——this man that

7    Recio had attempted to recruit——was a cooperating witness.  He

8    was working for the government, and he was recording Recio's

9    conversations.

10           And afterwards, when Recio and Costanzo thought they

11   were going to be caught, they lied.  Almost a year into the

12   bribery scheme, other law enforcement agents interviewed

13   Costanzo and Recio about what was going on, and they lied.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

NAQVCOS2                          Opening – Mr. Andrews

1          MR. ANDREWS:  They denied that Recio every asked

2     Costanzo for confidential information.  They denied that Recio

3     had ever given Costanzo any money.  And they denied that Recio

4     had ever given Costanzo a second secret phone, the phone they

5     used only for their dirty business.

6          So then how will the government prove the defendants'

7     guilt beyond a reasonable doubt?  You're going to see and hear

8     many different types of evidence at this trial.

9          First, you're going to see and hear Recio and

10    Costanzo's own words plotting the bribery scheme.  We're going

11    to show you their emails and their text messages.  You're going

12    to see how just two weeks before Recio quit the DEA he stole

13    confidential plans about the DEA's operations abroad,

14    operations run by Costanzo into foreign generals and corrupt

15    politicians.

16         And you're also going to see how Recio texted Costanzo

17    to search the very confidential DEA database again and again

18    and again so that Costanzo could tell Recio confidential

19    information about the DEA's criminal targets, potential clients

20    for Recio and the crooked attorneys that Recio was working

21    with.  And you'll also learn how law enforcement secretly

22    recorded Recio and Costanzo's phone calls, calls of Recio and

23    Costanzo speaking when they thought that no one was listening;

24    calls of Recio and Costanzo speaking their true selves.

25         And you're going to hear Recio and Costanzo scheme

1   with one of the crooked attorneys that they were working with

2   about how they were going to make, in their own words, "money,

3   money, money."

4           And you're going to hear Costanzo tell Recio about

5   what he was going to do to anybody who found out about the

6   bribes; how Costanzo was going to scare the shit out of them.

7   And if they want a problem, I'll make a problem.  I'll find

8   people to put problems on them.

9           And you're also going to hear the secret recordings

10  made by the cooperating witness, the former DEA confidential

11  informant that Recio had attempted to recruit into the bribery

12  scheme.  You're going to hear Recio tell this cooperating

13  witness on tape how Recio had secret information about when the

14  DEA was going to make charges and arrests.  And you're going to

15  hear one of the crooked attorneys that Recio and Costanzo were

16  working with tell this cooperating witness, Don't tell anybody

17  where that information comes from.  We don't want people to

18  know.

19          Now, to be clear, this cooperating witness committed

20  crimes, pled guilty, and recorded Recio in the hopes that a

21  judge would sentence him to less time in jail.  We are not

22  asking you to approve of this man's crimes.  We are asking you

23  to listen to the recordings that he made, Recio's words on tape

24  plotting the bribery scheme.  And when you do, you will see how

25  these recordings line up with a mountain of other evidence in

NAQVCOS2                    Opening - Mr. Andrews

1    this case, evidence including the bribes.

2              Because we're going to show you the bank records,

3    showing how Recio paid tens of thousands of dollars to

4    companies owned by Costanzo's father and one of Costanzo's

5    friends.  We're going to show you the fake invoices claiming

6    that these payments were for things like investigative services

7    and investments.  And we're going to show you Costanzo's tax

8    returns, where he didn't report a single dirty dollar of the

9    money that he was making.

10             And so as you'll learn, over the course of a year,

11   Costanzo sold Recio confidential information and hid his

12   actions from his colleagues, his bosses, and the prosecutors

13   that he worked with.  Costanzo and Recio thought they could get

14   away with it, and they were wrong.

15             Now, after you see and hear all of the evidence, I'll

16   have an opportunity to speak with you again.  But in the

17   meantime, I'd ask you to do three things:

18             First, please pay careful attention to the evidence.

19   Second, please follow the Court's instructions on the law.  And

20   third, use your common sense, the same common sense that guides

21   you throughout your lives outside of this courtroom.  And if

22   you do those three things, then at the end of this trial you

23   will have reached the only verdict that is consistent with the

24   evidence in this case:  that the defendants John Costanzo and

25   Manuel Recio are guilty.

1          THE COURT:  Thank you.

2          We'll now have the opening statement on behalf of

3   Mr. Costanzo.

4          Ms. Young.

5          MS. YOUNG:  John Costanzo wouldn't be bought, couldn't

6   be bought, and wasn't ever bought.  You will see no evidence in

7   this case of payments to John Costanzo for information, because

8   John Costanzo never took one dollar for giving out DEA

9   information.

10         The government's case will show connections that don't

11  exist, patterns where there are none, conclusions without clear

12  evidence.  That's why we are here.  The government's seeing

13  ghosts, because there was never a *quid pro quo*.  John Costanzo

14  never demanded, sought, or received anything of value to

15  violate his official duty as a DEA agent.  He never schemed or

16  agreed to scheme to deprive anyone of his honest services, not

17  the DEA, not the public.

18         Let me say it another way:  There were no bribes.

19         That's why John pleaded not guilty; that's him saying,

20  There was no scheme.  I didn't take or agree to take bribes

21  from anyone.  I always acted in good faith.  My only intention

22  was to act in the best interest of the DEA and the public.  I

23  am innocent.

24         Members of the jury, let me take a second to

25  reintroduce myself.  My name is Torrey Young.  And together

NAQVCOS2                           Opening - Ms. Young

1    with Marc Mukasey and our team, it is our privilege and

2    responsibility to represent DEA Special Agent John Costanzo,

3    Jr.

4           And John, if you could please stand up for a second.

5    This is John.  Thank you.

6           John has been a DEA agent for 24 years.  His father

7    was a DEA agent for 30 years.  The Costanzos have been serving

8    this country since the 1960s.

9           Now, you're going to hear in this case about John's

10   work life and his personal life.  I'm going to start with his

11   work life.

12          John actually began his career in the Secret Service.

13   A couple of years later, he moved to DEA and became a special

14   agent in Miami, Florida.  And the DEA's mission is to dismantle

15   drug trafficking and money laundering organizations; put them

16   out of business.

17          Now, how does DEA do that?  Information, information,

18   and more information.  DEA gets information from all sorts of

19   different places.  Sometimes it's from private citizens; other

20   times, people who are involved get caught and then, often with

21   lawyers and private investigators helping them, they choose to

22   cooperate.  They give DEA agents names, tips, bank account

23   info.  They give information to the government.  Why?

24   Leniency.  They get credit.  And DEA gets the information to

25   build more cases, to take down more drug trafficking, to

NAQVCOS2                    Opening - Ms. Young

1    advance DEA's mission.

2             And John, John was good at it.  He got promoted.  He

3    became a supervisor.  And he wasn't busy making arrests on the

4    street corner; he was supervising international operations in

5    places like Colombia and Venezuela to take down major drug

6    kingpins.

7             And it was during John's time in DEA that he met

8    Mr. Manuel Recio.  They served together in Miami and, for a

9    while, John reported to Manny.  And at the end of 2018, Manny

10   Recio retired from DEA and started a second career as a private

11   investigator.  That's not uncommon.  John's father did that,

12   Manny did that, John thought about that.  But John decided to

13   take a promotion and move to DEA headquarters in Washington,

14   D.C. instead.

15            Now, Manny did a bunch of things as a private

16   investigator which Mr. Gainor will tell you about.  But one of

17   the things he did as a private investigator was try to convince

18   drug traffickers to cooperate with the DEA.  So a lot of the

19   text messages and calls that you are going to see and hear in

20   this trial are between John and Manny, and they are about just

21   that:  John and Manny talking about names and info and money.

22   But it is not John trying to help drug traffickers, and he's

23   not trying to help drug traffickers' lawyers.  It was just the

24   opposite.  John is trying to help the DEA.  John is trying to

25   convince drug traffickers to work with the DEA to catch other

1    drug traffickers.  These are not discussions of a bribe scheme.

2    And John received no money for these discussions.

3          Evidence will show that the money is not coming from

4    where the government says it's coming from.  Money is not going

5    to where they say it's going.  And the money is not for what

6    the government says it's for.

7          You will see John's good-faith efforts to gather

8    information to the DEA, to follow up on leads, to get people to

9    cooperate.  It is John talking to his former boss who he

10   believes might have just left the DEA, but still has the DEA's

11   mission in his head and in his heart.  And listen carefully,

12   because that is what John was mostly doing, listening.  Know

13   why?  Because good agents listen when others talk.

14         Now, a bit about John's personal life.

15         John had friends.  He likes sports.  He saved up and

16   bought a condo in Miami.  He had a car and an on-and-off

17   girlfriend.  And he was a social guy who texts and calls and

18   talks and meets up.  And did John's work life and personal life

19   sometimes overlap?  Of course.  Of course they did.  They did

20   from the day he was born because his father was a DEA agent.

21         And when you work with people in an intense

22   environment, when you experience something that very few people

23   really experience or understand, and when you work with them

24   day after day, month after month, year after year, you become

25   friends with some of them.  You become like brothers with

1    others.  And you text them and you call them and you hang out

2    with them.  You go to dinner with them.  You go to a ball game

3    with them.  You wonder about the future with them.  It is

4    completely natural, completely normal, and completely innocent.

5            So did John go to a Yankee game to hang out with a few

6    friends?  Yes.  Was it a bribe?  Absolutely not.  And did John

7    cheat the DEA and the public by buying his condo?  Completely

8    absurd.  And did John ever compromise the mission of the DEA by

9    flying home for his birthday to visit his friend?  That's

10   ludicrous.  Because John Costanzo wouldn't be bought, he

11   couldn't be bought, and he wasn't ever bought; not with a

12   Yankee ticket, not with money, not with anything.  John never

13   agreed to be in any bribery scheme because there was no bribery

14   scheme, not with Manny Recio or anyone else.  There was no *quid*

15   *pro quo.*

16           There will be, though, "one you scratch my back, I'll

17   scratch yours" in this case, one person who acted corruptly,

18   one person who deprived the government of his honest services,

19   and it is not John Costanzo.  The guy who feared getting kicked

20   out of the country and threw out lies to see what would stick,

21   the guy who spewed misstatements and misinformation for hopes

22   of a get-out-of-jail-free card, and that guy is the

23   government's star witness.  And I submit that you will reject

24   his testimony.  Because the government is relying on the

25   unreliable, finding corrupt intent where there is only good

NAQVCOS2                    Opening - Ms. Young

1    faith, and assuming payments for promises that were never made.

2             So ladies and gentlemen, as you listen to the

3    evidence, keep in mind that the government may make a point on

4    a Wednesday, and we may counter on a Friday, and we may not

5    even respond to some things at all because it's the

6    government's burden of proof.  And we think you're going to see

7    right off the bat that the government is seeing ghosts; drawing

8    connections where there are none.

9             So we ask that you keep an open mind.  And as the

10   judge told you this morning, John is presumed innocent.  The

11   presumption of innocence means that you have to presume that

12   John is innocent as he sits here right now.  John is innocent

13   when you listen to the evidence, and John innocent when you

14   leave the courtroom to go deliberate.

15            And only if the government can prove each and every

16   element of each and every charge to each and every one of you

17   unanimously beyond a reasonable doubt can that presumption be

18   overcome.  And "beyond a reasonable doubt" is the highest

19   standard we have in the law because this is the most serious

20   kind of case we have in the law.

21            So every time you heard a juror say "not guilty," it

22   is because the government couldn't meet its burden.  And that's

23   why at the end of this case you're going to see that John

24   Costanzo wouldn't be bought, couldn't be bought, and wasn't

25   ever bought.  And that's why we'll ask you to return a verdict

NAQVCOS2                          Opening – Mr. Gainor

1    on all counts of not guilty.

2              THE COURT:  Thank you.

3              We'll now have the opening for Mr. Recio.

4              Mr. Gainor.

5              MR. GAINOR:  Manny Recio didn't bribe, engage in any

6    fraud, or conspire with Special Agent John Costanzo or anyone

7    else, for that matter.  He committed no crime.  And because of

8    that, he is not guilty of every single count in this

9    indictment.

10             Ladies and gentlemen of the jury, good morning.  My

11   name is Ron Gainor.  Myself and my partner, Amber Donner, will

12   be representing Manny Recio, a retired drug enforcement agent,

13   and the other defendant in this case.

14             Now, folks, as you are aware from listening to

15   Ms. Young, there is another side to this case.  And this is

16   something not only that Ms. Young focused on, but it's

17   something that I will now discuss and amplify.

18             Our side, Manny Recio's side, begins with Manny Recio

19   himself.  You're going to hear that Manny Recio became a drug

20   enforcement agent in 1997.  For the next two decades, more, 22

21   years, he participated in hundreds of investigations, focusing

22   in on domestic and international drug targets, individuals

23   breaking the law.  He became experienced.  He became

24   accomplished at identifying not just large-scale money

25   launderers and large-scale narcotics traffickers, but the

1    people that worked with them at all levels.  And he also became

2    an expert at getting people to cooperate, to plead guilty, to

3    further the DEA mission.

4          Manny worked hard over those two-plus decades, and he

5    moved up into the ranks of DEA in Miami.

6          He first started in Phoenix, came back to south

7    Florida, and was a special agent for some time, until he became

8    an ASAC, an Assistant Special Agent in Charge, someone who

9    supervised multiple groups of agents in the office, in his

10   case, over 50 men and women.  And his groups, the people under

11   him, became amongst the most successful and respected in DEA,

12   because they did their job day after day, week after week,

13   month after month, and year after year.

14         The evidence will show that after 22 years of being a

15   special agent and a manager, an Assistant Special Agent in

16   Charge, Manny Recio did what a lot of former agents do:  Went

17   on the private side of work.  Manny retired in 2018, after

18   attaining the retirement age of 50 years old, after

19   accomplishing over 20 years of government service, after

20   getting a salary of over 180,000 a year, the high end of

21   government service, went into the private sector and became a

22   private investigator, working with other criminal defense

23   attorneys, opened up his own company, Global Legal Consulting.

24         But as Ms. Young has told you and as I will again

25   amplify, Manny Recio never got the DEA out of his blood.  After

NAQVCOS2                           Opening – Mr. Gainor

1    22 years of being a DEA agent, he was still an agent deep down.

2    You will hear that with few exceptions, he worked with defense

3    attorneys and still represented drug defendants.  And again,

4    it's something that happens often where law enforcement agents

5    retire and then go into the private sector.

6            But what did Manny do when he went into the private

7    sector?  You're going to hear that he continued the DEA mission

8    when he was also trying to work in a private capacity.  He

9    tried to identify, work with, and facilitate the guilty pleas

10   of drug targets, the cooperation of drug targets, so they can

11   work with DEA.  Manny went from a supervisor in the Drug

12   Enforcement Agency, to working with defendants in a private

13   capacity, getting them to plead guilty, accept responsibility,

14   and cooperation with DEA.

15           This explains much of his contact with John Costanzo,

16   Special Agent Costanzo.  As Manny remained an asset to not only

17   Special Agent Costanzo in DEA, as well as other agents, you

18   will hear that Manny Recio worked with other special agents in

19   the Drug Enforcement Agency doing the same thing.  Are you

20   interested in this drug target?  Can this drug target

21   cooperate?  Can he further the DEA mission?  If he pleads

22   guilty and cooperates, what can you do?  Because he will help

23   your mission; he will help your case.

24           That's the way the war on drugs is fought, between a

25   partnership outside the DEA, with people -- not only

1    informants, but people who are able to supply, with defense

2    attorneys, drug targets who are willing to plead guilty,

3    cooperate, and then give information on others.  That's what

4    Manny developed an expertise in as a DEA agent and as a

5    supervisor, and that's what he continued when he went on the

6    private side as a private investigator.

7           The evidence will also show that Manny Recio was also

8    a friend of John Costanzo.  You heard that they worked

9    together; that Manny Recio supervised Special Agent John

10   Costanzo, who was a highly competent and effective DEA agent in

11   his own right.  One of the 50, one of the 50 that Manny

12   supervised.

13          And these best friends did have aspirations of the

14   future, perhaps maybe even going into business in the future.

15   You'll hear some of these conversations.  But as Ms. Young

16   pointed out, a lot of these conversations will be

17   mischaracterized by the government.  The prosecutors' theory is

18   that there was something very different, something sinister.

19   But there will be no credible evidence of corruption, no

20   credible evidence of bribery or fraud.  That's their side of

21   the story.  That's their side of the case which they have to

22   prove beyond a reasonable doubt, and they won't ever.  What you

23   will see from the prosecution is mischaracterizations of

24   conversations, speculation, guesswork, and a reliance on an

25   informant with the motivation to lie and a track record of

NAQVCOS2

1  lying, cheating, and stealing.

2          Ladies and gentlemen, this is a case about a current

3  DEA special agent and a former DEA agent that didn't commit any

4  crime, and instead tried to advance the DEA mission and

5  continue a fight on the war on narcotics that began over two

6  decades ago, when they both started working and Manny became a

7  supervisor.  Manny Recio never bribed or conspired to bribe

8  John Costanzo.  He never paid a cent for any information that

9  ultimately, ultimately, was designed to advance the DEA

10  mission.

11          Folks, at the conclusion of this case, after you wade

12  through the leaps, the guesswork, and the speculation in the

13  prosecutors' case, after you consider the evidence with an open

14  mind, knowing what the burden of proof is, knowing what the

15  presumption of innocence means, we'll ask that you return a

16  verdict of not guilty, not guilty on all counts, ladies and

17  gentlemen, because as Manny Recio sits here in this courtroom

18  today, he is not guilty.  He is truly not guilty.  Thank you.

19          THE COURT:  Thank you, Mr. Gainor.

20          Members of the jury, you've now heard the opening

21  statements of each of the parties.  And we're going to begin

22  with the evidence in the case, beginning with the first

23  witness.  We'll break for lunch at 1 o'clock.  So I believe

24  we'll be able to begin.

25          First I'm going to pass out notepads in case you would

NAQVCOS2

1    like to use notepads to take your own notes during the evidence

2    in the trial.  A couple of things about that:  One, don't write

3    on them; just every night we'll be keeping them on the chair

4    where you're sitting.  If you want to write your juror number,

5    you can write your juror number, but that's it, on the front:

6    1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15.  But that's

7    it for now.

8            The notes are for your own recollection; they are not

9    to be shown to other jurors.  Some people find that it's

10   helpful to take notes; others don't.  It's completely up to

11   you.  The fact that someone decides not to take notes doesn't

12   entitle that juror to any less of a voice when you get to

13   deliberations.  Again, don't show your notes to each other;

14   they are just for your own recollection, if you choose to take

15   notes.

16           You will be leaving them here in the courtroom every

17   evening until you actually deliberate.  When I instruct the

18   jury to deliberate, then you'll be able to take the notes back

19   with you.  Also, you will have copies of the exhibits in the

20   jury room, so you don't have to memorize every exhibit that

21   comes up during the trial.

22           Does everybody have a pen and a notepad?  Anybody need

23   a pen?  Okay.  All right.

24           Mr. Swett, is the government ready?

25           MR. SWETT:  Yes, your Honor.

NAQVCOS2                           Escobar - Direct

1              The government calls Special Agent Daniel Escobar.

2              THE COURT:  Yes.

3              Sir, if you'd please come up to the witness stand,

4    which is up here.  And I'll ask you to go ahead and have a seat

5    in the witness stand.  Pull the mic -- go ahead and have a

6    seat.  And pull the mic so it's pretty close like this, about

7    three inches from you.

8              THE WITNESS:  Does that work?

9              THE COURT:  Yes.  And you'll be sworn in by

10   Mr. Hampton.

11             THE WITNESS:  Yes, sir.

12    DANIEL ESCOBAR,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15             THE COURT:  Mr. Swett.

16             MR. SWETT:  Thank you, your Honor.

17   DIRECT EXAMINATION

18   BY MR. SWETT:

19   Q.  Good afternoon, Special Agent Escobar.

20   A.  Good afternoon.

21   Q.  Where do you work?

22   A.  For the DEA down in Miami.

23   Q.  Does that stand for Drug Enforcement Administration?

24   A.  Yes, sir.

25   Q.  What is your current title?

NAQVCOS2                          Escobar - Direct

1    A.   I'm an Assistant Special Agent in Charge.

2    Q.   Is that title sometimes shortened to ASAC?

3    A.   Yes, sir.

4    Q.   Okay.  And you said you work in Miami?

5    A.   Yes, sir.

6    Q.   Special Agent Escobar, could you look around the room

7    please.  Do you recognize any individuals in the courtroom that

8    you worked with at the DEA?

9    A.   Yes, sir.

10   Q.   Do you recognize John Costanzo, Jr.?

11   A.   Yes, sir.

12   Q.   Could you identify where he is and identify him by an

13   article of clothing?

14   A.   He's wearing a gray suit.

15   Q.   At which table?

16   A.   That table right there, sir.

17   Q.   Okay.

18              THE COURT:  The second table on the right?

19              THE WITNESS:  Second table on the right, yes, sir.

20              MR. SWETT:  Your Honor, I ask the record to reflect

21   that the witness has identified the defendant John Costanzo.

22              THE COURT:  Yes, the record so reflects.

23   Q.   Do you recognize anyone else you've worked with at the DEA?

24   A.   Yes, sir.

25   Q.   Who would that be?

NAQVCOS2                           Escobar - Direct

1   A.  Manny Recio, standing there in the blue suit.

2           MR. SWETT:  Your Honor, we'd ask the record to reflect

3   that Special Agent Escobar has identified Manuel Recio.

4           THE COURT:  It so reflects.

5   Q.  Now, you said your current title is Assistant Special Agent

6   in Charge?

7   A.  Yes, sir.

8   Q.  When did you become an ASAC in the Miami field division?

9   A.  I got promoted in March of 2019.

10  Q.  Who did you replace in that role?

11  A.  Manny Recio.

12  Q.  When you became an ASAC, did you work with John Costanzo?

13  A.  I did.

14  Q.  What was your relationship to him at that time?

15  A.  He was my group supervisor, so he reported up to me.

16  Q.  What, if anything, did you know about Costanzo and Recio

17  discussing DEA cases during the time you supervised Costanzo?

18  A.  I didn't know what they did.

19  Q.  We're going to come back to that in a minute.  I'd like to

20  talk a little bit about your background.

21  A.  Sure.

22  Q.  When did you join the DEA?

23  A.  I joined in 2002.

24  Q.  And can you just explain in very general terms what the

25  DEA's mission is?

NAQVCOS2                        Escobar - Direct

1   A.  Sure.  The DEA -- so our job is to enforce the narcotics

2   laws of the United States.

3   Q.  And what was your title when you joined the DEA?

4   A.  I was a special agent.

5   Q.  When you were -- when you became a special agent, did you

6   swear an oath?

7   A.  I did.

8   Q.  Do you recall the details of that oath?

9   A.  Yeah.  It's basically to uphold the Constitution of the

10  United States, to enforce the narcotics laws.

11  Q.  What was your first assignment when you joined the DEA?

12  A.  I was assigned to the high-intensity drug trafficking area

13  down in Miami, Florida.

14  Q.  Can you describe the general responsibility -- the general

15  responsibilities of a special agent in the DEA?

16  A.  Sure.  As a special agent of the Drug Enforcement

17  Administration, we are paired up with local law enforcement and

18  other federal law enforcement agents to target narcotics in

19  either a specific area or internationally.  So DEA, we work at

20  an international level for the most part.

21  Q.  While you were in Miami, were you ever promoted?

22  A.  I was.  I was promoted, yes, sir.

23  Q.  What was that promotion?

24  A.  I was promoted to the group supervisor in West Palm Beach,

25  Florida for approximately a year.  I was up there working with

NAQVCOS2                          Escobar - Direct

1    the task force group.

2    Q.  Okay.  I'm going to ask you about some of those terms you

3    just used.

4    A.  Yes, sir.

5    Q.  Let me start with "task force."  What's a task force?

6    A.  A task force group is a group of folks that are comprised

7    of state, local, and federal law enforcement targeting a

8    specific narcotic or area.

9    Q.  You also used the term "group supervisor," right?

10   A.  Yes, sir.

11   Q.  In fact, you said that was the position that you were

12   promoted to?

13   A.  That was my position, yes.

14   Q.  Can you explain the responsibilities of a group supervisor?

15   A.  Sure.  As a group supervisor in the DEA, we make sure that

16   the operations are run in a safe manner.  We kind of guide the

17   operations to make sure that all the policies and procedures

18   are in place that we do everything correctly.

19   Q.  When did you become a group supervisor?

20   A.  I became a group supervisor in 2010.

21   Q.  What training, if any, did you receive when you became a

22   group supervisor?

23   A.  I went to Quantico, Virginia for our group supervisor

24   institute, and we learned the basics of management at that

25   point.

NAQVCOS2                          Escobar – Direct

1    Q.   The basics of what?

2    A.   Management.

3    Q.   Okay.  Can you give some examples of what that included?

4    A.   Sure.  Like personnel issues, you know, how to deal with --

5    you know, because as a group supervisor, you're not dealing

6    only with the case stuff, but you're dealing with people, how

7    do you deal with the folks if there's issues within the group.

8    You know, a lot of personnel.

9    Q.   Did that include ethical issues?

10   A.   Yes, sir, ethical issues, yes, sir.

11   Q.   So you said you began as a group supervisor in West Palm

12   Beach?

13   A.   Yes, sir.

14   Q.   How many agents did you supervise in that role?

15   A.   I supervised one group comprised about ten folks.

16   Q.   Did you ever transfer to work as a group supervisor in a

17   different group?

18   A.   Yes.  Approximately a year later I was transferred back

19   down to Miami, Florida, and I was the group supervisor for

20   Group 10.

21   Q.   What kind of cases was Group 10 doing?

22   A.   Group 10 was doing international large-scale money

23   laundering investigations.  They were working money laundering

24   and specifically Attorney General-exempted operations, what we

25   call in the DEA AGEOs.

NAQVCOS2                        Escobar - Direct

1   Q.  Can you explain what an AGEO is?

2   A.  Sure.  An AGEO is a large-scale money laundering

3   investigation that we receive permission from the U.S. Attorney

4   or the Attorney General of the United States to move money, to

5   launder money from cartel organizations.

6   Q.  What's the purpose of allowing DEA agents to move cartel

7   money under the AGEO?

8   A.  The goal of the program is to target the large-scale cartel

9   organizations and to infiltrate them through the banking

10  systems.

11  Q.  You mentioned that this was something done under the

12  auspices of the Attorney General.  Can you just talk about the

13  approval process for an AGEO?

14  A.  Sure.  So when we apply for these AGEO operations, they go

15  through a rigorous process through the DEA; not only through

16  the DEA's office, but the United States Attorney's office and

17  any office that is involved in it.  So they -- as we're moving

18  up the chain, it gets to the Attorney General.  So the deputy

19  attorney generals are involved, the Attorney General himself;

20  they give us authorities to move this money.

21  Q.  Are there restrictions about what you can and can't do

22  under an AGEO?

23  A.  Yes, there's a lot of restrictions.

24  Q.  Are there any sensitivities around these kinds of

25  investigations?

1    A.  Yes, there could be classified information or other --

2    other things, yes.

3    Q.  Okay.  How long were you the group supervisor of Group 10?

4    A.  I was the group supervisor up until the point that I left

5    for the Bahamas, which was 2014; so for approximately three

6    years.

7    Q.  Why did you go to the Bahamas?

8    A.  I was -- I was selected to go to the Bahamas as the country

9    attaché of the DEA over there.

10   Q.  What does a country attaché do?

11   A.  So as a country attaché, I was the lead adviser to the

12   Ambassador of the United States on any narcotics-related issues

13   in the region; and anything that they needed from the DEA I was

14   the main point of contact for the ambassador.

15   Q.  What was your next role in the DEA after serving as country

16   attaché?

17   A.  My next role was I was -- I had to go to a headquarters

18   position and I went to our Office of Inspections, Office of

19   Professional Responsibility.

20   Q.  What does Office of Professional Responsibility do?

21   A.  Our OPR, how we refer to it is our internal affairs

22   department for the DEA.

23   Q.  So what kind of work were you doing with OPR?

24   A.  At that point I was investigating any allegations of

25   misconduct of DEA employees.

NAQVCOS2                          Escobar - Direct

1   Q.  How long did you work at OPR?

2   A.  Approximately two years.

3   Q.  What was your next role in the DEA after that?

4   A.  My next role was -- where I'm currently sitting now was

5   promoted to the Assistant Special Agent in Charge of Miami.

6   Q.  And again, can you remind the jury when you took on your

7   current role?

8   A.  Yeah.  March of 2019.

9   Q.  So as an ASAC, what are your responsibilities?

10  A.  So my current responsibilities, I have four groups that I

11  oversee.  I make sure that the groups are adhering to our

12  priorities of the DEA that we receive from the administrator.

13  On top of that, I deal with a lot of administrative tasks and

14  personnel issues.  We have special agents that I'm in charge

15  of, intel specialists, contractors, different folks that are

16  coming and going.  So it's a -- it's a -- there's quite a bit

17  of admin.

18  Q.  What kind of cases are these groups that you supervise

19  investigating?

20  A.  So my four groups have different cases.  We have one group

21  that's working AGEOs, one group that is working midlevel to

22  lower-level narcotics, I have another group that works strictly

23  local-impact cases that we work with our counterparts in the

24  state, and local where we just impact certain regions or

25  certain sections of the city.

NAQVCOS2                          Escobar - Direct

1   Q.  You mentioned that you previously served as a group

2   supervisor for Group 10 in Miami; correct?

3   A.  Yes, sir.

4   Q.  Is Group 10 one of the groups that you supervise in your

5   current role as an ASAC?

6   A.  Yes, sir.

7          MR. SWETT:  Okay.  At this point I'd like to show just

8   to the witness what has been marked Government Exhibit 2.  We

9   can show it to counsel as well.

10  Q.  Do you see an image on your screen?

11  A.  No, sir.  Yes, sir.

12  Q.  How about now?  Okay.

13          What does this image show?

14  A.  It's a picture of Manuel Recio.

15  Q.  And how long have you known Mr. Recio?

16  A.  For approximately 20 years.

17  Q.  And does this appear to be an accurate depiction of his

18  likeness?

19  A.  Yes, sir.

20          MR. SWETT:  The government offers Government Exhibit

21  2.

22          THE COURT:  Any objection?

23          MR. GAINOR:  No objection, your Honor.

24          THE COURT:  Government Exhibit 2 is admitted.

25          (Government's Exhibit 2 received in evidence)

NAQVCOS2                          Escobar - Direct

1        MR. SWETT:  Could we publish that to the jury please.

2   Q.  Special Agent Escobar, you said you've known Mr. Recio for

3   many years.  Did you ever work with him while he was at the

4   DEA?

5   A.  Yes, sir.

6   Q.  When was that?

7   A.  From when I was in Group 10, he was my immediate

8   supervisor.

9   Q.  What was his role at the time?

10  A.  He was the Acting Assistant Special Agent in Charge.

11  Q.  Okay.  And when Mr. Recio was the Acting Assistant Special

12  Agent in Charge, what were your interactions like with him?

13  A.  They were daily.  I would go to him for -- for -- to brief

14  him up on cases, give him updates on what we were doing.  So

15  they were daily interactions.

16  Q.  Okay.

17        MR. SWETT:  At this point I'd like to show the witness

18  and counsel what has been marked Government Exhibit 1.

19  Q.  Do you see the image on the screen?

20  A.  Yes, sir.

21  Q.  Who is that?

22  A.  That's John Costanzo.

23  Q.  How long have you known John Costanzo?

24  A.  Approximately the same amount of time, about 20 years.

25  Q.  Okay.  And does this image depict what he looks like?

NAQVCOS2                    Escobar - Direct

```
 1   A.  Yes, sir.
 2              MR. SWETT:  The government offers Government Exhibit 1
 3   into evidence.
 4              MR. MUKASEY:  No objection.
 5              THE COURT:  It's admitted, Government Exhibit 1.
 6              (Government's Exhibit 1 received in evidence)
 7              MR. SWETT:  Can we please publish that to the jury.
 8   Q.  Now, you said you've known John Costanzo for about 20
 9   years; is that right?
10   A.  Yes, sir.
11   Q.  When did you first begin working directly with John
12   Costanzo?
13   A.  My first direct -- it was when I moved back over in March
14   of 2019.
15   Q.  Okay.  And you had met Costanzo before then?
16   A.  Yes, sir.
17   Q.  When you moved back to Miami in March of 2019, what was
18   Costanzo's role with the DEA?
19   A.  He was a group supervisor.
20   Q.  Which group?
21   A.  Group 10.
22   Q.  Now, that was the group that you were previously group
23   supervisor for; correct?
24   A.  Yes.
25   Q.  Who replaced you when you left that role?
```

1    A.    When I left for the Bahamas, John Costanzo replaced me.

2    Q.    Okay.  And prior to taking over your role as group

3    supervisor of Group 10, where was John Costanzo working?

4    A.    Prior to that, John was in the homestead resident office.

5    Q.    Can you explain what the homestead resident office is?

6    A.    Sure.  The homestead resident office is -- it's an office

7    within the Miami field division.  It's a little bit south of

8    Miami, the city of Miami proper; so it's an office about 30, 40

9    miles south of Miami.

10   Q.    Did Recio and Costanzo work together in the homestead

11   resident office?

12   A.    Yes.

13   Q.    What was your understanding of the relationship between the

14   two of them?

15   A.    I believe they had a good relationship.  They worked

16   together for a long time.

17   Q.    Okay.

18              MR. SWETT:  I'd now like to show to the witness and

19   counsel what has been marked Government Exhibit 5.

20   Q.    What does this show?

21   A.    That is Eddie Pagan.

22   Q.    How do you know Eddie Pagan?

23   A.    Eddie Pagan was a task force officer.  I'm sorry, yes, a

24   task force officer with the DEA.

25   Q.    And does Government Exhibit 5 -- is that a fair

NAQVCOS2                          Escobar - Direct

1   representation of what he looks like?

2   A.  Yes, sir.

3              MR. SWETT:  The government offers Government Exhibit 5

4   into evidence.

5              THE COURT:  Admitted.

6              (Government's Exhibit 5 received in evidence)

7              MR. SWETT:  Publish it to the jury.

8   Q.  Okay.  So again, can you explain to the jury who this

9   person is?

10  A.  Sure.  Eddie Pagan is a task force officer.  So in the DEA

11  we work a lot with task force officers or TFOs, as we refer to

12  them.  And they're local law enforcement that have -- have been

13  sworn in as special agents with the DEA.  So they are, for all

14  intents and purposes, a DEA special agent on loan from their

15  host or parent agency.

16  Q.  The parent agency is where they typically work when they

17  are not task force officers?

18  A.  Correct.

19  Q.  Do you know what the parent agency -- withdrawn.

20             Do you know what Pagan's parent agency was?

21  A.  Yes.

22  Q.  What was it?

23  A.  Coral Gables PD.

24  Q.  PD?

25  A.  Yeah, police department.

NAQVCOS2                          Escobar - Direct

1    Q.   Now, you mentioned that Pagan is a task force officer.  Is

2    he currently a task force officer?

3    A.   He is not.

4    Q.   Okay.  In the time period when you returned to Miami as an

5    ASAC in 2019, was he a task force officer then?

6    A.   He was.

7    Q.   Where was he a task force officer?

8    A.   He was a task force officer in Group 10.

9    Q.   You were previously group supervisor for Group 10; correct?

10   A.   Correct.

11   Q.   Was Eddie Pagan a task force officer while you were

12   supervising Group 10?

13   A.   No.

14   Q.   Typically, how are task force officers assigned to specific

15   DEA groups?

16   A.   We go out and recruit different officers that would be good

17   for the job.  So typically the way we receive task force

18   officers is we go out, whether it's a supervisor, the special

19   agent, we go to the parent agencies, and go to their narcotics

20   squads or to other squads and try to recruit these folks.

21   Q.   Okay.  And again, who took over as group supervisor for

22   Group 10 after you left?

23   A.   Costanzo.

24   Q.   From the time you left Miami to go to the Bahamas to the

25   time you returned in March of 2019, what sort of interactions,

NAQVCOS2                      Escobar - Direct

1   if any, did you have with John Costanzo?

2   A.  Very limited during that time.

3   Q.  How about Manuel Recio?

4   A.  About the same, very limited.

5   Q.  Okay.  And when you came back to Miami in March of 2019,

6   how often did you interact with John Costanzo?

7   A.  I came back.  We worked every day.  Every day.

8   Q.  And again, what was the relationship between your role as

9   ASAC and his role as group supervisor of Group 10?

10  A.  So it was a -- you know, it was a subordinate employee

11  role, right.  So he would come to me for guidance or -- or

12  updates on cases.  He would tell me what the group was doing

13  and we would go from there.

14  Q.  How long did you supervise John Costanzo in Miami?

15  A.  For approximately three months.

16  Q.  What happened after that?

17  A.  So in June of '19, John Costanzo had got transferred up to

18  headquarters, to the -- to our DEA headquarters which is

19  located in Arlington, Virginia.

20  Q.  What interactions, if any, did you have with Costanzo after

21  that?

22  A.  Once again, very limited.  We talked probably directly a

23  few times, but he went to our financial op section, so he would

24  work with my office, but I had limited contact.

25  Q.  Now, when you went to Miami in March of 2019, you were

1    replacing Recio; correct?

2    A.   Correct.

3    Q.   What was your understanding as to why Recio was leaving the

4    role of ASAC in Miami?

5    A.   He left because he retired.

6    Q.   And did you have an initial understanding as to what, if

7    anything, he would do after his retirement?

8    A.   Yes, my understanding was he was going to go work for a

9    bank.

10   Q.   Do you remember where you heard that he was going to work

11   for a bank?

12   A.   Yeah, Manny told me.

13   Q.   And did there come a time when you learned that Manny

14   Recio, in fact, was not working for a bank?

15   A.   Yes.

16   Q.   What did you learn he was doing?

17   A.   I heard he was working with the local defense attorneys as

18   a private investigator.

19   Q.   Which defense attorneys?

20   A.   Lu Guerra, Dave Macey.

21   Q.   What's a private investigator?

22   A.   For private investigators, they just do investigations for

23   different organizations or whatever they're working for.  So

24   private investigator for a defense attorney will do background

25   investigations or checks for the -- for the defense to help out

NAQVCOS2                              Escobar – Direct

1    the cases.

2    Q.  Are private investigators part of the Drug Enforcement

3    Administration?

4    A.  No.

5    Q.  Do they report to the Drug Enforcement Administration?

6    A.  No.

7    Q.  Would you consider them in partnership with the Drug

8    Enforcement Administration?

9    A.  No.

10   Q.  What did you do when you learned that Recio was working as

11   a private investigator?

12   A.  I asked John Costanzo if he had heard that.

13   Q.  Why did you decide to go to John Costanzo and ask him?

14   A.  Because they were friends.

15   Q.  And this would have been after the time you had taken over

16   as ASAC, right?

17   A.  Correct.

18   Q.  So sometime after March of 2019?

19   A.  Correct.

20   Q.  So do you remember what you asked Special Agent Costanzo?

21   A.  Yeah.  I mean, just in general terms, I had asked him if he

22   had heard what was Manny doing.  I had heard he was working for

23   a bank.  And he mentioned -- you know, he said something to the

24   effect like Manny is doing his thing.

25   Q.  That's what he said, Manny is doing his thing?

NAQVCOS2                           Escobar - Direct

```
 1    A.  Yeah.

 2    Q.  Did you ask any more questions after that?

 3    A.  No, not after that.  I kind of left it alone.

 4    Q.  Why did you decide not to ask any more questions?

 5    A.  It really didn't concern me.

 6    Q.  What, if anything, did Special Agent Costanzo tell you

 7    about his involvement in Manny Recio's private investigative

 8    work?

 9            MR. MUKASEY:  Objection.

10            THE COURT:  Overruled.

11            MR. SWETT:  I'll ask the question again.

12    Q.  What, if anything, did John Costanzo tell you about his

13    involvement in Manny Recio's private investigative work?

14    A.  He didn't tell me anything.

15    Q.  What, if anything, did Special Agent Costanzo tell you

16    about his communications with Manny Recio about DEA cases?

17    A.  He didn't tell me anything.

18    Q.  What, if anything, did Special Agent Costanzo tell you

19    about a secret phone that he would use to communicate with

20    Manny Recio about DEA cases?

21            MR. MUKASEY:  Objection.

22            Argumentative.  Lacks foundation.

23            THE COURT:  Overruled.

24    Q.  I'll ask it again.

25            What, if anything, did Special Agent Costanzo tell you
```

NAQVCOS2                        Escobar - Direct

1   about a secret phone that he used to communicate with Manuel

2   Recio about DEA cases?

3   A.  He didn't tell me anything.

4   Q.  Did you ever authorize Special Agent Costanzo to use a

5   secret method of communication with Manuel Recio about DEA

6   cases?

7   A.  No.

8   Q.  What, if anything, did Costanzo tell you about steering DEA

9   targets to specific attorneys with Manuel Recio?

10  A.  He didn't tell me anything.

11  Q.  Did that include Luis Guerra?

12  A.  Correct.

13  Q.  And that included David Macey?

14  A.  Correct.

15          MR. SWETT:  All right.  At this time, I'd like to read

16  a stipulation that the parties have entered into.  This is

17  Government Exhibit S7.

18          Your Honor, would it be okay to show it to the jury or

19  should we wait until I've offered it?

20          THE COURT:  If it's stipulated, I'm fine going ahead

21  and showing it, if that's all right with defense counsel.

22          It's coming in anyway, right?

23          MR. MUKASEY:  No problem.

24          THE COURT:  Okay.  Go ahead.

25          MR. SWETT:  Okay.  Okay.  I'm going to read the first

NAQVCOS2                          Escobar - Direct

1    paragraph and then paragraph 1A.

2            It is hereby stipulated and agreed by and between the

3    United States of America, by Damian Williams, United States

4    Attorney for the Southern District of New York, Mathew Andrews,

5    Emily Deininger, and Sheb Swett, Assistant United States

6    Attorneys, of counsel; and John Costanzo, Jr., the defendant,

7    by and through the consent of his attorneys, Marc L. Mukasey,

8    Torrey K. Young, and Stephanie Guaba, Esq.; and Manuel Recio,

9    the defendant, by and through the consent of his attorneys,

10   Amber Donner and Ronald Gainor, Esq., that:

11           One.  If called to testify, a representative from the

12   United States District for the Southern District of Florida

13   would state that on February 28th, 2017, a grand jury sitting

14   in the United States District Court for the Southern District

15   of Florida issued an indictment in *United States v. Edison*

16   *Washington Prado Alava, et al*, 17 Crim. 20144, charging the

17   defendants with conspiracy to distribute cocaine.

18           (Continued on next page)

19

20

21

22

23

24

25

1          MR. SWETT:  I'm going to read the last paragraph on

2     this document, which is on page 4.

3          "It is further stipulated and agreed that this

4     stipulation may be received into evidence at trial."

5          And the government offers Government Exhibit S7 into

6     evidence.

7          MR. MUKASEY:  No objection.

8          THE COURT:  S7 is admitted.

9          (Government's Exhibit S7 received in evidence)

10         MR. SWETT:  Can we go back to paragraph 1A again.

11    BY MR. SWETT:

12    Q.   Special Agent Escobar paragraph 1A refers to an indictment.

13    What's an indictment?

14    A.   An indictment is a charging document by the United States

15    government charging an individual of a crime.

16    Q.   Who is the person named in the indictment referenced in the

17    stipulation?

18    A.   Edison Washington Prado Alava.

19    Q.   What is the crime charged?

20    A.   They are charged with conspiracy to distribute cocaine.

21    Q.   Where was the case charged?

22    A.   In the Southern District of Florida.

23         MR. SWETT:  Your Honor, at this time I would like to

24    read another stipulation.  This is Government Exhibit S2, which

25    we can put up on the screen for the jurors.  I'm going to start

Naq2Cos3                          Escobar - Direct

1    at paragraph 1.

2              "Government Exhibits 301 through 303A are true and

3    correct copies of records maintained by Yahoo, Inc., an e-mail

4    service provider for e-mail account mannyarecio@yahoo.com used

5    by Manuel Recio.

6              "Government Exhibit 303A is an attachment to

7    Government Exhibit 303.

8              "Government Exhibits 310 and 311 are true and correct

9    copies of records maintained by Google, Inc., an e-mail service

10   provider for e-mail account recio@globallegalconsulting.net,

11   used by Manuel Recio.

12             "It is further stipulated and agreed that Government

13   Exhibits 301" -- "302 through 303A, 310, 311, and this

14   stipulation may be admitted in evidence at trial."

15             I believe that 302 is a typo.  It should be 301.

16             But, your Honor, the government offers Government

17   Exhibit S2 into evidence.

18             THE COURT:  Admitted.

19             (Government's Exhibit S2 received in evidence)

20             MR. SWETT:  The government also offers Government

21   Exhibit 310 into evidence.

22             THE COURT:  Admitted.

23             (Government's Exhibit 310 received in evidence)

24             MR. SWETT:  Can we please publish Government Exhibit

25   310 to the jury.

Naq2Cos3                        Escobar - Direct

1    BY MR. SWETT:

2    Q.   Special Agent Escobar, what is this?

3    A.   An e-mail.

4    Q.   And who is the e-mail from?

5    A.   The e-mail is from CorrLinks.

6    Q.   Who is the e-mail to?

7    A.   Recio@globallegalconsulting.

8    Q.   What is the date of this e-mail?

9    A.   February 27, 2019.

10   Q.   What is the time that this e-mail was sent?

11   A.   At 2:09 a.m.

12   Q.   What is the subject of this e-mail?

13   A.   The subject is Prado Alava Edison Washington.

14   Q.   And the name in the subject line, how does that relate to

15   the name in the indictment that we just looked at?

16   A.   It is the same name that was in the indictment.

17   Q.   Would you read the first paragraph of Government Exhibit

18   310.

19   A.   "This is a system-generated message informing you that the

20   above-named person is a federal prisoner who seeks to add you

21   to his or her contact list for exchanging electronic messages.

22   There is no message from this prisoner at this time."

23   Q.   Okay.  And have you ever seen this -- withdrawn.

24         Were you aware of this e-mail at the time it was sent

25   in February of 2019?

Naq2Cos3                          Escobar - Direct

1    A.  No.

2    Q.  All right.  At this time I would like to read another

3    stipulation, which we can show to the jury.  This is Government

4    Exhibit S8, and I will indulge everyone's patience because this

5    one is quite long.  I will start with paragraph 1.

6              "Government Exhibits 320 through 325A, 397, and 1030

7    to 1032 are authentic copies of notes, call logs, and

8    communications extracted from the cell phone assigned call

9    number 786-271-2480, used by John Costanzo ('Costanzo

10   Phone-1').  Within these records:

11             "Government Exhibit 320 is a call log from Costanzo

12   Phone-1 from April 28, 2015 to November 17, 2019.

13             "Government Exhibit 321 contains communications sent

14   via iMessage between Costanzo Phone-1 and the cell phone

15   assigned call number 305-796-7463 used by Manuel Recio (the

16   'Recio Phone') between May 12, 2019 and October 28, 2019.

17             And to the next page.

18             "Government Exhibit 322 contains communications sent

19   via What's App between Costanzo Phone-1 and the Recio Phone

20   between October 27, 2018 and November 17, 2019.

21             "Government Exhibits 323 contains communications sent

22   via Telegram between Costanzo Phone-1 and the Recio Phone

23   between February 19, 2019 and June 3, 2019.

24             "Government Exhibit 324 is a note saved to Costanzo

25   Phone-1 on or about May 26, 2019.

Naq2Cos3                        Escobar - Direct

1          "Government Exhibit 324A is an excerpt from the

2     contacts in Costanzo Phone-1.

3          "Government Exhibit 325 contains visual depictions of

4     excerpts of communications sent via TextNow between Costanzo

5     Phone-1 and Jorge Hernandez Villazon between September 27, 2018

6     and May 6, 2019.  Government Exhibit 325A contains images of

7     attachments to GX 325.

8          "Government Exhibit 397 contains communications sent

9     via What's App between Costanzo Phone-1 and the cell phone with

10    call number 786-271-1852, used by Luis Guerra (the 'Guerra

11    Phone').  Government Exhibit 397B contains authentic visual

12    depictions of communications excerpted from GX 397.

13         "Government Exhibit 1030 contains communications,

14    images, and attachments sent via What's App between Costanzo

15    Phone-1 and the Macey Phone, between January 28, 2015 and

16    November 14, 2019.

17         "Government Exhibit 1031 contains communications,

18    images, and attachments sent via iMessage between Costanzo

19    Phone-1 and the phone assigned call number 305-490-7027, used

20    by David Macey (the 'Macey Phone'), between November 2, 2018

21    and November 17, 2019.

22         "Government Exhibit 1032 contains communications and

23    attachments sent via iMessage between Costanzo Phone-1 and the

24    cell phone assigned call number 305-218-1251, used by Edwin

25    Pagan III (the 'Pagan Phone') between February 14, 2019 and

Naq2Cos3                          Escobar - Direct

1    November 11, 2019.

2            Government Exhibits 317, 319, 326 through 359, 1020,

3    1025, 1026, and 1028 are authentic visual depictions of

4    communications and metadata excerpted from GX 321, GX 322,

5    GX 323, GX 1030, GX 1031, or GX 1032.  Government Exhibits

6    325A, GX 325B, GX 330A, GX 333A, GX 333B, GX 335A, GX 335B, GX

7    349A, GX 354A, GX 1020A, GX 1020B, GX 1026A, GX 1026B, GX

8    1026C, and GX 1028A are authentic visual depictions of

9    attachments to the corresponding government exhibits.

10           "2.  Government Exhibits 360, 361, 362, 363, 367, 397,

11   1029, and 1034 contain call logs, communications, and documents

12   extracted from the Recio Phone.  Within these records:

13           "Government Exhibit 360 is a call log from the Recio

14   Phone from October 9, 2018, to November 17, 2019.

15           "Government Exhibit 361 contains communications sent

16   via iMessage between Costanzo Phone-1 and the Recio Phone

17   between October 9, 2018 and October 28, 2019.

18           "Government Exhibit 362 contains communications sent

19   via Telegram between Costanzo Phone-1 and the Recio Phone

20   between February 19, 2019 and June 3, 2019.

21           "Government Exhibit 363 contains communications sent

22   via What's App between the cell phone with call number

23   786-566-0085 ('Costanzo Phone-2') and the Recio Phone between

24   May 31, 2019 and August 28, 2019.

25           "Government Exhibit 367 is a document saved on the

Naq2Cos3                          Escobar - Direct

1   Recio Phone.  There is no communication saved on the Recio
2   Phone transmitting the document to the Recio Phone.  The
3   metadata for Government Exhibit 367 reflects a file name of
4   'Invoice (No. 421) from EBCO International of Miami_1 PDF' and
5   a date created of November 12, 2018.
6           "Government Exhibit 1029 contains communications and
7   attachments sent via What's App between Costanzo Phone-1 and
8   the Recio Phone between November 27, 2018 and November 17,
9   2019.
10          "Government Exhibit 1034 through 1034C contains
11  communications and attachments sent via What's App between the
12  Recio Phone, Costanzo Phone-1 and the Guerra Phone.
13          "Government Exhibits 318, 364 through 366, and 368
14  through 379, 382 through 396, 397A, 1001 through 1019, 1021
15  through 1024, and 1027 are authentic visual depictions of
16  communications and metadata excerpted from GX 361, GX 362,
17  GX 363, or GX 1029.  Government Exhibits 368A, GX 370A,
18  GX 374A, 375A, 385A and GX 385B and GX 395A are authentic
19  visual depictions of attachments to the corresponding
20  government exhibit.
21          Government Exhibit 380 contains authentic visual
22  depictions of communications and metadata from an excerpt of
23  iMessage communications between the Recio Phone and the Macey
24  Phone.
25          Government Exhibit 381 contains authentic visual

Naq2Cos3                    Escobar - Direct

1   depictions of communications and metadata from an excerpt of

2   What's App communications between the Recio Phone and the Macey

3   Phone."

4            And now let's go to the last page.

5            "It is further stipulated and agreed that this

6   stipulation may be admitted in evidence at trial."

7            The government offers Government Exhibit S8 into

8   evidence.

9            THE COURT:  Admitted.

10           (Government's Exhibit S8 received in evidence)

11           MR. SWETT:  The government also offers Government

12  Exhibits 364 and 384 into evidence.

13           THE COURT:  Admitted.

14           MR. MUKASEY:  No objection.

15           THE COURT:  Admitted.

16           (Government's Exhibits 364, 384 received in evidence)

17  BY MR. SWETT:

18  Q.  Let's just pull up Government Exhibit 310 again very

19  quickly.

20           Special Agent Escobar, what's the date on this

21  message?

22  A.  It is February 27, 2019.

23  Q.  What is the name in the subject line?

24  A.  Subject line is Prado Alava Edison Washington.

25  Q.  Okay.  Can we pull up Government Exhibit 364 side by side

Naq2Cos3                        Escobar - Direct

1    with this?  You can show that to the jury as well.  You know

2    what let's just pull up Government Exhibit 364.

3            Do you see, Special Agent Escobar, Government Exhibit

4    364 on the right of the screen?

5    A.  I do.

6    Q.  Can you read the three lines at the top of that document?

7    A.  Sure.  It is Telegram chat thread, Manny Recio, 707-911-750

8    (gray), Johnny Costanzo 713-538-845 (green).

9    Q.  What is your understanding of Telegram?  What is that?

10   A.  Telegram is like a What's App.  It's a chatting or a

11   texting app.

12   Q.  Okay.  And what are the dates of the messages on this

13   screen?

14   A.  The dates are 2/27, 2019.

15   Q.  How does that relate to the date of the e-mail, Government

16   Exhibit 310?

17   A.  It is the same date.

18   Q.  Did these messages come before or after that e-mail?

19   A.  This was at 2 in the morning.  This came at, it looks like,

20   8 at night, so it's after the e-mail.

21   Q.  Okay.  I would like to read these messages.  If I will read

22   the green messages, which are the Johnny Costanzo messages, and

23   you can read the gray, does that work?

24   A.  Sure, that works.

25   Q.  "Papo, what the fuck is going on?"

Naq2Cos3                        Escobar - Direct

1   A.   "The Tumaco guy is afraid to cooperate and decided against

2   moving forward and Prado doesn't want Dave but wants me."

3   Q.   "Wow.  Okay.  Now I understand.  JM for life."

4        Special Agent Escobar, do you know anything about this

5   Prado case?

6   A.   No.

7   Q.   Okay.  And you mentioned earlier the attorneys you

8   understood Mr. Recio was working with, who are those attorneys?

9   A.   David Macey and Lui Guerra.

10  Q.   At the bottom it says "JM for life."  What is Special Agent

11  Costanzo's first name?

12  A.   John.

13  Q.   What's is Mr. Recio's first name?

14  A.   Manny.

15  Q.   Okay.  Let's take those down and let's pull up Government

16  Exhibit 384.

17       Can you read the top three lines of this document,

18  please?

19  A.   Sure.  It's Telegram chat thread, Manny Recio 707-911-750

20  (gray).  Johnny Costanzo 713-758-845 (green).

21  Q.   I think you said 758, but is it actually 578?

22  A.   Yes, 578.

23  Q.   So this is another Telegram chat thread.  Could we read

24  this one as well?  And before we do that, what is the date on

25  these messages?

Naq2Cos3                              Escobar - Direct

1   A.  These are April 25, 2019.

2   Q.  So how does that relate to the documents we just looked

3   at?

4   A.  This is after that.  It's a few months after.

5   Q.  Okay.  Could we read these?  And I'm going to ask you to

6   read the Manny Recio messages in gray and I will read the

7   Johnny Costanzo in green.

8   A.  Okay.  "I'm recommending Lui to Prado.  Fuck Ruben.  What

9   do you think?  Maybe we can talk to Lui to go 50/50."

10  Q.  "Meeting with him *mañana*."

11          Do you know a criminal defense attorney with the first

12  name Ruben?

13  A.  Yes.

14  Q.  Who would that be?

15  A.  Ruben Oliva.

16  Q.  Where does he work?

17  A.  Miami.

18  Q.  And again, who did you hear that Mr. Recio was working

19  with?

20  A.  David Macey and Lui Guerra.

21  Q.  Okay.  Let's just read these one more time.  Could you

22  start from the top?

23  A.  Yes.  "I'm recommending Lui to Prado.  Fuck Ruben.  What do

24  you think" --

25          MR. MUKASEY:  I'm going to object.  We just went

Naq2Cos3                        Escobar - Direct

1    through this.  It's asked and answered.

2              THE COURT:  It's okay.  You can go through it.

3    A.  "Maybe we can talk to Lui to go 50/50."

4    Q.  "Meeting with him *mañana*."

5              Okay.  We can take that exhibit down.

6              Special Agent Escobar, I want to finish with some

7    questions about your experience working in the DEA.

8              Is it your understanding that the DEA has standards

9    governing the conduct of special agents?

10   A.  Yes.

11   Q.  Where are those standards memorialized?

12   A.  In our personnel management manual.

13   Q.  During your time with the DEA, what training, if any, have

14   you received regarding the standards in the personnel manual?

15   A.  We receive it when we first come in -- when we go to the

16   academy, we will receive it at Quantico, then we receive it

17   every year with the standards of conduct training.

18   Q.  Did you also mention that you became a group supervisor at

19   some point?  Did that also touch upon the standards --

20   A.  Yes.

21   Q.  -- that you are describing?

22   A.  Yes, sir.

23   Q.  Now, we have talked about private investigators today.

24   During your time both as a regular agent in the DEA and as a

25   supervisor, have you encountered private investigators?

Naq2Cos3                        Escobar - Direct

1    A.  I have, yeah.

2    Q.  And what role, if any, does a private investigator have as

3    part of a law enforcement team?

4    A.  So it doesn't have a role with our team.  It has a role

5    with the defense.

6    Q.  Okay.  And the defense is not part of law enforcement,

7    correct?

8    A.  Correct.

9    Q.  What kind of -- withdrawn.

10           In your experience as an agent, how frequently would

11   you interact with private investigators?

12   A.  Very --

13           MR. MUKASEY:  Objection, 401, his interactions.

14           THE COURT:  Sustained.

15   BY MR. SWETT:

16   Q.  Special Agent Escobar, are you familiar with the term

17   NADDIS?

18   A.  I am.

19   Q.  What is NADDIS?

20   A.  NADDIS is our internal DEA data clearinghouse.  It's a

21   place where we put case information and target information of

22   subjects that we are investigating.

23   Q.  Is it an acronym?

24   A.  It is.

25   Q.  Do you know what it stands for?

1   A.   Narcotics and Dangerous Drugs Indexing System.

2   Q.   How would you characterize the information that's contained

3   in NADDIS?

4   A.   Law enforcement sensitive.

5   Q.   What does law enforcement sensitive mean?

6   A.   That only law enforcement personnel or you as prosecutors

7   that we are dealing with, that we are the only ones that can

8   see that information.

9   Q.   During your time at the DEA, have you ever conducted

10   searches in NADDIS on behalf of private individuals?

11          MR. MUKASEY:   Objection.   401.

12          THE COURT:   Overruled.

13   A.   So, no.

14   Q.   Does that include private investigators?

15   A.   Correct.

16   Q.   Does that include defense attorneys?

17   A.   Correct.

18   Q.   Why not?

19   A.   Well --

20          MR. MUKASEY:   Objection.   401.

21          THE COURT:   Overruled.

22   A.   Well, we -- if we receive information, we run it, right, we

23   will take information, run it, but we don't disseminate that

24   information back, right.   So we will run the information and

25   use it for our investigations, right, so --

Naq2Cos3                          Escobar – Direct

1    Q.  Let me see.  Let me make sure I understand, then.  If you

2    receive information that's relevant to an investigation, what

3    might you do to learn more about that investigation?

4    A.  Right, so we will run it into NADDIS to see what's in the

5    NADDIS system, if there are other cases related to those folks.

6    If there is somebody else that's been working that group or

7    that person, then we go back and we will communicate with law

8    enforcement to see how we can work the case.

9    Q.  Now, during your time in the DEA, have you ever shared the

10   information that you viewed in NADDIS with a private

11   investigator?

12            MR. MUKASEY:  Objection.  401.

13            THE COURT:  Overruled.

14   A.  No.

15   Q.  Have you ever shared that information that you saw in

16   NADDIS with a defense attorney?

17   A.  No.

18   Q.  Why not?

19   A.  It's against our policy.

20   Q.  Special Agent Escobar, have you ever told a private

21   investigator when the government planned to seek an indictment

22   against a DEA target?

23   A.  No.

24   Q.  Have you ever told a defense attorney when the government

25   planned to seek an indictment against a DEA target?

Naq2Cos3                    Escobar - Direct

1           MR. MUKASEY:  Objection about his actions, Judge.

2           THE COURT:  Overruled.

3  A.  No.

4  Q.  Why not?

5  A.  It's against our policy.

6  Q.  Special Agent Escobar, have you ever told a private

7  investigator when the government planned to arrest an

8  individual?

9  A.  No.

10          MR. MUKASEY:  Objection.

11          THE COURT:  Overruled.

12 Q.  Have you ever told a defense attorney when the government

13 planned to arrest an individual?

14 A.  No.

15 Q.  Why not?

16 A.  It's against our policy.

17          MR. SWETT:  No further questions.

18          THE COURT:  Thank you.  It's 12:55.  Should we go

19 ahead and break for lunch?

20          MR. MUKASEY:  I can do five minutes or we can break.

21 It's up to you.  Do you want to take a break?  Let's break.

22          THE COURT:  Why don't we break because I have to

23 handle another matter in another courtroom at 1:00.

24          So I'm going to give you an hour for lunch, ladies and

25 gentlemen.  We will resume promptly at 2:00, so please try to

Naq2Cos3                          Escobar - Direct

1    be back five minutes before 2:00.

2              And I just want to remind you that you are not

3    discussing your case.

4              Please leave your notepads closed on your chairs, and

5    we will see you in the courtroom promptly at 2:00.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Naq2Cos3                          Escobar - Direct

1          (Jury not present)

2          THE COURT:  We will be in recess until 2:00.

3          MR. MUKASEY:  Judge, could I raise one quick matter

4     outside the presence of the witness?

5          THE COURT:  Sure.

6          MR. MUKASEY:  It will take two seconds.

7          (Witness not present)

8          MR. MUKASEY:  I don't want to disrupt the pretty

9     amicable working relationship we have had with the government,

10    but during jury selection, we received 3500 material for this

11    witness.  That's hard to deal with, right?  We don't have a

12    computer system here.  We don't have a printer here.  If their

13    paralegals are e-mailing our paralegals 3500 material for a

14    witness who is about to get on the stand it's, for all intents

15    and purposes, useless to us.

16         THE COURT:  Presumably it's because of a meeting last

17    night or this morning.

18         MR. MUKASEY:  Right.  But we could have had it, you

19    know, sometime this morning, and it could have been printed out

20    and given to us in court, rather than e-mailed to our paralegal

21    who is reading it on his phone.

22         Look, I know there is last minute stuff all the time,

23    but if we can get it in a form and in a timely way, rather than

24    three minutes before the witness goes on the stand, I would

25    appreciate it.

Naq2Cos3                    Escobar – Direct

1             THE COURT:  Mr. Swett, would you like to respond.

2             MR. SWETT:  We met with him this morning.  If we do

3    that again, we are happy to print out copies.  But, obviously,

4    the statute requires production after he testifies on direct.

5    So we are trying to be helpful here, but it was generated at

6    8:30 or 8:45 this morning.  So I can print out copies.

7             THE COURT:  Yeah, if you can print out copies so it

8    doesn't have to go through someone at the office getting it to

9    them, that would be helpful.

10            MR. MUKASEY:  Thank you.

11            MR. SWETT:  Yes, your Honor.

12            THE COURT:  All right.  See you at 2:00.

13            (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

NAQVCOS4

```
1              A F T E R N O O N   S E S S I O N

2                       2:10 P.M.

3          THE COURT:  I believe all the jurors are back from

4    lunch.  Are you all ready?

5          MS. DEININGER:  We are.

6          We did have two issues that did come up pertaining to

7    our next witness.  I don't know if you wanted to try and

8    briefly address those before bringing the jury in.

9          The first relates to Government Exhibit 704A.  This is

10   one of the ones we emailed about, I think, two days ago.  There

11   was an objection to the government's choice of words in the

12   header of a summary chart as being characterizations, as

13   opposed to, appropriately, a summary of information contained

14   in underlying exhibits.  That's a summary chart of text

15   messages sent by Recio and David Macey to Costanzo asking to

16   run or look up information for certain names; and then dates

17   that those names are run in NADDIS.

18          So the question is whether we need to change the word

19   "requestor" in the summary table.

20          THE COURT:  Requestor.  I didn't have a chance to look

21   at all the underlying exhibits, but what's the factual basis

22   for using the word "requestor"?

23          MS. DEININGER:  The summary table is based on a

24   compilation of different text messages in which Recio --

25   primarily Recio texts Costanzo and says something like, Can you
```

NAQVCOS4

1  look up this person.  Can you run this person in NADDIS.  And

2  we believe that to be submitting a request to Costanzo, that's

3  the basis for the use of that word.

4          THE COURT:  Seems fairly accurate.  What's the

5  argument otherwise?

6          MR. MUKASEY:  I think it is a terrific chart for

7  summation, but it is not a summary chart under 1006.  It is not

8  the place -- or is it 1003?  It is not the place for the

9  government's characterization of what the evidence says, does,

10  or suggests.

11          THE COURT:  There's no limitation of summary charts to

12  closing that I'm aware of.

13          MR. MUKASEY:  No, no.  But there is a limitation on

14  summary charts to characterizing and arguing.  And if they want

15  to list all the text messages, I don't really have a problem

16  with that.

17          THE COURT:  They can't characterize a request as a

18  request?

19          MR. MUKASEY:  Yeah, we don't think that they are

20  appropriately characterized as requests.  We have our own view

21  of what they are.

22          THE COURT:  I think it's fine.

23          Overruled.

24          Anything else?

25          MS. DEININGER:  The other issue is that we just

NAQVCOS4

1    received a proposed limiting instruction from Costanzo's

2    counsel that they want to be read in connection with Inspector

3    Miller's testimony, who is expected to be our second witness.

4    It's a proposed limiting instruction as to the principle that

5    basically violations of DEA policies or standards of conduct

6    are not alone a federal crime.

7              We just haven't had any time to consider this or

8    research it and are kind of -- first impression is that this is

9    something that's probably more appropriate for a final jury

10   charge.  I'm raising it because it's been proposed by defense

11   counsel.  I know they believe it should be given today, and I

12   don't think we are prepared to consent to that instruction.

13             THE COURT:  Okay.

14             MR. MUKASEY:  Maybe not consent to it, but I think

15   it's appropriate.  And I think it's very standard in cases

16   where violations of bank policy, violations of office policy.

17   And in this case, violations of government policy are being

18   testified about to say to the jury, Look, you may hear some

19   testimony that some office policies or institution policies

20   were violated here.

21             THE COURT:  Except that this is -- at least some of

22   the charged crimes are defined by the word "duty," right?

23   Official duty.

24             MR. MUKASEY:  Correct.

25             THE COURT:  Which I would think makes the line of a

NAQVCOS4

1    DEA policy perhaps coterminous with someone's violation of

2    criminal law.

3         MR. MUKASEY:  Not their criminal liability.  It can't

4    be coterminous.

5         THE COURT:  Well, it's not sufficient.  But as to the

6    scope of the duty, there are additional things required, of

7    course.  But as to the scope of the duty -- I mean, it's true,

8    the mere violation of a DEA policy itself does not establish a

9    crime.  That's got to be right.

10        MS. DEININGER:  I don't think we dispute that.  I just

11   don't think we believe a limiting instruction is necessary on

12   that just because the witness is going to be talking about

13   standards of conduct.  I don't think we would object to an

14   appropriate instruction along those lines in the final jury

15   charge.

16        MR. MUKASEY:  Judge, can I hand this up to you and see

17   if it meets your approval?

18        THE COURT:  Sure.

19        MR. MUKASEY:  I understand the government doesn't

20   consent; they don't even want to think about it.  The policies

21   to not define the term "duty," I think that's an ultimate

22   question for the jury.  But I do think it's appropriate.  And

23   it's been my experience that when policies and standards within

24   an institution are the subject of testimony, that the jury

25   understand violating these, whatever you want to call them,

NAQVCOS4                         Escobar - Cross

1     duties, policies, standards, customs, is not the equivalent of

2     a criminal law violation.

3             THE COURT:  Okay.  You can hand that up and I'll take

4     a look while we do the cross.  Thank you.

5             All right.  Can we bring the jury out.

6             MR. SWETT:  And we'll bring the witness in.

7             THE COURT:  All right.

8             (Jury present)

9             THE COURT:  You may be seated.

10            Welcome back, ladies and gentlemen.

11            The witness Daniel Escobar is on the stand, was sworn

12    in.  You remain under oath.

13            Mr. Mukasey, you may begin your cross-examination.

14            MR. MUKASEY:  Thank you, Judge.

15    CROSS-EXAMINATION

16    BY MR. MUKASEY:

17    Q.  Good afternoon, Special Agent Escobar.

18    A.  Good afternoon, sir.

19    Q.  During the time that you were an ASAC in Miami and John was

20    the group supervisor of Group 10, that was about 90 days,

21    right?

22    A.  Yes, sir.

23    Q.  But you had a much longer relationship with John; correct?

24    A.  Yes, I've known John for a long time.

25    Q.  And you guys had cases that sort of worked together or

NAQVCOS4                      Escobar - Cross

1    worked in the same circles?

2    A.  Yes.

3    Q.  And you did AGEO cases, is that right?

4    A.  That's correct.

5    Q.  And John did AGEO cases, right?

6    A.  Yes.

7    Q.  And you guys had occasion to cross paths at meetings or

8    conferences or connection with cases, right?

9    A.  Yes.

10   Q.  And John, you came to learn, ran a lot of informants,

11   right?

12   A.  John did, yes.

13   Q.  And when I say "ran informants," I mean he worked with

14   people who were providing information to the DEA on

15   investigation.  Do you understand what I mean?

16   A.  Yes, sir.

17   Q.  And you ran informants, right?

18   A.  Yes.

19   Q.  And you knew John to work on large cases in Venezuela,

20   right?

21   A.  Yes.

22   Q.  And Colombia, yes?

23   A.  Yes.

24   Q.  And John did that well, yes?

25   A.  Yes.

NAQVCOS4                          Escobar – Cross

1    Q.  Now, with respect to the AGEO — and again, we'll just maybe

2    remind the jury after lunch that stands for Attorney General

3    Exempted Operation; correct?

4    A.  Correct.

5    Q.  An AGEO is a kind of undercover operation that targets the

6    financial -- the money movements of large narcotics or drug

7    trafficking organizations?

8    A.  Correct.

9    Q.  And that's like multimillion-dollar or maybe sometimes even

10   billion-dollar operations, right?

11   A.  Correct.

12   Q.  That's what John was focused on when he was the GS, the

13   group supervisor of Group 10, right?

14   A.  Correct.

15   Q.  And in the course of running those kinds of investigations,

16   did the group have occasion to seize money, take money, from

17   drug trafficking organizations?

18   A.  Yes.

19   Q.  And on occasion to take drugs away from drug trafficking

20   organizations?

21   A.  Yes.

22   Q.  And the idea behind AGEOs is to try to dismantle drug

23   trafficking organizations from the financial side, I think you

24   said, right?

25   A.  That's correct.

NAQVCOS4                          Escobar – Cross

1    Q.  And that's part of the DEA's mission, right?

2    A.  It is.

3    Q.  Now, in order to build a big AGEO case against a drug

4    trafficking organization, it's important to collect

5    information, yes?

6    A.  Correct.

7    Q.  And analyze that information?

8    A.  Yes.

9    Q.  And use that information to advance or build the

10   investigation, right?

11   A.  That's right.

12   Q.  And is it fair to say that as an agent, you at all levels

13   are trying to gather information?

14   A.  Yes, that's fair.

15   Q.  Now, these big AGEO cases and the cases John worked on in

16   Venezuela and the cases he worked on in Colombia, those don't

17   happen overnight, right?

18   A.  No, sir.

19   Q.  It takes weeks, months, and often years to build those

20   kinds of cases; correct?

21   A.  That is correct.

22   Q.  And all different sources of information, yeah?

23   A.  Can you repeat?

24   Q.  It takes all different sources of information?

25   A.  Yes.  Correct.

NAQVCOS4                         Escobar - Cross

1    Q.  And on some of these cases, from time to time I think you

2    said Washington, DEA headquarters, is involved, right?

3    A.  Correct.

4    Q.  Department of Justice is involved, right?

5    A.  Yes, sir.

6    Q.  Now, during the course of an investigation, information can

7    come from all sorts of different places; is that right?

8    A.  That's correct.

9    Q.  Literally anywhere and everywhere you can get information

10   that's helpful, helps advance the case, right?

11   A.  Correct.

12   Q.  And just taking a couple of different sources of

13   information, if I can, Group 10 can get information to help

14   build a case from another DEA group, right?

15   A.  Correct.

16   Q.  Either in Miami or in California or Ohio, right?

17   A.  Yes.  Correct.

18   Q.  They could also get information from an international DEA

19   office, a DEA office overseas, right?

20   A.  Correct.

21   Q.  Is another source of information for building a big case

22   information from private citizens?

23   A.  It could be, yes, sir.

24   Q.  Information from members of the public, right?

25   A.  Yes, sir.

NAQVCOS4                        Escobar - Cross

1    Q.  And in fact, DEA has the ability to accept information from

2    any member of the public, like on a hotline or a tips website,

3    I think; is that right?

4    A.  That's correct.

5    Q.  And so anyone can pick up the phone, private citizen, and

6    call their local DEA office and provide information, right?

7    A.  Correct.

8    Q.  And the DEA divisions or field offices, those phone numbers

9    are publicly listed?

10   A.  I'm sorry, again.

11   Q.  Phone numbers to the various DEA offices, those are

12   publicly listed?

13   A.  Correct.  Yes, sir.

14   Q.  Okay.  And information can also come to help build a case

15   from people who themselves have been involved in the narcotics

16   trade, right?

17   A.  Yes.

18   Q.  Okay.  And I think we've heard a couple of different terms

19   for how to refer to those people, right?  We heard the term

20   "source," right, a source of information?

21   A.  Yes, sir.

22   Q.  So sometimes the source of information might be somebody

23   who got caught in a drug trafficking problem, shall we say?

24   A.  Yes.

25   Q.  And decides to maybe turn over and give information to the

NAQVCOS4                    Escobar - Cross

1    government to help them?

2    A.  Correct.

3    Q.  Have you heard people call that "flipping"?

4    A.  Flipping, yes, sir.

5    Q.  Okay.  Like flipping from being a guy who was violating the

6    narcotics laws to being a guy who tries to help DEA, right?

7    A.  Correct.

8    Q.  Okay.  And there's also something called a confidential

9    informant, right?

10   A.  Yes.

11   Q.  And a confidential informant is somebody who the DEA will

12   actually pay for information when they get it on occasion,

13   right?

14   A.  Yes, it could be, yes.

15   Q.  Okay.  And you have to go through a lot of official

16   paperwork to become a confidential informant, right?

17   A.  Yes, paperwork, yes.

18   Q.  Now, another kind of person involved in the narcotics trade

19   who may end up providing information is someone called a

20   cooperating witness, right?

21   A.  Correct.

22   Q.  And let's make sure we're on the same page with what a

23   cooperating witness is.  Cooperating witness is somebody -- can

24   be somebody who's charged with a crime and decides that they

25   would like to hope for leniency in that crime and so they

1    provide information.  So they are not getting money, but they

2    are getting leniency; is that right?

3    A.  Yes, that's one source.

4    Q.  And often those people have to plead guilty, these

5    cooperating witnesses, right?

6    A.  Yes.

7    Q.  They want leniency in exchange for their information?

8    A.  Yes.

9    Q.  Okay.  Now, if you have a target that you're investigating

10   who you think could be a source of information and he has not

11   been charged with a crime, you don't need permission to try to

12   flip that person, right?

13   A.  Can you rephrase -- like permission from who?

14   Q.  From the U.S. Attorney's Office, for example.

15   A.  You don't necessarily need permission; but we in general,

16   we're working with the U.S. Attorney's Office in these kind of

17   cases.

18   Q.  Okay.  But if your group encounters somebody and they are

19   not charged and they don't have a lawyer and you think they may

20   be a good source, you don't need permission to try to flip

21   them, right?

22   A.  No, no.

23   Q.  Okay.  Now, just with respect to the structure of -- I

24   think we've talked about ASACs like yourself, right, Assistant

25   Special Agents in Charge.  We've talked about group

NAQVCOS4                          Escobar - Cross

1    supervisors.  That's sort of top, maybe the middle.  And the

2    actual agents that are sort of on the street or running cases

3    or doing intelligence, they're special agents, right?

4    A.  Correct.  Yes.

5    Q.  With respect to each case, each individual investigation,

6    there's something called a case agent, right?

7    A.  Yes.

8    Q.  And the case agent is the man or woman who is in charge of

9    running that case, right?

10   A.  Correct.  The direction of the case.

11   Q.  Right.  Okay.

12        Now, you talked a little bit about training, and I

13   think you said you went to Quantico --

14   A.  Yes, sir.

15   Q.  -- to do some training.  The agents that you supervised,

16   they also had training, right?

17   A.  Yes, sir.

18   Q.  And they also go to Quantico; correct?

19   A.  Correct.

20   Q.  And periodically, they receive other training after they

21   leave Quantico when they're on the job?

22   A.  Yes, sir.

23   Q.  And is it fair to say that a significant amount of training

24   as an agent occurs on the job?

25   A.  Yes, sir.

NAQVCOS4                          Escobar - Cross

1    Q.  And agents are encouraged to learn from the customs and

2    practices of other agents, right?

3    A.  Correct.

4    Q.  And during your career in terms of the experience you

5    picked up on the job, you learned how to analyze how phones,

6    telephones, are used in the course of the narcotics trafficking

7    business, right?

8    A.  Yes, sir.

9    Q.  And I imagine since you've worked on AGEOs, you've also had

10   occasion to learn how financial institutions, bank accounts,

11   wires are used to advance drug trafficking?

12   A.  Yes.

13   Q.  Okay.  And the kinds of steps that drug traffickers take to

14   hide their activities, is that something else you pick up on

15   the job?

16   A.  Yes, sir.

17   Q.  Now, with respect to the agents that you are supervising as

18   an ASAC or as a GS, a group supervisor, you're not

19   micromanaging them; correct?

20   A.  No, sir.

21   Q.  And you're not sitting over their shoulder watching every

22   move, right?

23   A.  Correct.

24   Q.  And you trust your agents to do what they're supposed to

25   do?

NAQVCOS4                          Escobar – Cross

1   A.  Yes, sir.

2   Q.  And when John was under your supervision, is it fair to say

3   that you expected him to manage himself?

4   A.  I did, yes.

5   Q.  And to make good decisions?

6   A.  Yes.

7   Q.  And exercise good judgment?

8   A.  Yes.

9   Q.  Problem solve when he had to problem solve?

10  A.  Yes.

11  Q.  Now, you talked about, I think, the personnel manual.  And

12  I think you said the personnel manual guides the conduct of

13  agents; is that right?

14  A.  Correct.

15  Q.  That thing is long; correct?

16  A.  Yes, it's --

17  Q.  Like a zillion pages?

18  A.  Very big.

19  Q.  Right.  And you don't carry that around with you?

20  A.  No, sir.

21  Q.  It's available online, right?

22  A.  Correct.

23  Q.  And how many chapters does that personnel manual have?

24  A.  I'm not sure.  Several.

25  Q.  Like several dozen?

1   A.  Like probably a dozen.

2   Q.  Okay.  And are you familiar with something called the

3   agent's manual?

4   A.  Yes.

5   Q.  Okay.  And the agent's manual is also a whole long list of

6   policies, procedures, conduct, etc., right?

7   A.  Yes.

8   Q.  And you don't carry that around with you?

9   A.  No, sir.

10  Q.  That's also available online because it's like a million

11  pages?

12  A.  Yes.  Correct.

13  Q.  I'm being a little facetious here, but it's long?

14  A.  It's several chapters.

15  Q.  And DEA has a lot of other manuals that govern agents'

16  conduct, right?

17  A.  I would say those are the two main ones that deal with

18  conduct.

19  Q.  Are you familiar with the administrative manual?

20  A.  Yes.

21  Q.  That's another manual that guides conduct?

22  A.  Yes.

23  Q.  Are you familiar with the lab operations manual that guides

24  your conduct?

25  A.  Yeah, for lab employees, yes, sir.

NAQVCOS4                          Escobar - Cross

1    Q.   Okay.  And of course, there's the planning and inspection

2    manual you know?

3    A.   Yes.

4    Q.   Okay.  And there's the practitioner's manual?

5    A.   Not familiar with that one.

6    Q.   A lot of manuals?

7    A.   Yes.

8    Q.   They all govern conduct, correct?

9    A.   Yes.

10   Q.   And there's a field manual.  You're not aware of that?

11   A.   Not aware of that.

12   Q.   Okay.  Are you aware of the money laundering investigative

13   manual?

14   A.   Yes.

15   Q.   Okay.  That's another manual that kicks in to govern

16   conduct, right?

17   A.   Yes.

18   Q.   Okay.  And the international operations manual, you must be

19   familiar with that one?

20   A.   Yes.

21   Q.   Okay.  Now, none of these manuals, as far as you know, say

22   that an agent may never communicate with a private

23   investigator?

24   A.   No.

25   Q.   And none of these manuals say that an agent can never speak

NAQVCOS4                          Escobar - Cross

1   to a defense attorney?

2   A.  Correct.

3   Q.  And none of these manuals say that an agent may never think

4   while he's on duty about what he might do when he retires?

5   A.  Correct.

6   Q.  None of these manuals say that an active agent may never

7   accept information from a retired agent, right?

8   A.  Correct.

9   Q.  You also talked with Mr. Swett a little bit about a phone,

10  so I want to talk to you a little bit about phones.

11          You mentioned you were unaware of a certain phone that

12  John had?

13  A.  Yes.

14  Q.  You're not aware of all the phones that all your agents

15  carry; correct?

16  A.  That is correct.

17  Q.  And there were points in your career where you carried

18  multiple phones, right?

19  A.  Yes.

20  Q.  And DEA issues a telephone, a cell phone, to the agents,

21  right?

22  A.  Correct.

23  Q.  And agents are also permitted to carry personal phones,

24  right?

25  A.  Yes.

NAQVCOS4                      Escobar - Cross

1    Q.  And there were times in your career when you walked around

2    with three or four different phones, right?

3    A.  Yes.

4    Q.  And did your supervisors know every single phone you

5    carried for whatever reason?

6    A.  I'm not sure if they would have known or not.  I don't -- I

7    don't believe so.

8    Q.  Okay.  And the reason you carried different phones is

9    because you were being responsible, right?

10   A.  Yes.

11   Q.  And what I mean by that is you carried different phones for

12   different geographic areas that you went to, right?

13   A.  Correct.

14   Q.  Like a Colombian phone, for example?

15   A.  Correct.

16   Q.  A Panamanian phone?

17   A.  Yes.

18   Q.  A New York phone?  A Mexican phone maybe?

19   A.  Yes.

20   Q.  And are you aware that certain DEA agents carry different

21   phones to deal with different sources of information?

22   A.  Yes.

23   Q.  Okay.  And it's not uncommon in your experience for a

24   single agent to carry multiple phones because he might have

25   multiple sources calling him, multiple different people calling

NAQVCOS4                          Escobar – Cross

1    him, right?

2    A.   That's correct.

3    Q.   Okay.  And you want to be careful about a particular phone

4    getting compromised by the bad guys?

5    A.   Exactly.

6    Q.   And you know when you go overseas to some countries that,

7    you know, may be more heavily involved in narcotics

8    trafficking, they can intercept your telephones, they can

9    wiretap you or cut into your communications and listen without

10   you even knowing, right?

11   A.   Correct.

12   Q.   That's another reason to carry extra phones and be careful

13   with your phones, right?

14   A.   Yes, sir.

15   Q.   Okay.  Now, there was some discussion about encrypted phone

16   applications that you had with Mr. Swett, do you remember that?

17   A.   Yes.

18   Q.   WhatsApp is an encrypted phone application, yes?

19   A.   Yes.

20   Q.   And in your experience, WhatsApp is commonly used among DEA

21   agents, yes?

22   A.   Correct.

23   Q.   And especially when they travel overseas?

24   A.   Yes.

25   Q.   John traveled overseas, yes?

NAQVCOS4                        Escobar - Cross

1    A.  Yes.

2    Q.  And the WhatsApp application, does it come on the DEA

3    phone?

4    A.  You have to download it to -- from the store.

5    Q.  But it's totally permissible?

6    A.  Yes.

7    Q.  Now, you mentioned a little bit about learning about

8    Mr. Recio and his retirement from DEA.  Pretty common for

9    agents to retire and go to work in the private sector for the

10   defense side; is that correct?

11   A.  It's common, yes.

12   Q.  And that's sort of been a growing field in the past five

13   years?

14   A.  Yes.

15   Q.  You also were asked about a couple of defense attorneys.

16          In the course of your career, you've had occasion to

17   deal with defense lawyers, I imagine?

18   A.  Yes.

19   Q.  And in your experience, when agents and defense lawyers

20   work on cases together for two or three or four years, they're

21   going to get to know each other, right?

22   A.  Yes.

23   Q.  And they form a relationship, yes?

24   A.  Correct.

25   Q.  And if you've worked like ten cases with somebody where,

NAQVCOS4                        Escobar – Cross

1    you know, you're on the government side and they're on the

2    defense side, you form a relationship with them?

3    A.   Yes.

4    Q.   And there were certain defense attorneys that you preferred

5    to work with, right?

6    A.   There were defense attorneys that -- yeah, that typically

7    worked the same kind of cases that we were working, yeah.

8    Q.   And there were defense attorneys you preferred to work with

9    because you knew them?

10   A.   Sure.

11   Q.   And those are lawyers whose kind of real house, whose

12   specialty area is drug trafficking; correct?

13   A.   Yes.

14   Q.   David Macey is one of those guys?

15   A.   I never worked with Mr. Macey.

16   Q.   Okay.  But you know other --

17   A.   Yes, I am aware of who he is.  He's well-known in the

18   narcotic defense field in Miami.

19   Q.   And it's often helpful to know the defense lawyer because

20   you may be able to engage in a conversation to convince his

21   client to cooperate with you, right?

22   A.   Sure.

23   Q.   A question or two, if you don't mind, about NADDIS.  Right.

24   And I think you said NADDIS was this indexing system, the

25   Narcotics and Dangerous Drugs Indexing System?

NAQVCOS4                        Escobar - Cross

1    A.  Correct.

2    Q.  That's kind of an information bank within DEA, yes?

3    A.  Yes.

4    Q.  And it's, for all intents and purposes, a database of tips,

5    right?

6    A.  Correct.  Case work, information, yeah.

7    Q.  Anybody who learns any information about a case can put it

8    in NADDIS, yes?

9    A.  Yes.

10   Q.  Now, you need to log in if you're a special agent to get

11   into NADDIS, right?

12   A.  Correct.

13   Q.  And you have a login ID?

14   A.  Yes.

15   Q.  And when you get into NADDIS with your login ID, NADDIS

16   keeps track of the fact that you've been in the system, right?

17   A.  It should, yes, sir.

18   Q.  In other words, if an agent logs into NADDIS to do a

19   search, it leaves a footprint?

20   A.  It should, yes.

21   Q.  Or an electronic footprint?

22   A.  Yes.

23   Q.  And that's commonly known by the agents, yes?

24   A.  Yes.

25   Q.  Now, let's talk a little bit about the information in

NAQVCOS4                         Escobar - Cross

1  NADDIS.  Well, first of all, a lot of people have access to
2  NADDIS, right?
3  A.  Special agents and intel specialists.
4  Q.  And intel specialists are not special agents?
5  A.  No, they are not.
6  Q.  Okay.  They are a different group of people?
7  A.  They are a different category in DEA; correct.
8  Q.  Okay.  Now, if you are a special agent or an intel analyst,
9  and you want to see if somebody you're investigating is already
10 being investigated by the Cleveland office, you can check that
11 out in NADDIS, right?
12 A.  Yes.
13 Q.  Or if you want to find out if a particular cooperating
14 witness or source of information might be helpful to a certain
15 case, you could check that out in NADDIS, right?
16 A.  They have a different system for sources of information.
17 Q.  Okay.  Fair enough.
18          But if you had to find out the name of somebody who
19 was running a case, a case agent name, you could find out a
20 case agent name in NADDIS, yes?
21 A.  Yes, sir.
22 Q.  Okay.  And then you could direct your source of
23 information, whether it's a public citizen, a private citizen,
24 to the case agent?
25 A.  Correct.

NAQVCOS4                        Escobar - Cross

1    Q.  Okay.  And is it responsible conduct for an agent to run

2    something in NADDIS almost every time they learn new

3    information?

4    A.  I would say it's -- yes, that's good practice.

5    Q.  It's prudent, right?

6    A.  Yeah, it's prudent.  Yup.

7    Q.  Okay.  With respect to the information that is in NADDIS,

8    it comes from all different areas.  It comes from agents or

9    analysts, it can come secondhand, thirdhand, fourth hand,

10   right?

11   A.  Correct.

12   Q.  So NADDIS information is not perfect, right?

13   A.  It could be pertinent, yes.

14   Q.  I said it's not perfect?

15   A.  Oh, perfect.  Yes, correct, it is not perfect.

16   Q.  In other words, it can be wrong?

17   A.  Correct.  We have to collaborate on that and figure it out,

18   yes.

19   Q.  Right.  And NADDIS has information that's old and stale,

20   right?

21   A.  Yes, sir.

22   Q.  And it has information that's wrong?

23   A.  Yes.

24   Q.  And it has information that has changed since it was put

25   in?

1   A.  Yes.

2   Q.  And NADDIS isn't fact-checked; it's just a bank that stores

3   things; it's not fact-checked?

4   A.  Correct.

5   Q.  Have you ever heard the story, Special Agent Escobar, about

6   the guy who ran the name John LNU in NADDIS?

7   A.  No.

8            MR. SWETT:  Objection.

9   Q.  The name John LNU, L-N-U.  Did you ever encounter that name

10  in NADDIS?

11  A.  Have I ever seen it?

12  Q.  Yes.

13  A.  Yes.

14  Q.  "John LNU" stands for John Last Name Unknown; correct?

15  A.  Correct.

16  Q.  His name is in NADDIS, right?

17  A.  His name?  Yeah, John LNU.

18           MR. SWETT:  Objection.

19           THE COURT:  I think you need to clarify the question.

20  Sustained to that extent.

21  Q.  There are John Doe-type names in NADDIS, yes?

22  A.  Yes.

23  Q.  Okay.  Now, you mentioned a conversation or at least an

24  encounter you had with John Costanzo after you, I guess,

25  learned that Mr. Recio retired, right?

NAQVCOS4                        Escobar - Cross

1    A.  Yes.

2    Q.  And Mr. Swett asked you a bunch of questions, did Agent

3    Costanzo tell you about a telephone that he had, tell you that

4    he was talking to Recio.  Do you remember those questions?

5    A.  Yes.

6    Q.  I want to just go through that encounter again.

7            My understanding from your testimony was you thought

8    Manny Recio was working at a bank, right?

9    A.  Correct.

10   Q.  And you may have learned otherwise, right?

11   A.  Correct.

12   Q.  And you went to John to kind of ask him what's up, right?

13   A.  Yes.

14   Q.  That was sort of a casual approach and just kind of a

15   "what's up with our old buddy"?

16   A.  Yes, very casual.

17   Q.  It wasn't some sort of investigation?

18   A.  No.

19   Q.  Okay.  And I think you said you asked, What's the deal with

20   Manny?  What's he doing?

21   A.  Correct.  Yes.

22   Q.  And John said something to the effect of, He's doing his

23   thing.

24   A.  Exactly.

25   Q.  Okay.  And after that, you asked no more questions, right?

1    A.  Correct.

2    Q.  None of your business; correct?

3    A.  Correct.

4    Q.  You just left it at that?

5    A.  Yes.

6    Q.  And you never asked him about any telephone, right?

7    A.  No.

8    Q.  You never asked him about his ongoing discussions with

9    Recio, right?

10   A.  No.

11   Q.  And you never asked him about Recio's work with defense

12   attorneys, right?

13   A.  No.

14   Q.  Was this the equivalent of what I would call water cooler

15   conversation; like, Hey, what's up with our old buddy?

16   A.  Yeah, that's fair.

17   Q.  Okay.  Almost done, Special Agent Escobar.

18        You were shown a couple of text messages.

19   A.  Yes.

20   Q.  And Mr. Swett asked you to read them back and forth with

21   him?

22   A.  Yes, sir.

23   Q.  You were not part of those text chains, right?

24   A.  No.

25   Q.  And you don't actually know anything about those text

1    chains, right?

2    A.   Correct.

3    Q.   And you don't know what came before?

4    A.   Correct.

5    Q.   You don't know what came after?

6    A.   No.

7    Q.   And you don't know the context at all?

8    A.   No, sir.

9    Q.   You were basically shown those text messages by the U.S.

10   Attorney's Office four hours -- four years, I should say, after

11   they happened, right?

12   A.   Yes.

13   Q.   And you were just kind of reading the words off the page?

14   A.   Correct.

15   Q.   You've worked with confidential sources, yes?

16   A.   Yes.

17   Q.   Are you familiar with any confidential sources who were

18   deactivated by DEA?

19            MR. SWETT:   Objection.  Outside the scope of direct.

20            THE COURT:   Overruled.

21   A.   Can you repeat the question?

22   Q.   Are you familiar with any confidential sources that were

23   deactivated by DEA, yes or no?

24   A.   Yes.

25   Q.   Are you familiar with any that were reactivated?

NAQVCOS4                          Escobar – Cross

1    A.   Yes.

2    Q.   Okay.  And that had to go through a very rigorous process?

3    A.   Yeah.  It's the same process.  I mean, to deactivate, some

4    paperwork; to reactivate, you know, reverse the paperwork.

5              MR. MUKASEY:  May I have one moment, Judge?

6              THE COURT:  Sure.

7              (Counsel conferred)

8              MR. MUKASEY:  Thank you, Special Agent Escobar.

9              THE WITNESS:  Thank you, sir.

10             THE COURT:  Mr. Gainor.

11             MR. GAINOR:  Yes, your Honor.

12   CROSS-EXAMINATION

13   BY MR. GAINOR:

14   Q.   Special Agent Escobar, good afternoon.

15   A.   Good afternoon.

16   Q.   My name is Ron Gainor.  I represent Manny Recio.

17             This is the first time you and I have had the pleasure

18   of meeting each other; correct?

19   A.   Yes, sir.

20   Q.   All right.  And not that there's anything wrong with it,

21   you've had the opportunity to meet and discuss your testimony

22   with members of the prosecutors' team several times; correct?

23   A.   Yes, we spoke, yes.

24   Q.   In fact, the most recent meeting was 8:30 in the morning

25   today; correct?

NAQVCOS4                          Escobar - Cross

 1    A.  Yes.

 2    Q.  Now, on direct and to a good extent with Mr. Mukasey's

 3    cross-examination, you have testified with regard to your

 4    responsibilities at DEA and the people that you oversee;

 5    correct?

 6    A.  Correct.

 7    Q.  And I believe you testified during direct examination that

 8    you currently oversee four groups; correct?

 9    A.  Correct.

10    Q.  All right.  And one of them is Group 10?

11    A.  Yes.

12    Q.  All right.  And Group 10 deals with these, for the most

13    part, larger international narcotics money laundering

14    investigations, is that fair?

15    A.  That's fair, yes, sir.

16    Q.  And then these other groups would be more in different

17    areas, including domestic areas too; correct?

18    A.  Correct.

19    Q.  And there might be some overlap into -- into international

20    subject matter with these other groups?

21    A.  Yes.

22    Q.  And there's a number of people that you oversee in these

23    four groups, maybe anywhere between six to seven or eight

24    people per group, does that sound about right?

25    A.  Yeah, that's fair.  Yes, sir.

NAQVCOS4                          Escobar – Cross

1   Q.  And obviously you're familiar from being in DEA with the

2   personnel in your group, some outside of your group; correct?

3   A.  Yes.

4   Q.  Are you familiar with Special Agent Robert Luken, for

5   instance?

6   A.  I am.

7   Q.  Goes by the name "Shaggy," just to see how much you know.

8   A.  Yes.

9   Q.  Is that correct?

10  A.  That's correct.

11  Q.  All right.  He's one of the people that are in groups that

12  you had supervised?

13  A.  Yes.

14  Q.  Also familiar with a Special Agent Brian Smith?

15  A.  Brian Smith, yes.

16  Q.  He also goes by the name "Smitty"; correct?

17  A.  Correct.

18  Q.  He's also one of the people from time to time that you've

19  had contact with?

20  A.  Yes.

21  Q.  Contact with Special Agent Guillermo Fuentes?

22  A.  Not –- not in probably ten years.

23  Q.  But –-

24  A.  In the past.

25  Q.  In the past?

NAQVCOS4                         Escobar - Cross

1    A.  Yes.

2    Q.  Special Agent John Waters?

3    A.  Yes.

4    Q.  Within ten years?

5    A.  Probably -- yeah, probably about that.

6    Q.  Special Agent James Lowndes, L-O-W-N-D-E-S, you've heard of

7    him?

8    A.  Doesn't sound familiar.

9    Q.  Supervised dozens of agents and come in contact with even

10   more than dozens, would that be fair to say?

11   A.  Yes.

12   Q.  Had contact with Lee Lucas, Special Agent Lee Lucas?

13   A.  In the past.

14   Q.  Yes?

15   A.  Yes, in the past, yes.

16   Q.  Special Agent Jeremy Youngblood?

17   A.  Yes, in the past.

18   Q.  How about Special Agent Keri Evans?

19   A.  Keri Evans?  Yes, that one's been a lot longer.

20   Q.  You also specifically talked about responsibilities, not

21   only as an ASAC, an Assistant Special Agent in Charge, but

22   responsibilities of the people, the subordinates below you;

23   correct?  Do you remember that testimony?

24   A.  Yes.

25   Q.  And I believe we had already covered to some extent and

NAQVCOS4                              Escobar – Cross

1    some of the other lawyers did responsibilities with regard to

2    investigating the money laundering investigations and their

3    intersection with narcotics organizations, that's common?

4    A.  That's very common, yes, sir.

5    Q.  Your responsibilities involve people that have been

6    arrested in country in the United States; correct?

7    A.  Yes.

8    Q.  And people that get arrested outside of the country as

9    well; correct?

10   A.  Yes.

11   Q.  Pursuant to what is called a provisional arrest warrant,

12   you've worked with that before?

13   A.  I have, yes, sir.

14   Q.  On more than one occasion, sir?

15   A.  Yes.

16   Q.  A provisional arrest warrant, for instance, in terms of

17   your responsibilities, your exposure, involves potentially

18   arresting somebody on an arrest warrant outside of the country

19   where there is a sealed indictment inside of this country?

20            MR. SWETT:  Objection to the form.

21            THE COURT:  If you could clarify please.

22   Q.  Someone who's arrested on a provisional arrest warrant

23   usually is outside of the country; correct?

24   A.  Correct.

25   Q.  And there would be corresponding paperwork in country, in

1   the United States, in the form of a — not unusual — sealed

2   indictment; correct?

3   A.   Correct.

4   Q.   You've worked with provisional arrest warrants and reviewed

5   them before?

6   A.   I have, yes, sir.

7   Q.   They typically contain a lot of information?

8   A.   Yes.

9   Q.   Including an agent's name?

10  A.   Yes.

11  Q.   You've worked with something called 959 charges before?

12  A.   Yes.

13  Q.   That's importation of drugs that make it inside of the

14  country originating from outside of the country?

15  A.   That is correct.

16  Q.   You were asked some questions by both the prosecutor and

17  Mr. Mukasey with regard to three of the exhibits or several of

18  the exhibits that you were shown.  You remember that first

19  exhibit being that CorrLinks invite?

20  A.   Yes.

21  Q.   You're familiar with CorrLinks being the federal prison

22  mailing system or emailing system between inmates and people

23  actually in the -- defense attorneys or private investigators?

24  A.   Yes.

25  Q.   You were also shown chats before that I believe you

NAQVCOS4                    Escobar - Cross

1   answered questions about that you had no participation in

2   either before or after, you were just asked to review those

3   chats, you had no personal knowledge of them?

4   A.  Correct.

5   Q.  But one of the chats that you read, I think it was

6   Government Exhibit GX 364, there was a discussion of someone, a

7   Tumaco guy being afraid to cooperate, do you remember that

8   exchange?

9   A.  Yes.

10  Q.  And this concept of cooperation, not to belabor the point,

11  is the idea that someone who is arrested or about to be

12  arrested would give potentially and hopefully information to

13  DEA or other law enforcement that can be used, correct, in the

14  investigation?

15  A.  That's correct.

16  Q.  There were other discussions that you were asked about, a

17  contact that Mr. Recio may have had with two defense attorneys

18  in particular?

19  A.  Yes.

20  Q.  It would be Mr. Macey and Mr. Guerra?

21  A.  Yes, sir.

22  Q.  You are aware that -- from talking to people, from your

23  experience, that Mr. Recio worked with other defense attorneys

24  as well?

25          MR. SWETT:  Objection.  Hearsay.

1              THE COURT:  Sustained.
2    Q.  But in any event, you don't have any personal knowledge of
3    the content in any of those texts that you were shown?
4    A.  I do not, no.
5              MR. GAINOR:  If I may have a moment, your Honor.
6              THE COURT:  Sure.
7              (Counsel conferred)
8              MR. GAINOR:  I have nothing further, your Honor.
9              THE COURT:  Thank you.
10             Redirect, Mr. Swett?
11             MR. SWETT:  Yes, your Honor.
12   REDIRECT EXAMINATION
13   BY MR. SWETT:
14   Q.  Special Agent Escobar, why don't we start talking about the
15   relationships between agents and attorneys.  You were asked on
16   cross-examination about attorneys that you've worked with;
17   correct?
18   A.  Yes.
19   Q.  And you were asked if there were particular attorneys that
20   have -- that you've developed a rapport with after working with
21   them on a number of cases; is that right?
22   A.  That's correct.
23   Q.  Special Agent Escobar, if you can estimate, approximately
24   how many times do you think you would speak one-on-one with a
25   defense attorney about the work you were doing in a given year?

NAQVCOS4                          Escobar – Redirect

1    A.  One-on-one, very limited.  Dozen times.

2    Q.  A dozen times in a single year.  Not hundreds of times?

3    A.  No.

4    Q.  When you were speaking with the defense attorneys, can you

5    describe the situation generally?

6    A.  Correct.

7    Q.  Excuse me.  Let me rephrase.

8           Can you describe the circumstances in which you would

9    interact with defense attorneys.

10   A.  Sure.  If we're discussing a case, we would talk about

11   possible cooperation or where everything can go, what the --

12   what the defendant is -- what can he bring to the table.  So we

13   would just talk about generalities of the case.

14   Q.  And who was involved in those conversations?

15   A.  Typically it would be the case agent, the co-case agent,

16   the defendant, the defense attorney, and U.S. Attorney's

17   Office.

18   Q.  So again, how frequently would you have one-on-one

19   conversations with defense attorneys about these cases?

20   A.  A dozen times.

21   Q.  Let me ask the same questions about private investigators.

22   How frequently, in your experience, were you speaking

23   one-on-one with private investigators about criminal cases?

24   A.  So when I was doing cases, there was -- private

25   investigators weren't a huge scenario, that wasn't happening a

NAQVCOS4                        Escobar - Redirect

1    lot.  So I talked very infrequently with private investigators,

2    very infrequently, if at all.

3    Q.  But it's fair to say that you're not having hundreds of

4    calls with the defense attorney to talk about the case?

5    A.  No.

6    Q.  Or text messages either?

7    A.  No.

8    Q.  Okay.  Now, with respect to those relationships with

9    attorneys, what, if anything, would you ever do to steer cases

10   to specific defense attorneys?

11   A.  To a specific defense attorney?  I wouldn't -- I would let

12   the client or the defendant make his decision up on whoever he

13   wanted to go with.

14   Q.  So why wouldn't you direct or try to direct DEA targets to

15   specific attorneys?

16   A.  Just for the transparency of the scenario.

17   Q.  And again, about the relationship you had with these

18   attorneys, what payments, if any, did you ever receive from

19   these attorneys?

20   A.  None.

21   Q.  Why not?

22   A.  Against policy.

23   Q.  And how about private investigators, what payments, if any,

24   did you ever receive from private investigators?

25   A.  None.

NAQVCOS4                              Escobar - Redirect

1    Q.  Why not?

2    A.  It's against our policy.

3    Q.  Now, you were asked on cross-examination about what you

4    asked Special Agent Costanzo regarding his relationship with

5    Recio.  Do you remember that?

6    A.  Yes.

7    Q.  And I think you were asked on cross-examination if this was

8    essentially water cooler talk, right?

9    A.  Correct.

10   Q.  Now, again, how frequently would you communicate with

11   Special Agent Costanzo when you were supervising him?

12   A.  Probably on a daily basis.

13   Q.  And you would talk about lots of different aspects of the

14   cases he was working?

15   A.  Yeah.  I would get briefed up on the cases and he would

16   tell me what was going on.

17   Q.  What, if anything, did he ever tell you about Recio's

18   involvement in any of the work that Group 10 was doing?

19   A.  He didn't tell me anything.

20   Q.  And if he had told you that Recio was involved in Group 10

21   work, how would you have reacted?

22            MR. MUKASEY:  Objection.

23            THE COURT:  Overruled.

24            MR. MUKASEY:  Calls for speculation.

25            THE COURT:  Overruled.

NAQVCOS4                          Escobar - Redirect

1    Q.  What would you have done if Special Agent Costanzo had told

2    you about Recio's involvement as a private investigator in

3    Group 10 work?

4    A.  I would have told him to be careful.  Be careful with that

5    relationship because there could be an appearance of, you know,

6    passing information.

7    Q.  But again, he never told you anything about that?

8    A.  Never told me anything about it.

9    Q.  So you had no knowledge as to whether Manuel Recio was

10   working with Special Agent Costanzo while you were supervising

11   Agent Costanzo?

12   A.  Correct.

13   Q.  There was some cross-examination about carrying multiple

14   phones.  Do you remember that?

15   A.  Yes.

16   Q.  So maybe you can just explain why an agent might have

17   multiple phones.

18   A.  Sure.  So in my scenario, I was the undercover of a big

19   AGEO investigation, and I was dealing with different folks from

20   different -- different parts of the country, different parts of

21   the world.  I had informants in Colombia, some in Panama, some

22   in Mexico.  And I didn't want to -- me personally, I didn't

23   want to cross the -- have the phones intersected for several

24   reasons.  Number one, I want to know who I was talking to at a

25   certain time.  Second, I didn't want to put myself in a bad

NAQVCOS4                    Escobar - Redirect

scenario by picking up the wrong phone and, you know, giving up

a different part of a case to them.  So for me, that's why I

carried around different phones; it was more of a communication

safety for me, so that's why I carried different phones.

Q.  And who paid for those phones?

A.  Mostly out of the operation, out of the DEA operation.

Q.  So did a defense attorney pay for those undercover phones?

A.  No.

Q.  Did a private investigator pay for those undercover phones?

A.  No.

Q.  And in general, with respect to the phones you're using,

which phones would you use to conduct DEA work?

A.  For DEA business, I had my DEA phone.  I would use that to

talk to the U.S. attorneys, defense attorneys, you know,

whoever needed to talk to me from DEA.  And then, you know, the

other phones were strictly for the confidential informants or

whoever the target was of that investigation on that phone.

Q.  And what sort of DEA work, if any, would you conduct on

your personal phone?

A.  None.

Q.  Okay.  And I think there was some discussion on

cross-examination about having specific phones to speak with

specific sources.  Is that something you're familiar with?

A.  Yes.

Q.  Now, as far as you knew as the ASAC supervising Group 10,

NAQVCOS4                              Escobar – Redirect

1    was Mr. Recio a source for Group 10?

2    A.   No.

3    Q.   He wasn't signed up as a source?

4    A.   He was not signed up as a source, no, sir.

5    Q.   There was no paperwork indicating that Mr. Recio was an

6    active source for Group 10?

7    A.   No.

8    Q.   And as far as you know, was there any authorization to get

9    a special phone for anyone to communicate with Mr. Recio about

10   DEA work?

11   A.   No.

12   Q.   Now, when an agent has authorization to get a phone to

13   communicate with a source, again, who pays for that phone?

14   A.   DEA.

15                 (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Naq2Cos5                    Escobar - Redirect

1    Q.  The source wouldn't pay for it?

2    A.  No.

3    Q.  And would a member of the defense side pay for it?

4    A.  No.

5    Q.  But again, sitting here today, what, if anything, do you

6    know about a phone that Special Agent Costanzo used to

7    communicate with Mr. Recio about DEA cases?

8            MR. MUKASEY:  Asked and answered twice.

9            THE COURT:  Sustained.

10   Q.  There were some questions about on-the-job training.  Do

11   you recall those questions?

12   A.  Yes.

13   Q.   I believe you were asked if significant training occurs

14   on the job, is that right?

15   A.  Right.

16   Q.  Now, who would you say in a group is primarily responsible

17   for ensuring that that training complies with DEA policies?

18   A.  So when we come out of the academy, we receive what we call

19   field training agents.  So we get a senior agent that's been on

20   the job for quite some time, and then we use them as kind of

21   the, like, the guiding principle.  So those are the ones who

22   give most of the instruction on how you build cases and how you

23   do that.  So . . .

24   Q.  And is there a formal training to supplement the on-the-job

25   training?

Naq2Cos5                          Escobar - Redirect

1   A.  Well, they went through the academy, right, so that's the

2   formal side of the house.  And then when they get into the

3   field, that's where they start working with the field agents

4   and, you know, they go that route.

5   Q.  And what opportunities, if any, do agents have to get a

6   refresher on the DEA policies that they have to abide by?

7   A.  So for policies every year, we have to take our standards

8   of conduct test.  Every year we have to sign it.  And then

9   throughout your career, you are always getting, like,

10  continuing education, going to Quantico for different classes

11  and whatnot.  So throughout your career, you have an

12  opportunity to take more training.

13  Q.  Now, I think you testified earlier about the voluminous

14  amount of materials that the DEA has in various manuals, right?

15  A.  Yes.

16  Q.  Now, your testimony is that sharing NADDIS information is a

17  violation of DEA policy, right?

18  A.  Correct.

19  Q.  Can you tell me the chapter that that's contained in?

20  A.  I know it is in the personnel manual.

21  Q.  But you don't know the specific provision?

22  A.  No, sir.

23  Q.  Do you have any doubt as to whether that is a DEA policy?

24  A.  No.  I know it is.

25          THE COURT:  I just want to clarify, you said now your

Naq2Cos5                           Escobar – Redirect

1    testimony is that sharing what information is a violation?

2              MR. SWETT:  NADDIS information.

3              THE COURT:  NADDIS.  Sorry.  I missed that.

4              And that's what you understood in answering?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Thank you.

7    BY MR. SWETT:

8    Q.  But when you talked about the policies, can you give me the

9    specific chapter and verse of those policies?

10   A.  No, sir.

11   Q.  Okay.  But how is it that you are familiar with these

12   policies, then?

13   A.  Well, we get training on it every year, so every year we

14   have to sign them, we have to sign the policy.  I know it is in

15   the personnel manual.  And when I was in OPR, we used that

16   manual quite a bit for violations of any kinds of standards of

17   conduct.

18   Q.  Okay.  And let me now ask you about the information that

19   agents use to investigate cases.

20              You were asked on cross-examination about where the

21   DEA can gather its information from, is that right?

22   A.  Yes.

23   Q.  And I believe there were a number of categories that you

24   went through with Mr. Mukasey, including private citizens,

25   right?

Escobar – Redirect

1    A.   That is correct.

2    Q.   And other DEA cases?

3    A.   Correct.

4    Q.   And potential sources or cooperators, is that right?

5    A.   Correct.

6    Q.   Now, when you testified about that, that was all about

7    information coming into the DEA, right?

8    A.   Correct.

9    Q.   So before an arrest is made, what information, if any,

10   would the DEA share with a private citizen?

11   A.   Probably none.

12   Q.   And before an arrest is made, what sort of information

13   about its investigations would the DEA share with a source of

14   information?

15   A.   Typically nothing.

16   Q.   So when you were talking about the flow of information for

17   DEA cases, which direction does that information flow?

18   A.   The flow is always coming to the agent.  So it's coming

19   from the source or whoever is bringing that information to the

20   agent.  The agent takes it in at that point, disseminates it

21   back through law enforcement channels.

22   Q.   And you talked on direct about this concept of law

23   enforcement sensitive information.  Can you just explain what

24   that is again?

25   A.   Sure.  It could be anything that has to do with an arrest,

Naq2Cos5                    Escobar - Redirect

1    an indictment, case-specific information, targets of -- targets

2    of the investigation.  It's anything that has -- that is

3    related to the case.

4              THE COURT:  Just if I could just ask, just so it's

5    clear, when you said targets of the investigation, if you could

6    just explain to the jury what that means.

7              THE WITNESS:  Sure.  So target of the investigation is

8    somebody who we believe has committed a narcotics violation.

9    So those are what we would consider our target of the

10   investigation.  So we would investigate that person to see if

11   there is any wrongdoing and then either move towards an

12   indictment or arrest or dispel the information and move on with

13   it.

14   BY MR. SWETT:

15   Q.  So, again, in your 20-some-odd career as a DEA agent, what

16   information from NADDIS, if any, have you ever shared with

17   defense attorneys?

18   A.  None.

19   Q.  What information, if any, from NADDIS have you shared with

20   private investigators?

21   A.  None.

22   Q.  What information, if any, about forthcoming arrests have

23   you shared with defense attorneys?

24   A.  None.

25   Q.  Same question for private investigators.

Naq2CoS                         Escobar - Recross

1    A.  None.

2                    MR. SWETT:  No further questions.

3                    THE COURT:  Thank you.  Anything further?

4                    MR. MUKASEY:  Very briefly.

5    RECROSS EXAMINATION

6    BY MR. MUKASEY:

7    Q.  Special Agent Escobar, you have had occasion to tell a

8    defense attorney, hey, your guy's got a problem, and this is

9    what it is, and you would tell a defense attorney that to

10   encourage him to come in and cooperate, is that correct?

11   A.  I don't recall doing that.

12   Q.  Okay.  Can I -- did you give a statement in connection with

13   this matter on November 18, 2019?

14   A.  Yes.

15   Q.  May I refresh your recollection --

16   A.  Sure.

17   Q.  -- if you don't remember?

18   A.  Sure.

19   Q.  Just for the witness and the government, can you put up

20   3517-003, page 31, and you can start at line 3.  Read it

21   silently to yourself, and I would just ask --

22   A.  Yes.

23   Q.  -- does that refresh your recollection that, on occasion,

24   you would tell a defense lawyer, hey, your guy, your client has

25   a problem, to encourage him to come in and cooperate?

Naq2CoS

1    A.  Yes, that is correct.

2    Q.  Thank you.

3            THE COURT:  Anything further, Mr. Gainor?

4            MR. GAINOR:  No, your Honor.

5            THE COURT:  Anything further, Mr. Swett?

6            MR. SWETT:  No, your Honor.

7            THE COURT:  Thank you.  You may step down, sir.

8            THE WITNESS:  Thank you.

9            (Witness excused)

10           THE COURT:  Ms. Deininger, are you up next?

11           MS. DEININGER:  I am.  The government calls Inspector

12   Steven Miller.

13           THE COURT:  All right.

14           MR. MUKASEY:  Your Honor, this is the witness that I

15   handed the document to you about earlier.

16           THE COURT:  Yes.  Thank you.

17           (Pause)

18    STEVEN MILLER,

19        called as a witness by the government,

20        having been duly sworn, testified as follows:

21           THE COURT:  Ms. Deininger.

22           MS. DEININGER:  Thank you.

23           Before we begin, I just would like to first read in a

24   stipulation.  So it's Government Exhibit S4.  If there is no

25   objection, we will have it published for the jury as well.

Naq2CoS

1          MR. MUKASEY:  No objection.

2          MR. GAINOR:  No objection.

3          MS. DEININGER:  I'm going to read starting at

4     paragraph 1:

5          "Government Exhibits 101, 104 through 113B, 116 and

6     120 are records from the Drug Enforcement Administration.  The

7     government exhibits listed above consist of records that were

8     kept and maintained in the course of regular practice of the

9     regularly conducted business activity of the entities described

10    above and were made at or near the time of the matters set

11    forth in the records by a person, or from information

12    transmitted by a person, with knowledge of the matters set

13    forth therein."

14          On the next page it says, "It is further stipulated

15    and agreed that Government Exhibits 101, 104, 106A, and 107

16    through 113B, 116 and 120 and this stipulation be admitted in

17    evidence at trial."

18          At this time the government would like to offer into

19    evidence Government Exhibits -- the stipulation and Government

20    Exhibits 101, 104, 106A, 107, 110, 111, 113A, 113B, and 120.

21          THE COURT:  They are admitted.

22          MS. DEININGER:  Thank you.

23          (Government's Exhibits S4, 101, 104, 106A, 107, 110,

24    111, 113A, 113B, 120 received in evidence)

25          MS. DEININGER:  The government would also like to

Naq2CoS                          Miller – Direct

1    offer into evidence, pursuant to stipulation S8, which was the

2    cell phone excerpt stipulation Mr. Swett read, Government

3    Exhibits 339, 341, 344, 345, 347, 349, 351, 354, 396, 1001,

4    1003, 1020, 1020B, 1034, 1034A, 1034B, and 1034C.

5              THE COURT:  They are admitted.

6              MS. DEININGER:  Thank you.

7              (Government's Exhibits 339, 341, 344, 345, 347, 349,

8    351, 354, 396, 1001, 1003, 1020, 1020B, 1034, 1034A, 1034B,

9    1034C received in evidence)

10    DIRECT EXAMINATION

11    BY MS. DEININGER:

12    Q.  Good afternoon, Inspector Miller.

13    A.  Good afternoon.

14    Q.  Where do you work?

15    A.  I work at the Drug Enforcement Administration, the Office

16    of Professional Responsibility.

17    Q.  And how long have you worked with the DEA?

18    A.  Approximately 16 years.

19    Q.  And what's your current title?

20    A.  Again, I'm inspector with the Office of Professional

21    Responsibility.

22    Q.  What is the Office of Professional Responsibility?

23    A.  The Office of Professional Responsibility is a unit that's

24    attached to headquarters and we investigate instances of

25    employee misconduct and policy violations by DEA employees.

Naq2CoS                          Miller - Direct

1  Q.  And how long have you been an inspector in that group?

2  A.  Since January of this year.

3  Q.  What are your general roles and responsibilities as an

4  inspector in the Office of Professional Responsibility?

5  A.  Again, we primarily investigate DEA misconduct and policy

6  violations by its employees.

7  Q.  And can you just walk me through the roles you held at the

8  DEA before your current position?

9  A.  Sure.  Once I completed the DEA academy, I was assigned to

10  the New York Field Division up until 2013, when I transferred

11  to the Washington, D.C. field division.  In 2016 I then

12  transferred to the Newark, New Jersey field division.  In 2018,

13  I was promoted to a supervisory special agent, and then in

14  2023, in January, I took the headquarters position and became

15  an inspector with OPR.

16  Q.  So I believe you said between 2007 and 2018 you held roles

17  as special agent in various different offices, correct?

18  A.  That's correct.

19  Q.  And as a special agent, generally what were your roles and

20  responsibilities?

21  A.  As a special agent you primarily identify, infiltrate,

22  investigate, disrupt and dismantle drug trafficking and money

23  laundering organizations.

24  Q.  And then in 2018 you said you became a supervisory special

25  agent.  Are you still considered a special agent when you

Naq2CoS                         Miller - Direct

1    become a supervisor?

2    A.  Yes.

3    Q.  Okay.  And how did your roles and responsibilities change

4    at that time, if at all?

5    A.  So primarily as a supervisor you now supervise those agents

6    who are disrupting and dismantling money laundering and

7    drug-trafficking organizations.

8    Q.  All right.  I want to turn to a different topic.

9           Are you familiar with something called NADDIS?

10   A.  Yes.

11   Q.  And what is NADDIS?

12   A.  NADDIS stands for the Narcotics and Dangerous Drugs

13   Information System.  It is a data index and collection system

14   that we use in the DEA.

15   Q.  And what types of information does NADDIS contain?

16   A.  NADDIS will contain information that we garner from our

17   investigations, such as, names of subjects, targets, addresses,

18   license plate numbers, phone numbers.  Anything investigative

19   that we glean from our time out in the field that's placed into

20   reports, is subsequently put into NADDIS.

21   Q.  Does it also contain the reports themselves that you have

22   mentioned?

23   A.  Yes.

24   Q.  And who has access to NADDIS?

25   A.  Certain personnel within DEA.

1    Q.   And what personnel in general have access to NADDIS?

2    A.   The people who are qualified, have the appropriate

3    clearances have access to NADDIS.

4    Q.   What type of clearances do you need?

5    A.   As a special agent you receive a top secret clearance.

6    Q.   Does anyone outside of DEA have access to NADDIS?

7    A.   No.

8    Q.   And how is NADDIS accessed?

9    A.   NADDIS is accessed through our DEA intranet.  What you

10   basically do is you log in to your computer and you access an

11   intranet which is just utilized by DEA personnel.  You go to a

12   program called Concorde, and then Concorde has a list of links,

13   hyperlinks that you can go to.  You search for the hyperlink on

14   the left-hand side that says search 2.0 and that will take you

15   to NADDIS.

16   Q.   We will probably walk through that in just a minute, but I

17   wanted to ask you was the information within NADDIS public?

18   A.   No.

19   Q.   Where does that information come from?

20   A.   Again, that's gleaned from our investigations and that can

21   comprise of information that we may receive from confidential

22   sources, information that we generate on our own, information

23   that we receive from other law enforcement sources as well.

24   Q.   I would like to show, just for the witness and counsel,

25   Government Exhibit -- what is marked as Government Exhibit 117.

1          Inspector Miller, can you see that on your screen?

2    A.  I can now.

3    Q.  What is this?

4    A.  That is the website or the intranet site that I referred

5    to.  After you access the DEA intranet, you go to the Concorde

6    website, and then you will see Concorde applications on the

7    left-hand side.

8    Q.  To your knowledge have there been any significant changes

9    to this interface since November 2019?

10   A.  Not to my knowledge.

11   Q.  So this is substantially how this system would have

12   appeared in 2018 and 2019?

13   A.  Yes.

14          MS. DEININGER:  Government offers Government Exhibit

15   117 into evidence.

16          MR. MUKASEY:  Objection.

17          THE COURT:  Objection or no objection?

18          MR. MUKASEY:  Objection.

19          THE COURT:  I'm going to overrule the objection and

20   allowed it.  Exhibit 117 is admitted.

21          (Government's Exhibit 117 received in evidence)

22          MS. DEININGER:  If you can publish for the jury.

23   BY MS. DEININGER:

24   Q.  Inspector Muller, if we look at the very top of this

25   exhibit there is a green line with white lettering that says

Naq2CoS                          Miller - Direct

1   "DEA Sensitive But Unclassified."  Sorry, Ms. Pierre, further

2   up above that.  There is the line that says "DEA Sensitive But

3   Unclassified"?

4   A.  Yes.

5   Q.  Inspector Miller, what does that refer to?

6   A.  So that's part of the DEA intranet.  That is accessible to

7   DEA employees, so it's only accessible by DEA employees, so

8   it's --

9   Q.  And what does it mean that the information is DEA sensitive

10  but unclassified?

11  A.  Again, you can only access these websites if you are a DEA

12  employee and have the appropriate clearances.

13  Q.  Again, what clearances would you need?

14  A.  This is just for standard DEA employees, so any DEA

15  employee can access that intranet.

16  Q.  Slightly below that there is another green line with white

17  lettering this one says DEA/Law Enforcement Sensitive?

18  A.  Again, that is accessible to DEA employees with the

19  appropriate clearances, but it's law enforcement sensitive,

20  which means that you would need the appropriate clearances to

21  access these websites or this information.

22  Q.  And how does this differ from what we saw that we were

23  looking at a moment ago -- what's the different between --

24  strike that.

25          What's the difference between DEA sensitive which we

1    saw on the top line and DEA/law enforcement sensitive which we

2    are looking at here?

3    A.   So the DEA law enforcement sensitive banner, everything

4    underneath that is only accessible to certain DEA personnel,

5    not every DEA personnel.

6    Q.   And how -- is this the screen where you would access NADDIS

7    from?

8    A.   Yes.

9    Q.   And how would you do that?

10    A.   So on the left-hand side are the applications.  You scroll

11    down to -- on the application side in that sort of grayish blue

12    box and you -- there is a tab that will say search 2.0

13    underneath -- in alphabetical order.  You can't see it.  It's

14    cut off on the bottom there.  But it would be underneath those

15    applications beginning with the letter P.

16    Q.   We can't see that link here.

17    A.   Right.

18    Q.   But you would normally see that in alphabetical order

19    farther down on the screen?

20    A.   That's correct.

21    Q.   We can take this down.  I would like to publish just for

22    the witness and counsel Government Exhibit 118.

23            Inspector Miller what is this?

24    A.   After you click on search 2.0 this is the screen that

25    appears.

Naq2CoS                    Miller - Direct

1          MS. DEININGER:  The government would like to offer

2   Government Exhibit 118 into evidence.

3          THE COURT:  118 is admitted.

4          MR. MUKASEY:  Judge, may I just briefly *voir dire* the

5   witness?

6          THE COURT:  What do you want to know.

7          MR. MUKASEY:  Whether this screen in the form it's

8   displayed now was the exact way that it looked in 2018 and

9   2019.

10          THE WITNESS:  More or less, yes.

11          MR. MUKASEY:  More or less?

12          THE WITNESS:  I don't know.  So, for instance, on the

13   previous screen there might have been updates made to certain

14   programs.  It might be -- instead of version 2.0, it might have

15   been version 1.0 in 2018.  I can't speak to that.

16          MR. MUKASEY:  But you are not positive as to whether

17   this screen that's up there now, Government Exhibit 118, is --

18          THE WITNESS:  No.  This is what you would see in 2018.

19          MR. MUKASEY:  Exactly the same?

20          THE WITNESS:  Substantially the same.

21          MR. MUKASEY:  Thank you.

22          MS. DEININGER:  Is the exhibit admitted?

23          THE COURT:  It is admitted, yeah.

24          (Government's Exhibit 118 received in evidence)

25   BY MS. DEININGER:

Naq2CoS                          Miller – Direct

1    Q.  What are we looking at?

2    A.  After you hit the link to search 2.0, this screen would

3    appear.

4    Q.  Again, in the top third of the screen, there is a green bar

5    with white lettering that says DEA.  What does that say?

6    A.  "DEA sensitive but unclassified."

7    Q.  And what does it say below that under the search bar or

8    under the website?  Yeah, right there.  Sorry.

9    A.  "DEA/law enforcement sensitive."

10   Q.  Again, what does DEA/law enforcement sensitive mean?

11   A.  Again, that's accessible or that website is accessible to

12   certain DEA personnel with the appropriate clearances.

13   Q.  And then can you just read for me what it says below

14   "NADDIS security and warning notice."

15   A.  Sure.  The first bullet "NADDIS is for official use only."

16   Q.  I'm sorry.  If you could stop right there, actually.  What

17   does "official use" mean?  What's your understanding?

18   A.  So my understanding of official use is only for purposes

19   related to the investigation that you are currently engaged in.

20   Q.  Okay.  You can keep reading.

21   A.  " browsing through NADDIS is prohibited.  Access to NADDIS

22   is for authorized purposes only."

23   Q.  You can pause there.  Again, what's your understanding of

24   what authorized purposes are here?

25   A.  Authorized purposes are purposes that, for lack of a better

Naq2CoS                          Miller - Direct

1  term, are authorized.  So an authorized purpose would be in

2  furtherance of your investigation or to conduct your

3  investigations, your DEA investigations, you would access

4  NADDIS.

5  Q.  Okay.  You can keep going.

6  A.  "Use of NADDIS for personal or unauthorized use is

7  prohibited.  Access to NADDIS is based on a *bona fide*

8  need-to-know basis."

9  Q.  If you can stop there, what was your understanding of what

10  it means by *bona fide* need-to-know basis?

11  A.  So when you access NADDIS, for example, a need-to-know

12  basis would again be related to your investigative efforts or

13  DEA case, information that you would need to know in

14  furtherance of that investigation.  A *bona fide* use would be

15  what I just outlined.  Something that isn't *bona fide* would be

16  if you put your neighbor's name into NADDIS and you just want

17  to see who lives nextdoor to you, that's not a *bona fide* use of

18  NADDIS.

19  Q.  Okay.  You can keep going, the line that starts "use of

20  NADDIS."

21  A.  "Use of NADDIS to satisfy personal or nonwork-related

22  curiosity is prohibited.  No person has a right to access

23  NADDIS information solely by virtue of title or position.

24  Querying NADDIS records of individuals and businesses for

25  personal reasons is prohibited.  Employees, contractors,

1   consultants, TFOs, TFAs, military, and other law enforcement

2   agency personnel of the United States government are bound by

3   the requirements of the Privacy Act."

4   Q.  Okay.  You can stop there.

5          There is a reference here to TFOs.  Do you know what

6   that is?

7   A.  TFO stands for task force officer.

8   Q.  So what do you do if you want to move forward and access

9   the NADDIS database after you get to this NADDIS security and

10  warning notice screen?

11  A.  So on the right-hand side of the screen are the radio

12  buttons that you can indicate what the search is being

13  conducted on behalf of.  You choose one of those radio buttons,

14  and it takes you to the next screen.

15  Q.  Can you explain these three options for me briefly?

16  A.  Sure.  "Self" is pretty self explanatory.  You are using

17  NADDIS to search on behalf of yourself, your investigation.

18          "Firebird user" is anyone who has access to Firebird.

19  So, for instance, if a coworker is out on the street and they

20  want you to run somebody in NADDIS, you could do it under that.

21  Q.  And what is -- I'm sorry, what is Firebird?

22  A.  Firebirds are our internal system, our internal DEA system.

23  It's just the name of the application.

24  Q.  So it's another name for the intranet, basically?

25  A.  Yeah, yeah.

Naq2CoS                          Miller - Direct

1    Q.  And what's a non-Firebird user?

2    A.  Non-Firebird user would be a person who is not -- doesn't

3    have access to Firebird, so it's basically a request, it might

4    be a request at a local law enforcement personnel, could you

5    run this person in NADDIS.

6    Q.  And --

7    A.  We -- go ahead.  I'm sorry.

8    Q.  I think you started to address my question, but what are

9    some circumstances in which you would conduct a search on

10   behalf of a non-Firebird user, someone who themselves doesn't

11   have access to NADDIS?

12   A.  So if you are working an investigation in conjunction with

13   another law enforcement agency, federal partner or local

14   partner, they may ask you -- they may come across something in

15   a case that you are working together like, hey, I came across

16   this license plate on surveillance.  It's related to our case.

17   Could you run it into NADDIS and see what comes up?  So that

18   would be an instance where it would be a non-Firebird user.

19   Q.  Are there any limitations on your ability to run NADDIS

20   searches for a non-Firebird user?

21   A.  In terms of when we can or cannot do it?

22   Q.  Or what you can and cannot do it for.

23   A.  Yeah, it has to be related to your DEA investigative

24   efforts.

25   Q.  I would like to now show for the witness and counsel

1    Government Exhibit 119.

2              And Inspector Miller, what is this?

3    A.  So that's the next screen after you hit one of those radio

4    buttons on the right-hand side of the previous screen.  This

5    will now pull up.

6    Q.  To your understanding, is this still substantially the same

7    format that it was in in 2018 and 2019?

8    A.  It appears so.

9    Q.  Government offers Government Exhibit 119 into evidence.

10             MR. MUKASEY:  Same objection for the record.

11             THE COURT:  Okay.  119 is admitted.

12             (Government's Exhibit 119 received in evidence)

13             MS. DEININGER:  You can publish for the jury.

14   BY MS. DEININGER:

15   Q.  So, again, Inspector Miller, what are we looking at?

16   A.  So this is the actual search entry screen.  So it functions

17   much in the way as like if you were to do a Google search.  So

18   whatever you are searching, you enter into that box, which I

19   just highlighted, and you enter your search term in there, hit

20   the button search, and then the results should pull up.

21   Q.  And so this is basically the NADDIS search screen, is that

22   correct?

23   A.  Yeah, it will -- the search screen allows you to access

24   NADDIS records.

25   Q.  Okay.  Thank you.

Naq2CoS                              Miller – Direct

1          And, again, do you see the green bar that says DEA/law

2    enforcement sensitive?

3    A.   Yes.

4    Q.   What does that apply to on the screen we are looking at?

5    A.   Again, that screen is only accessible to certain DEA

6    personnel with the appropriate clearances.

7    Q.   And does that apply as well to the records that can be

8    accessed through NADDIS?

9    A.   Yes.

10   Q.   So you said that the search bar works much like Google.

11   What sort of search terms can you generally used to search in

12   NADDIS.

13   A.   So there is a -- if you look at the bar closely, it says,

14   for instance, you could do -- you could enter a name in there,

15   such as Sally Smith.  You could enter a case number.  You could

16   enter a license plate number.  You can enter the tail number on

17   an airplane, addresses.  Basically anything that you come

18   across as a result of your investigation, you can enter into.

19   Q.   Do special agents receive training on how to use NADDIS?

20   A.   Yes.

21   Q.   And how do they receive that training?

22   A.   First you receive training, you receive a block of training

23   at the DEA academy in Quantico, Virginia.  You are basically

24   brought into a computer lab, everyone has a screen, and they

25   instruct you on how to use NADDIS, how to conduct searches in

Naq2CoS                           Miller - Direct

1    it.

2    Q.  And what other types of information are included in the

3    training on how to use NADDIS?

4    A.  You are also instructed on when and why you should

5    disseminate that information and who you can disseminate it to.

6    Q.  How frequently would a -- in your experience, how

7    frequently would a DEA special agent access NADDIS?

8    A.  In my experience if you are an agent who is working on an

9    active investigation, you would access NADDIS several times a

10   week.

11   Q.  And how about a supervisory special agent?  Would their use

12   of NADDIS be different?

13              MR. MUKASEY:  Objection.  Foundation.

14              THE COURT:  If you know.  Do you know?

15              THE WITNESS:  Yes.

16              THE COURT:  You can answer.

17   A.  As a supervisory special agent, your role has changed from

18   that of a field agent in that you are not -- in DEA you are not

19   conducting investigations, you are not conducting -- actively

20   conducting drug investigations, so your use would be less

21   frequent.

22   Q.  Does the DEA maintain records regarding NADDIS use?

23   A.  Yes.

24   Q.  What sort of records does it maintain?

25   A.  You can run an audit of a DEA NADDIS user.

Naq2CoS                          Miller - Direct

1   Q.  Would the -- what does the audit show?

2   A.  The audit shows what that person is searching for in

3   NADDIS.

4   Q.  So it shows the searches that they have run in the past?

5   A.  That's correct.

6   Q.  And are those records made at the time a NADDIS search is

7   conducted?

8   A.  Yes.

9   Q.  Are those records maintained by the DEA in the course of

10  its regularly conducted activity?

11  A.  Yes.

12  Q.  Are those NADDIS audit records regularly relied upon in the

13  DEA?

14  A.  Yes.

15  Q.  Are those NADDIS audit records something that are relied

16  upon in the investigative work conducted by the Office of

17  Professional Responsibility?

18  A.  Yes.

19  Q.  I would like to show what is -- just for the witness and

20  counsel, take a minute, what is four different exhibits.

21          One, the first one is marked as Government Exhibit

22  102.  If you can just take a look at this, Inspector Miller,

23  what is this?

24  A.  That is an audit log from NADDIS.

25  Q.  And if we can look at Government Exhibit 103.  Ms. Pierre,

Naq2CoS                              Miller - Direct

1    if we can scroll to the top.

2            Inspector Miller, if you can just take a minute, what

3    is this?

4    A.  A portion of an audit log from NADDIS.

5    Q.  If we can pull up Government Exhibit 114.

6            Inspector Miller, what is this?

7    A.  That's the same.  It's an audit log from NADDIS.

8    Q.  And Government Exhibit 115.

9            What is this?

10   A.  Audit log from NADDIS.

11           MS. DEININGER:  The government would offer Government

12   Exhibits 102, 103, 114, and 115 into evidence.

13           MR. MUKASEY:  Objection.  May we approach?

14           THE COURT:  Yes.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Naq2CoS                        Miller – Direct

1          (At the sidebar)

2          THE COURT:  Sorry for the interruption.  I know you

3     want to avoid sidebars.

4          This is something that we made a record on during the

5     course of this case.  It is our inability to get the NADDIS

6     information that we have asked for and I think DEA's inability

7     to retrieve it.  Most specifically, with respect to these

8     exhibits, I don't believe they qualify as business records

9     under 803(6) because they were created for purposes of this

10    litigation.

11         There is a case called *Palmer v. Hoffman,* Supreme

12    Court case, that holds that records that are created for the

13    purposes of a litigation do not satisfy business records.  To

14    be honest, it was pre-Federal Rules of Evidence, but it does

15    talk about business records getting into evidence.  So while

16    it's not under the Federal Rules, it does stand for the

17    proposition that documents that are created for purposes of a

18    litigation as these logs are, are not business records.

19         MS. DEININGER:  I think the witness testified that the

20    underlying records themselves that are in audit logs are

21    created at the time the searches are run.  They are maintained

22    by the DEA in the regular course of conduct.  All that happens

23    is that a query runs for specific of those records to be pulled

24    out.

25         There is actually case on this in the Second Circuit,

Naq2CoS                         Miller - Direct

1    in the Southern District, holding that those -- the records of

2    those queries are admissible as business records.  It is the

3    same, honestly, as when we send a subpoena to a phone service

4    provider for a subscriber enforced for a specific number.  They

5    run a query and give us everything that that phone number has

6    been subscribed to, and that is routinely admitted.

7           But Judge Rakoff recently addressed this in *United*

8    *States v. Booth*——it is 2022 WL 3139651——and held that "the only

9    actions taken in anticipation of litigation were to export

10   without alteration a subset of the data contained in voluminous

11   electronic databases such that only those records pertaining to

12   particular individuals were produced," and then admitted those

13   as a business record.

14          THE COURT:  So how was this created?  So this was --

15   are these screenshots or are these copies of spreadsheets that

16   are actually from database or what?

17          MS. DEININGER:  I think there is a way in the database

18   to run a query for, say, every search that was run by John

19   Costanzo and it will generate a report.  Two of these

20   spreadsheets are that.

21          The other two you could also run a query for, say give

22   me records of all searches that related to a specific name, and

23   the other two are that.  We have asked for searches run for --

24   I would have to look at the exhibits to see what the names

25   were, but names that were run.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Naq2CoS                              Miller - Direct

1              MR. MUKASEY:  I believe they were curated for purposes

2    of this litigation and, as such, they are not created at or

3    about the time of the records reflected or the actions

4    reflected in the records.  They are actually created way later

5    for purposes of this.

6              THE COURT:  But how is it different from contacting a

7    phone provider, e-mail provider, and saying give me all the

8    documents that correspond to this range or this inquiry and

9    then you get a subset of the data?

10             MR. MUKASEY:  I haven't heard that these are created

11   at about the time of the searches.  I don't know if they are or

12   they are not, but they were curated, as I understand it, for

13   these purposes, not in the normal course of business

14   documenting what happened at the time it happened.

15             THE COURT:  Well, the underlying information is

16   clearly a business record.  You are saying the way it was

17   extracted makes them not a business record.

18             MR. MUKASEY:  And the way it is presented, correct.

19             THE COURT:  I think it sounds like what Judge Rakoff

20   addressed, and I'm going to overrule the objection.

21             (Continued on next page)

22

23

24

25

Naq2CoS                         Miller - Direct

1              (In open court)

2              MS. DEININGER:  Your Honor, we might ask your

3      indulgence.  I'm happy to keep going on, but it also seems like

4      it might be a good time for a brief break.

5              THE COURT:  Yeah.  Why don't we take a ten-minute

6      bathroom break.

7              Please leave your note pads on your chairs.  You are

8      not yet deliberating.  We will recess for ten minutes.  We will

9      be in recess for ten minutes.

10             (Recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAQVCOS6                          Miller - Direct

1           THE COURT:  I've been looking at the proposed

2     instruction.  I'm not necessarily opposed to saying something

3     about the distinction between violation of DEA policies and the

4     elements of the charged crimes.  I don't think this does it.  I

5     don't know if there's a way to do it without referencing how

6     it's relevant to official duty.  And once you reference

7     official duty, you're starting to define the crimes and it just

8     gets -- I just think it gets confusing.  So you know, I'm

9     inclined to just explain it in the instructions.

10          MR. MUKASEY:  The final instructions.

11          THE COURT:  Yes, the final instructions.

12          MR. MUKASEY:  Thank you for considering it.

13          THE COURT:  Okay.  Are you all ready?

14          (Jury present)

15          THE COURT:  Please be seated, ladies and gentlemen.

16          Okay.  Ms. Deininger.

17          MS. DEININGER:  Thank you.

18          Ms. Pierre, can we show just for counsel and the

19    witness what is marked as Government Exhibit 704A.

20          THE COURT:  Just to be clear, you had moved those four

21    exhibits.

22          MS. DEININGER:  Yes.  If it isn't already, we are

23    offering into evidence Government Exhibit 102, 103, 114, and

24    115.

25          THE COURT:  They are admitted.

NAQVCOS6                      Miller - Direct

1              (Government's Exhibits 102, 103, 114, 115 received in

2      evidence)

3              MS. DEININGER:  Thank you.

4              And now we're showing what's marked as Government

5      Exhibit 704A.

6      Q.  Inspector Miller, do you recognize this?

7      A.  Yes.

8      Q.  What is it?

9      A.  It is a summary chart provided to me by the U.S. Attorney's

10     Office.

11     Q.  Did you review the record used to prepare this chart?

12     A.  Yes.

13     Q.  What types of records generally were those?

14     A.  I reviewed the NADDIS audit logs, as well as a few pages of

15     text message conversations.

16     Q.  And who provided you with those records?

17     A.  United States Attorney's Office.

18     Q.  Does the information in Government Exhibit 704A fairly and

19     accurately reflect the information in those underlying records

20     you just described?

21     A.  Yes.

22             MS. DEININGER:  The government offers Government

23     Exhibit 704A into evidence.

24             MR. MUKASEY:  With the previously stated objection on

25     the record.

NAQVCOS6                          Miller - Direct

1               THE COURT:  Noted.

2               And 704A is admitted as a summary chart.

3               (Government's Exhibit 704A received in evidence)

4               MS. DEININGER:  Okay.  Ms. Pierre, you can publish for

5     everyone.

6     Q.  Inspector Miller, can you just walk me through -- I'd like

7     to ask you to just walk me through the columns and explain what

8     this summary chart shows.  So for example, column A says

9     request date and time.  What does that refer to?

10    A.  So that refers to the text message conversations that I

11    reviewed.  That was the time that a request was made to search

12    a subject in NADDIS.

13    Q.  And what does the next column "requestor" refer to?

14    A.  That is the person -- based upon my review of the text

15    message conversations, is the person who is requesting the

16    search in NADDIS.

17    Q.  And what does -- and generally, who was making these

18    requests?

19    A.  23 columns and Manuel Recio was making the requests.

20              MS. DEININGER:  And we scroll down a bit on the page.

21    Q.  There is one line in blue where the name of the requestor

22    is David Macey.  Was there a different requestor in that

23    instance?

24    A.  Yes.  David Macey.

25    Q.  And who was receiving these requests?

1    A.  John Costanzo.

2    Q.  And so we go back up, the third column is titled name run

3    in NADDIS.  What does that column show?

4    A.  The requestor is asking John Costanzo to run that subject

5    name in NADDIS.

6    Q.  And in the fourth column it says NADDIS search date and

7    time.  What does that show?

8    A.  That shows when John Costanzo ran that subject name in

9    NADDIS.

10   Q.  And again, we scroll down in this table.  There are two

11   lines here near the bottom where there's a notation that says:

12   Ran by Edwin Pagan.  What does that mean?

13   A.  That shows -- that indicates that TFO Pagan ran those

14   subject names in NADDIS.

15   Q.  In those two cases, the NADDIS search was not run by John

16   Costanzo?

17   A.  That is correct.

18   Q.  And in all of these other instances, were you able to

19   confirm from the DEA audit records that John Costanzo had run a

20   NADDIS search for these names?

21   A.  Yes.

22   Q.  And generally, what did you learn from your review of the

23   text message communications and the NADDIS audit logs

24   referenced here?

25   A.  As a result of my review of those documents, the requestor,

NAQVCOS6                          Miller – Direct

1    again, majority of the times was Manuel Recio requested a name

2    to be searched in NADDIS at a particular date and time.  Made

3    that request to John Costanzo, and then shortly in time

4    thereafter the request was made, the audit log shows that John

5    Costanzo ran those names in NADDIS.

6    Q.  And what do you mean by "shortly in time thereafter"?

7    A.  Could be a day later, it could be the same day, maybe a few

8    minutes, hour later.

9    Q.  Do you know if this chart reflects all of the names that

10   Manuel Recio asked John Costanzo to run in NADDIS?

11   A.  Do not.

12   Q.  Do you know who chose which requests and searches to

13   include in this summary chart?

14   A.  U.S. Attorney's Office.

15   Q.  If John Costanzo had another DEA employee run a NADDIS

16   search for him, would that show up in a NADDIS audit report for

17   John Costanzo's NADDIS activity?

18          MR. MUKASEY:  Objection.

19          THE COURT:  Overruled.

20   A.  No, it would not.

21   Q.  I want to look at some of the examples of the text message

22   requests that are referred to in this summary chart.

23          MS. DEININGER:  Ms. Pierre, you can pull up side by

24   side Government Exhibit 704A, which we're looking at now, and

25   then also Government Exhibit 1001, which is in evidence.

NAQVCOS6                          Miller - Direct

1          We're just having a little bit of a technical issue.

2     Q.  Okay.  Here we go.  All right.  So and Inspector Miller,

3     first looking at just the top of Government Exhibit 704A, which

4     is on the left-hand side, what are the names in the top two

5     lines of that chart?

6     A.  The names of the NADDIS or the requestor?

7     Q.  The names run on NADDIS, yes.

8     A.  First line is Marco Antonio Flores Moreno.

9     Q.  And what's the name in the next line?

10    A.  Edgar Marval.

11    Q.  Okay.  And so now we look at Government Exhibit 1001, which

12    is on the right.  Can you read what it says at the top there

13    for me, the top three lines.

14    A.  Native iMessage thread.  Manny Recio, 305-796-7463 (gray).

15    Johnny Costanzo, 786-271-2480 (green).

16    Q.  Okay.  I want to read through this.  If you can read the

17    messages from Manny Recio in gray; I'll read the ones from

18    Johnny Costanzo in green.

19          Before we do that, what is the date of these text

20    messages?

21    A.  November 13th, 2018.

22    Q.  All right.  Let's -- if you can start reading.

23          MR. MUKASEY:  Judge, I'm going to object to the form.

24    If the witness wants to read what's in evidence, but the back

25    and forth role play I'm objecting to.

NAQVCOS6                           Miller - Direct

1          THE COURT:  I think it's fine.  Overruled.

2    Q.  You can read the text messages in gray.

3    A.  1151, Marco Antonio Flores Moreno.  Pedro Antonio Becerra

4    Cardenas Cuidadano Columbia.

5    Q.  Flores was a general, was just appointed to some minister

6    of some shit.

7    A.  John, anyone have a case on Floes, then Flores, next line.

8    Q.  Which one?

9    A.  Marco Antonio Flores Moreno.

10   Q.  Oh, not that I saw initially.  Call you in a few?

11   A.  He may be associated with a company named US D&D

12   International.

13          MS. DEININGER:  And we can close that out.

14          And now I'd like to pull up next to Government Exhibit

15   704A, Government Exhibit 339.

16   Q.  Okay.  Inspector Miller, do you see, looking at Government

17   Exhibit 704A on the left, what name it says shows as requested

18   on February 19th, 2019 at 10:40 a.m.?

19   A.  Karen Trujillo Suarez.

20   Q.  So let's go.  And now let's go over to Government Exhibit

21   339.  And again, what does it say on the top three lines?

22   A.  Telegram chat thread JC 713-578-845 (green).  Manny Recio,

23   707-911-750 (gray).

24   Q.  I'm going to again read the messages from JC in green, and

25   if you can read the messages from Manuel Recio in gray.

1          Guillermo Fuentes is involved.

2    A.  Nice.

3    Q.  Why else?

4    A.  I just need case agent in D.C.  Call me and give me a

5    summary on his NADDIS.

6    Q.  And there's five outgoing calls of varying durations.

7    A.  I'll get you a decision before noon.

8    Q.  Thanks.  Joshua Cliff 5713220/608.

9          MS. DEININGER:  Let's continue, Ms. Pierre.

10   Q.  Call Fuentes first.  Nothing on Karen Trujillo Suarez.

11   Mara Hewitt 404-893-7487 Atlanta contact for German.

12   A.  Great.

13         MS. DEININGER:  Let's go back to Government Exhibit

14   704A.  And Ms. Pierre, you can pull up next to it this time

15   Government Exhibit 341.

16         Sorry.

17   Q.  All right.  So we're looking on the left-hand side at

18   Government Exhibit 704A.  Can you read the names for me that

19   were requested on April 28th, 2019?

20   A.  Paola Tapiero Portilla.  And then Ligio Geraldo Bellar

21   Kazar.

22   Q.  Who does it say requested that these names be searched?

23   A.  Both requests were made by Manuel Recio.

24   Q.  And then again, based on your review of the NADDIS audit

25   records, did John Costanzo conduct a NADDIS search for these

NAQVCOS6                        Miller - Direct

1    names?

2    A.  Based upon the audit, yes.

3    Q.  So let's now look at Government Exhibit 341, which is on

4    the right.  And if you can again read the three lines at the

5    top.

6    A.  Telegram chat thread.  Manny Recio 70791750 (gray).  JC

7    713-578-845 (green).

8    Q.  If you can again read the text messages from Manny Recio

9    which are in gray; I will read the ones from JC that are in

10   green.

11   A.  Tomorrow can you run Paola Tapiero Portilla, Ligio Geraldo

12   Bellar Kazar.

13   Q.  What time do you get in?

14   A.  Around five.  John, we're about to take this shit to

15   another level.  I'm starting to make some in roadside.

16   Inroads.

17   Q.  Okay.  Dave is going to drop off the pass to his building.

18   I will have it.  We also need to talk, so make time.

19   A.  I'll pass it by.  Can you look up the names I gave you.

20           There's a missed call.

21   Q.  And there's an outgoing call.

22           MS. DEININGER:  I think that's the end of this one;

23   correct?  Okay.  So we can close -- all right.  We can close

24   that down.

25           If we go back to Government Exhibit 704A and pull up

NAQVCOS6                         Miller - Direct

1   next to it Government Exhibit 341 -- sorry, that's the one we

2   were just looking at.  Okay.  Sorry.  Instead of 341,

3   Government Exhibit 1020.

4   Q.  All right.  So Inspector Miller, on the left-hand side,

5   looking at Government Exhibit 704A, can you read the names on

6   the last three lines of that summary chart?  Of the names that

7   are being requested to be run in NADDIS.

8   A.  The first one is Roni Alejander Caballero Martinez.  Second

9   one is Aler Baldomero Samoya -- Samayoa Recinos.  And then the

10  third one is Edwin Benigno.

11  Q.  And who is -- who does this chart show is making that

12  request?

13  A.  Manuel Recio.

14  Q.  And when is it being made?

15  A.  November 11th, 2019.

16  Q.  And were you able to determine if John Costanzo had

17  searched for these names in NADDIS?

18  A.  Based upon the audit, yes.

19  Q.  And when had he run that search?

20  A.  The following day, November 12th, 2019.

21  Q.  So now we go look at Government exhibit 1020.

22          Can you read what it says at the top?

23  A.  WhatsApp messages thread.  Manny Recio, 13057967463 (gray).

24   Johnny Costanzo, 17862712480 (green).

25  Q.  It shows that the top of this message there are two

NAQVCOS6                          Miller - Direct

1    attachments.  I'd like to pull up one of those.

2              MS. DEININGER:  Ms. Pierre, in place of Government

3    Exhibit 704A, can you pull up 1020B.

4              Okay.  Thank you.

5    Q.  So Inspector Miller, at the bottom of the attachment to

6    this text message, Government Exhibit 1020B, is there -- is

7    there a name?

8    A.  Two names, yes.

9    Q.  And what are those names?

10   A.  Aler Baldomero Samayoa Recinos and Roni Alejander Caballero

11   Martinez.

12   Q.  And if we look back to the WhatsApp message thread in

13   Government Exhibit 1020, who is sending those attachment?

14   A.  That attachment is being sent by Manny Recio.

15   Q.  To whom?

16   A.  John Costanzo.

17   Q.  Okay.  I'd like to now read the messages below the

18   attachments.  If you can again read the messages from Manny

19   Recio in gray; I'll read the ones from Johnny Costanzo in

20   green.

21   A.  The two attachments sent.  And then John, tomorrow let me

22   know about this guy.

23   Q.  Okay, Papo.  Edwin Benigno agents are Arron Padgit.  This

24   guy is affiliated with transport Indios Barrera.  Get you the

25   agent's number.  Aler is Peter Maher, Memphis.  Good friend of

NAQVCOS6                        Miller – Direct

1    the GS nugget.  Pete's number is 571-362-2278.  I believe you

2    talked to him in other shit before also.  SOD Brentwood has a

3    piece.  The rest of the targets nada.

4              We can just go back to Government Exhibit 704A now.

5              All right.  So Inspector Miller, looking at Government

6    Exhibit 704A, how many requests for NADDIS searches in total

7    are reflected in this chart?  I can give you a minute to look

8    through it if you need to.

9    A.  23.

10   Q.  Okay.  Was each of those a request for a different name to

11   be searched in NADDIS?

12   A.  Yes.

13   Q.  And what was the -- and in each of those cases was the name

14   searched in NADDIS by either John Costanzo or, in two

15   instances, by Edwin Pagan?

16   A.  Based upon the audits, yes.

17   Q.  And what was the date range of when those native searches

18   were run?

19   A.  November of 2018 to November 2019.

20   Q.  Okay.  And again, you mentioned before that you, I think,

21   generally found that the NADDIS searches were run near in time

22   to when the text message requests that you reviewed; correct?

23   A.  That's correct.

24   Q.  So I just want to make sure we review a few of those.

25              So just looking back at the first top line, the

NAQVCOS6                        Miller - Direct

1    second -- the second line from the top regarding Edgar Marval,

2    we looked at this before for a second.  But when does the

3    summary chart show that the text message request was received?

4    A.  The request was made on November 14, 2018 at 3:48 p.m.

5    Q.  And then when did it show that the NADDIS date and time

6    was?

7    A.  The following day, November 15, 2018, at 10:31 a.m.

8    Q.  And just for another example, if we go down three more

9    lines, it says there was a search run for Victor Eduardo Lopez

10   Cuellar.  When does it say that John Costanzo received that

11   request?

12   A.  November 29, 2018 at 9:35 a.m.

13   Q.  When does it show that that NADDIS search was run?

14   A.  November 29, 2018 at 10:47 a.m.

15   Q.  And again, was that -- that was a NADDIS search that was

16   run by John Costanzo?

17   A.  Correct.

18   Q.  Okay.  Can NADDIS audit logs show you what type of files a

19   DEA employee accessed after conducting a search?

20   A.  Yes.  So to be more specific, it can show you -- the audit

21   log can show you what type of information they accessed in

22   NADDIS based upon an initial search.  So for instance, if you

23   type in a subject and certain records pop up, there might be

24   records that show that a vehicle is attributed to him or an

25   address, you could click on that vehicle and address.

NAQVCOS6                    Miller – Direct

1   Q.  I want to look at an example of how -- what the NADDIS

2   audit logs show us for these searches.  Before we do that, if

3   we can just look at the top line of this chart again.

4           Again, what is the name in the very first line that

5   was run on NADDIS?

6   A.  The name of the chart?  I'm sorry.

7   Q.  The name in the column that says name run in NADDIS, the

8   first one at the top.

9   A.  Marco Antonio Flores Moreno.

10  Q.  And again, this is a request that came from Manuel Recio,

11  right?

12  A.  That's correct.

13          MS. DEININGER:  Ms. Pierre, we can publish what's in

14  evidence as Government Exhibit 103.

15  Q.  Inspector Miller, again, what is this?

16  A.  That's the NADDIS audit log run for John Costanzo.

17  Q.  Okay.  And generally, what does it show?

18  A.  So it will show the user name, the person who's accessing

19  NADDIS, the time and date that they have accessed it, who

20  they're searching for, and the search terms that are entered,

21  the results received; and if there were any further sort of

22  clicks on that subject, the results received.

23  Q.  So specifically looking at column A, user name, what is

24  that?

25  A.  John A. Costanzo.

NAQVCOS6                    Miller - Direct

1   Q.  And what does user name refer to?

2   A.  That is the person who is using NADDIS.

3   Q.  And what about column C activity date, what does that tell

4   you?

5   A.  That's the date and time that that person is using NADDIS.

6   Q.  Okay.

7              MS. DEININGER:  If we can scroll to the right to

8   column F.

9   Q.  What does action type tell you?

10  A.  It's showing you what that person is doing in NADDIS.

11  Q.  Go ahead.

12  A.  In this instance here, line No. 2 shows search.  So a

13  search term was entered into the search box that I spoke about

14  earlier, sort of functions like a Google search box.  Then that

15  pulls up results.  Then that third or the subsequent line show

16  click.  That shows that the user is clicking on one of the

17  results that was received in relation to that search.

18  Q.  And column G action location, what is that?

19  A.  That is just like I alluded to, so that's initially the

20  search box where it says Concorde search.  And it pulls up all

21  the links that are generated from entering the search term into

22  that search box.

23  Q.  And then a little bit more to the right, column K is

24  navigated URL.  What does that show?

25  A.  So those are the results that you receive.  So for

1    instance, the second line shows that the name that was entered

2    or the search term that was entered; and then what the person

3    clicked on after the search term generated links to it.

4            So in line 3 it says identifying numbers.  In line 7,

5    it will say remarks.  So once you enter a search term into the

6    box, it will generate certain information and links that you

7    can click on.  They are all classified as either identifying

8    numbers, remarks, vehicles, case numbers.  You can click on

9    those and see if there's any further information under those

10   sort of subheadings.

11   Q.  And one last one, column L, which is right to the right,

12   this says it's labeled additional search data.  What does that

13   show you?

14   A.  That's -- that's the -- again, that's the search form.

15   This is sort of the sources where the information is generated

16   from.  So for instance, if you look on 14, the name was

17   entered.  They searched sort of a compilation of information

18   that was garnered from tolls, from our PTAR system, our

19   priority targeting system; ESS, which is a system which will

20   associate addresses and other sort of public information with

21   that search term.  So these are all the sources that that

22   search term has garnered for it to provide information.

23           So for instance, you enter the name Oscar Orobio,

24   O-R-O-B-I-O, and then any information on Oscar, if there is

25   any, is coming from these sources; so ESS, from tolls, and that

NAQVCOS6                          Miller - Direct

1    information is generated in the NADDIS record.

2    Q.  You just mentioned before that one of the sources was

3    tolls.  What are tolls?

4    A.  Tolls are information garnered from telephone tolls.  So

5    when you run a toll history on someone on a phone number that

6    may be attributed to this person, it will show like tolls, it

7    might show phone numbers that are associated with this person

8    based upon toll documents or toll records.

9    Q.  And toll records are the same thing as call records, they

10   show calls incoming, outgoing?

11   A.  Call detail records, toll records, yeah.  They are

12   generally interchangeable.

13            MS. DEININGER:  So we go back to column A.  And if we

14   can scroll down to lines 357 to 364.

15   Q.  Looking at lines 357 to 364, who does it show conducted

16   these searches?

17   A.  User name is John Costanzo.

18   Q.  And when were they conducted?

19   A.  November 15, 2018 at approximately 10:38 a.m.

20   Q.  And if we scroll over to columns F and G, can you see what

21   sort of action he was taking?

22   A.  So in column 357, there is a search.  It appears to be a

23   search term that was entered.

24   Q.  And then below that where it says -- I think it says

25   Concorde search results and Concorde links.  What does that

NAQVCOS6                      Miller - Direct

1   show us?

2   A.  So again, that's what I alluded to.  The search term is

3   placed into the box, it generates links to certain subsets of

4   information, and you would click on those links or those

5   subsets of information to find out what they say.

6          So for instance, you enter a name in.  It may show

7   vehicles, phone numbers, addresses located to that -- or

8   attributable to that person or any sort of narrative

9   information.  You could click on that and then you could get

10  that information.

11         MS. DEININGER:  And then if we scroll to the right, to

12  columns K through L, can we do it so we can -- is it possible

13  to do it so we can see both of them at the same time?

14         Thank you.

15  Q.  What does this -- what does this show us that Costanzo was

16  accessing?

17  A.  So based upon this section of the NADDIS audit, the name

18  Flores Moreno was searched.  It looks like it might have been

19  searched again.  And then what happened is again, if you look

20  in column K, NADDIS has retrieved addresses, vehicles, detailed

21  remarks, and identifying numbers for the name Flores Moreno.

22  Q.  Okay.  And Flores Moreno, that's one of the names that we

23  just looked at in the NADDIS summary chart in Government

24  Exhibit 704A, correct?

25  A.  Correct.

NAQVCOS6                        Miller - Direct

Q.  And when we look under the information that was retrieved
under column K, one of the things that's mentioned here is
retrieve remarks.  What does that refer to?

A.  So retrieve remarks generally refers to any remarks that
are attributed to that subject that could be garnered from what
we call our DEA-6s or reports of investigation.

        So for instance, if -- in this case, if Flores Moreno
was seen on surveillance at a certain time and location, that
might be noted in the report of investigation, and that would
be then placed into his remarks section -- that might be placed
into his remarks section in NADDIS.

Q.  And then the next line below that says retrieve identifying
numbers.  What does that mean?

A.  Identifying numbers could be anything that's -- any sort of
numbers that are associated with you, including Social Security
number, date of birth, alien ID number, telephone numbers, any
identifiers or identifying numbers.

Q.  Right actually above retrieve remarks it says detail.  What
does that refer to?

A.  Again, that is in reference to the search.  That might be
another subset of information that is listed in NADDIS.  Just
details.

Q.  Would the type of information that John Costanzo is
retrieving here from NADDIS be public?

A.  No.

1  Q.  Would this information be considered confidential?

2  A.  Yes.

3  Q.  Why?

4  A.  Well, you have information there which, again, if that

5  becomes public, can jeopardize a DEA investigation.  And if,

6  for instance, you have confidential sources who are providing

7  information against Flores Moreno, if that were to come out

8  that that information is attributable to them, you could place

9  their lives in jeopardy, as well as any DEA personnel

10  associated with the investigation.

11          MS. DEININGER:  Ms. Pierre, you can take this down

12  now.

13  Q.  And Inspector Miller, I wanted to turn to a different

14  topic.  Generally speaking, does the DEA have standards

15  governing agent -- the conduct of agents?

16  A.  Yes.

17  Q.  And where are those standards memorialized?

18  A.  They are memorialized in our various manuals.  They are

19  memorialized in the personnel manual, the agent's manual, and

20  our standards of conduct.

21  Q.  Are those standards of conduct part of the personnel

22  manual?

23  A.  Yes, the standards of conduct are generally an outline for

24  ethical principles that guide each DEA personnel.

25  Q.  And what is the difference generally between the personnel

1    manual that contains the standards of conduct and the agent's

2    manual?

3    A.   The agent's manual is substantially more expansive, and the

4    agent's manual provides us -- sort of goes on how to conduct

5    investigations, how to process evidence, how to do certain

6    things that are above the standards of conduct.

7         So the agent's manual is more a day-to-day how-to

8    guide to conduct -- to be a DEA agent, how to seize evidence,

9    how to process evidence; whereas the personnel manual, again,

10   is sort of encompassing the ethical standards in DEA.

11        MS. DEININGER:  Ms. Pierre, if you can publish what's

12   in evidence as Government Exhibit 113A.

13   Q.   Inspector Miller, can you see this?

14   A.   Yes.

15   Q.   What is this?

16   A.   That is the section of the DEA personnel manual.

17   Q.   And is this the entirety of the personnel manual or is this

18   just an excerpt of it?

19   A.   An excerpt.

20   Q.   At the top where it says 2735 Employee Responsibilities and

21   Conduct, there's a date, December 23rd, 2016.  What does that

22   date refer to?

23   A.   That date can refer to the date not so much when the entire

24   personnel manual was enacted, but if there were any changes or

25   policy additions made to the personnel manual or that section,

NAQVCOS6                        Miller - Direct

1    they were added on December 23rd, 2016.

2    Q.  So this version of this section of the personnel manual

3    would have been in effect from December 23rd, 2016 going

4    forward?

5    A.  Yes.

6    Q.  Until it was revised again?

7    A.  Until any revisions were added or any changes were made,

8    yes.

9    Q.  Do you know how frequently the standards of conduct are

10   generally updated?

11   A.  It's not -- there's no timeline set.  It's just basically

12   if the policy is revised, then the manual is then revised, and

13   that's reflected on the date.  But there's no -- it's not

14   overhauled every year and changed every year.  It's sporadic.

15   Q.  Are DEA employees able to access the personnel manual?

16   A.  Yes.

17   Q.  How?

18   A.  So what I alluded to earlier, that you have the DEA

19   intranet.  And if you do -- if you search a certain section,

20   there's a subsection called "Manuals."  And if you click on

21   "Manuals," it will list all the manuals governing policies and

22   procedures in DEA.  There's the personnel manual, the agent's

23   manual, there's the laboratory manual.  There's a bunch of

24   manuals on the list.

25   Q.  You mentioned before that you are currently employed in the

1  Office of Professional Responsibility for the DEA; correct?

2  A.  That's correct.

3  Q.  And that one of the Office of Professional Responsibility

4  responsibilities is to investigate violations of the standards

5  of conduct?

6  A.  That's correct.

7  Q.  How many people work in the Office of Professional

8  Responsibility?

9  A.  So we have headquarters, which is in Arlington, Virginia.

10  There are two investigative groups attached to that.  Then we

11  have offices in Plantation, Florida; Newark, New Jersey; in

12  Dallas, Texas; in Los Angeles or California.  And generally,

13  those will consist of five inspectors such as myself, and then

14  one senior inspector.  Those senior inspectors then report to

15  what we call an ADCI.  And then that ADCI will report to the

16  deputy chief inspector.

17  Q.  What is an ADCI?

18  A.  It is -- I believe it's assistant deputy chief inspector.

19  Q.  And so how many people in total would you estimate are

20  employed in the Office of Professional Responsibility at the

21  DEA?

22  A.  Generally, based upon rotations, I mean, it can be anywhere

23  from 30 to 50.

24  Q.  Can violations of the standards of conduct result in

25  disciplinary actions?

1  A.  Yes.

2  Q.  What sort of disciplinary actions?

3          MR. MUKASEY:  Objection.

4          THE COURT:  Overruled.

5  A.  Disciplinary actions are a result of our human resource

6  board.  We at OPR only compile a report, so we don't hand down

7  discipline per se.  But disciplinary actions can range anywhere

8  from a letter of caution to removal.

9          MS. DEININGER:  Ms. Pierre, we can turn to page 2 of

10  Government Exhibit 113A now.

11  Q.  Inspector Miller, do you see at the top where it says under

12  2735.11, General Provisions, Section A, it says:  Purposes of

13  the standards of DEA standards of conduct.

14          Can you read point one for me and sub point E.

15  A.  Sub point E?  I'm sorry.

16  Q.  Can you start with just reading the sentence following

17  point one.

18  A.  Okay.  To provide -- purpose of DEA's standards of conduct.

19  To provide guidance and framework in which DEA personnel may

20  embody and uphold DEA's core values.

21  Q.  What does subsection E say?

22  A.  Uncompromising, personal, professional, and institutional

23  integrity.

24  Q.  And then if we can scroll down a little bit.  And can you

25  read what is in here, points two through four under the

NAQVCOS6                          Miller - Direct

1    general -- under the purposes.

2    A.  Subsection two:  To inform personnel of standards of

3    conduct expected of them as DEA employees and of the potential

4    penalties imposed for breaches of such standards.

5            Three.  To set forth standards of behavior which will

6    protect and grow the reputation of the DEA with the American

7    public.

8            Four.  To ensure DEA's law enforcement mission is not

9    impeded, restricted, or otherwise adversely influenced by

10   employee's misconduct.

11   Q.  And now right under this it says there's a section B, scope

12   of the DEA's standards of conduct, and then a paragraph H.  Can

13   you read just the first sentence in paragraph H?

14   A.  Except where specifically excluded, the standards of

15   conduct apply to all employees, including task force officers

16   and special government employees as defined in 18 United States

17   Code, Section 202(a).

18   Q.  Okay.  I'd like to turn to page 3 now, and under the

19   section 2735.12, responsibilities.  There's a section labeled B

20   supervisors.  Can you read the intro to that and paragraph 1.

21   A.  Supervisors.  It is the responsibility of DEA's

22   supervisors, in addition to their duties and responsibilities

23   as employees of this agency, to:

24           Set and maintain high standards of personal conduct as

25   an example to employees.  Supervisory personnel will be held to

NAQVCOS6                    Miller - Direct

1   a higher standard of conduct given their status as managers.

2   Failure to act in response to a situation that the supervisor

3   was or should have been aware of may subject the supervisor to

4   disciplinary action or other appropriate measures.

5   Q.   And generally, what does this provision provide?

6   A.   This -- what does it provide?

7   Q.   Or what is it?

8   A.   Oh, this is -- in OPR parlance we refer to this section as

9   failure to supervise.

10  Q.   Now, is a failure to ensure that DEA agents -- the

11  supervisor -- is supervisor also complying with standards of

12  conduct?

13  A.   Yes.

14  Q.   If we go to page 4, there is a section C, all DEA employees

15  that starts near the top.  Can you read the sentence right

16  after it says -- up to the -- right after it says "All DEA

17  employees."

18  A.   DEA personnel --

19            MR. MUKASEY:  I'm going to object and again request

20  that at this point, as we dive in here, that instruction is

21  appropriate or a similar one is appropriate.

22            THE COURT:  Well, why don't we complete this line of

23  questioning and we'll address it at the end or tomorrow

24  morning.

25  Q.   Sorry.  You can read starting in Section C, "All DEA

NAQVCOS6                          Miller – Direct

1    employees."

2    A.   DEA personnel as members of the law enforcement community

3    occupy positions of trust.

4    Q.   And you can read up to the colon.

5    A.   It is the responsibility of all DEA employees to:

6    Q.   Now, just go into paragraph 4.  What does it say?  It is

7    the responsibility of DEA employees to, and then you can

8    continue reading.

9    A.   Certify that they have read and understand the DEA

10   standards of conduct, as embodied in Section 2735 of the

11   personnel manual by signing the standards of conduct annual

12   employee certification form DEA-343.

13   Q.   So what does that refer to?

14   A.   Every year the DEA employees have to read and affirm that

15   they've read and understand the standards of conduct.

16   Q.   And is that done at a specific time every year?

17   A.   Usually more often than not it's done at the beginning or

18   end of the fiscal year.  In the federal government we -- we're

19   in the fiscal -- we use the fiscal cycle, so that would -- the

20   end of the fiscal year is September 30th, the beginning is

21   October 1st.  So usually around that time.

22   Q.   This is something that all DEA personnel must do?

23   A.   Yes.

24   Q.   If we can now turn to page 9.

25            Okay.  Here towards the middle of the page there's a

NAQVCOS6                    Miller – Direct

1    section labeled "Use of Nonpublic Information."

2              Can you read that for me?

3    A.  Use of nonpublic information.  An employee shall not engage

4    in a financial transaction using nonpublic information nor

5    allow the improper use of nonpublic information to further

6    his/her own private interest or that of another, whether

7    through advice or recommendation, or by knowing unauthorized

8    disclosure.  Nonpublic information includes DEA sensitive

9    information, for example, information that may compromise an

10   ongoing investigation or prosecution, provide an unfair

11   advantage to a company competing for a DOJ/DEA contract, or

12   reveal the identities of confidential sources or DEA special

13   agents or task force officers, as well as the items identified

14   in 5 CFR Section 2635.703.

15   Q.  Can you give an example of a violation of this standard of

16   conduct?

17   A.  Yes.  If you were to, let's say, provide information to

18   your neighbor who is not a DEA employee or doesn't have the

19   appropriate clearances about an investigation that you're

20   working and provide nonpublic information.  So for instance,

21   you were to say, Hey, on Thursday we have a sealed indictment

22   and I'm going to arrest this person.  That information is not

23   public, and sharing that information with a nonDEA employee

24   would be a violation of this section.

25   Q.  Would giving information from NADDIS to a private

NAQVCOS6                        Miller - Direct

1   investigator in exchange for money be a violation of this

2   policy?

3           MR. MUKASEY:  Objection.

4           THE COURT:  Overruled.

5   A.  Yes.

6   Q.  Would giving information from NADDIS to a defense lawyer in

7   exchange for money be a violation of this policy?

8   A.  Yes.

9           MS. DEININGER:  All right.  Ms. Pierre, we can now --

10  actually, we can just stay on this page.

11  Q.  I want to look at the next section, 2735.15, gifts from

12  outside or nonfederal sources.

13          Inspector Miller, if you can just start at Section A

14  and read through the end of the page.

15  A.  Section A.  Gift includes any gratuity, favor --

16  Q.  Sorry.  We can actually start at paragraph -- upper case A.

17  A.  Capital A.  Okay.

18          An employee shall not accept a gift from a prohibited

19  source.  A DEA employee also shall not accept a gift given

20  because of his or her official position.  For the purposes of

21  this section, the following definitions apply:  Gift includes

22  any gratuity, favor, discount, entertainment, hospitality,

23  loan, forbearance, or other item having monetary value

24  including, but not limited to, gifts of training,

25  transportation, local travel, lodging, and meals.

NAQVCOS6                        Miller - Direct

1          MS. DEININGER:  If we scroll to the next page, Ms.

2     Pierre.

3          THE COURT:  It's 5 o'clock, so I want to --

4          MS. DEININGER:  That's fine.

5          THE COURT:  -- finish.

6          If you want to finish this one point, you can.

7          MS. DEININGER:  Why don't we finish this one rule.

8          THE COURT:  Okay.

9          MS. DEININGER:  Okay.

10          Ms. Pierre, if you can scroll down to the next page.

11    Q.  And I want to -- under paragraph B here, I just want to

12    read B1 and B4.

13    A.  "Prohibited source" means any person who is seeking

14    official action by the employee's agency, and has interests

15    that may be substantially affected by the performance or

16    nonperformance of the employee's official duties.

17          MS. DEININGER:  And then one more in this.  If we

18    scroll down to the bottom of the page, paragraph C here.

19    Q.  Inspector Miller, if I can just ask you to read paragraph C

20    to the bottom of the page.

21    A.  Even if an exception identified in paragraph B above or 5

22    CFR Section 2635.204 applies to an employee, an employee shall

23    not accept a gift if:  It is given in return for being

24    influenced in the performance of an official act; the employee

25    solicits or coerces the offering of a gift; the employee

NAQVCOS6                          Miller - Direct

1    accepts gifts from any source on a basis so frequently that a

2    reasonable person would be led to believe the employee is using

3    his or her public office for private gain.

4              MS. DEININGER:  That was all I wanted to cover in this

5    section, so it's a good time to break.

6              THE COURT:  Okay.  Thanks.

7              Folks, we're going to break for today.  We'll resume

8    tomorrow morning.  We'll have coffee and bagels for you in the

9    morning.  So please try to arrive between 9 and 9:15, and we'll

10   try to start at 9:30 promptly.

11             Please remember not to do any research or discussion

12   about the case.  Please leave your notepads on your chairs

13   closed and have a good night, everybody.  See you tomorrow

14   morning.

15             (Jury not present)

16             THE COURT:  You may step down.

17             If you'd step out for a minute.  Thank you.

18             (Witness not present)

19             THE COURT:  You all may be seated.

20             I wanted to see if you all wanted to address any

21   issues before we break.

22             MR. SWETT:  Your Honor, one small thing from earlier

23   today.  When I read Government Exhibit S2 into the record, I

24   read the final paragraph which admitted 302 through 303A, 310

25   and 311.  And then I stated that that might be a typo and that

NAQVCOS6                         Miller - Direct

1    301 should also be included.  I was mistaken there.  That was

2    not a typo.  So it was the government's intention only to

3    introduce 302 through 303A, 310 and 311, as reflected in the

4    stipulation.

5             THE COURT:  So the one that is not admitted is which

6    one?

7             MR. SWETT:  It's Government Exhibit 301.  It is

8    authenticated under this, but it's not admitted.

9             THE COURT:  It's not yet admitted.  Okay.

10            MR. SWETT:  Okay.

11            THE COURT:  Thank you.

12            And I'm open to the idea of some limiting instruction

13   about sort of flagging for the jury that there's a difference

14   between DEA policies and standards of conduct on the one hand

15   and the elements of the crime.  I wasn't comfortable with the

16   proposed instruction that defense counsel provided because I

17   thought it might be a little confusing.

18            MR. MUKASEY:  Judge, I have a thought.  I'm just

19   picking up on that to try to wrap it up.

20            Perhaps we can submit an instruction tonight/tomorrow

21   morning that simply suggests that they've heard testimony

22   regarding DEA policies.  But something along the lines of they

23   should wait till the end of the case to understand all the

24   instructions that will play into the elements of the charges.

25   Something more generic like that, if that would suit the Court.

NAQVCOS6                          Miller - Direct

1          MR. SWETT:  I think we're happy to review language

2    that's proposed and we can discuss tomorrow morning.

3          THE COURT:  Why don't we try to discuss something at

4    9:15.  If you could try to agree something along those lines, I

5    think that would be fine, something that flags the point you

6    just made.  I will explain in detail later the elements of the

7    crime.  Pointing out that by itself a violation of a DEA policy

8    does not establish the crime; it's not sufficient to establish

9    the crime.

10          MR. MUKASEY:  That's fine.

11          THE COURT:  If you guys could confer and we'll craft

12    something.  Could you do that?

13          MR. SWETT:  We'll certainly -- yes, absolutely, your

14    Honor.

15          THE COURT:  All right.  Great.

16          MR. GAINOR:  Your Honor, I'm sorry to interrupt.

17    There is one other matter when the Court moves off of this that

18    we wanted to address.

19          THE COURT:  Okay.

20          MR. GAINOR:  It does deal with Mr. Hernandez Villazon.

21    So I don't know from the government whether or not that witness

22    is taking the stand tomorrow; there was some mention that he

23    might.  But I think that there is some unfinished business with

24    regard to the production of materials related to the blackball

25    memo from DEA.

NAQVCOS6                          Miller - Direct

1           As the Court knows, we have gotten a heavily redacted

2    blackball memo from the DEA, but there was some issues with

3    regard to accompanying DEA-6s that were prepared apparently by

4    Ulysses Delgado, which was the controlling agent.  And I had

5    been in contact with the government.

6           I don't want to misspeak, but it's my understanding

7    that those DEA-6s will not be turned over to the defense, but

8    there was some suggestion — and I'm sure Mr. Swett would

9    correct me if I'm wrong — that the DEA would be in a position

10   to turn them over for an *in camera* review by the Court.

11          We'd be asking for such a review.

12          THE COURT:  Just to back up for a second, did you say

13   a redacted version of the report has been produced that's

14   different from the two or three-page summary?

15          MR. SWETT:  Yes, your Honor.

16          After the Court asked us to confer with DEA, we asked

17   if they would produce it, and they produced a version that

18   redacted out information about other sources.

19          (Continued on next page)

20

21

22

23

24

25

Naq2Cos7

1    THE COURT:  Oh, but it does have sort of all the

2  relevant information about this witness.

3    MR. SWETT:  I think it has -- I think by redacting out

4  information of other sources, it redacts out some of the

5  allegations that he revealed who that source was, but those

6  allegations are also summarized in an F.B.I. memo which has

7  been turned over.

8    MR. GAINOR:  Well, we don't know exactly, so we would

9  be asking for -- if the understanding is that the DEA would

10  turn over that unredacted memo and the accompanying DEA 6s for

11  *in camera* review, we would be asking for that.

12    MR. SWETT:  The DEA -- so we have spoken to DEA

13  counsel on this.  Again, we don't have this document.  Their

14  view is that this is not a document they want to turn over and

15  that they have complied with discovery requests as the

16  information contained in the form——and it's actually called a

17  512D——has been turned over.  So the facts have been provided,

18  and they do not want to turn over the document.  And they have

19  stated their position that if the Court is inclined to order

20  production of this document or has further questions about this

21  document, they would like the Court to review it *in camera*s to

22  determine whether the DEA has complied with its discovery

23  obligations.

24    THE COURT:  Discovery obligation being the subpoena.

25    MR. SWETT:  Correct.

Naq2Cos7

1          THE COURT:  Okay.  So when you say the document,

2     again, you are talking about the unredacted version of it, of

3     the report?

4          MR. SWETT:  Well, I think what I am talking about is

5     this form that the agent filled out that they don't have, but I

6     think we can probably throw the unredacted version of the

7     deactivation memo on to the pile as well.

8          THE COURT:  Okay.  So could you provide that to me *in*

9     *camera*, for *in camera*s review?

10          MS. DEININGER:  I think we can ask the DEA to provide

11     it because we currently don't have it and we don't expect them

12     to produce it directly to us.  But we can submit that request

13     to them.

14          THE COURT:  Okay.

15          MR. MUKASEY:  Judge, I'm informed that an additional

16     reason for needing this, rather than just sort of trying to pry

17     every last piece of paper we can get, is that there are varying

18     renditions or varying stories from the cooperating witness

19     about why he was deactivated which we think go to his

20     credibility.

21          THE COURT:  And those different stories are reflected

22     in these documents or not?

23          MR. MUKASEY:  In -- well, we don't know what's

24     reflected in these documents, but we certainly know various

25     versions of his excuses.

Naq2Cos7

1        THE COURT:  Okay.  So what does the government have

2    that you have not provided to the defense?  Anything?

3        MS. DEININGER:  We don't --

4        MR. SWETT:  When you say "government," do you mean

5    prosecution team?

6        THE COURT:  Yes.

7        MR. SWETT:  Nothing.

8        THE COURT:  So you have only seen the redacted

9    version, as well.

10        MR. SWETT:  We have seen the unredacted version and

11    then we marked it for production.  The DEA then produced a

12    letter summarizing the impeachment material, and then, after we

13    requested, they produced a redacted version.

14        I have told defense counsel and at this point, having

15    been a middleman on this, I'm happy to tell the Court, I think

16    the F.B.I. memo that they have in its unredacted form is the

17    most fulsome version of events here.  That's my best

18    recollection.

19        But we are happy for the Court to review the documents

20    *in camera* and determine whether there is something in there

21    that they are entitled to, facts that they haven't gotten yet

22    about the deactivation.

23        THE COURT:  Okay.

24        MS. DEININGER:  And just to be clear, when we say we

25    have reviewed the unredacted memo, it was only when Mr. Swett

Naq2Cos7

1    took the trip down to Florida and was able to review it at the

2    DEA's offices.  We have never otherwise had it in our

3    possession.

4                THE COURT:  Right.  Understood.

5                Explain to me the difference between the report,

6    redacted and unredacted version on the one hand and these other

7    6s.  What are those?  Those are DEA investigation memos?

8                MR. SWETT:  Well, the DEA investigation memos are

9    called 6s, but our understanding is that this additional

10   document that they are asking for is not a 6.  It is called a

11   512D, and it is some sort of deactivation form that they have.

12               THE COURT:  That DEA has.

13               MR. SWETT:  Correct.

14               There are —— we produced a number of 6s related to the

15   cooperator.  There were quarterly reports that kind of

16   summarized his ongoing cooperation at a high level without

17   getting into the specifics, and we produced all of those, and

18   the DEA, I think, in general has no problem turning over the

19   6s, but this 512D they have an issue providing.

20               MR. GAINOR:  But the 512D references a DEA 6, just to

21   be clear, so . . .

22               THE COURT:  Okay.  Do you have the exhibit number of

23   the F.B.I. report that you referred to?

24               MR. SWETT:  It would be in the 3500 materials and I

25   think I would need to go back and check because there are about

Naq2Cos7

1   250 documents in the cooperator's 3500.

2           THE COURT:  So if you could communicate the request to

3   the DEA, I'm happy to review anything *in camera*.  I'm not sure

4   as a formal matter how they would get that to me.  I don't know

5   if they would be comfortable e-mailing it.  They might not be.

6   If they could e-mail it with a password or something like that,

7   I would be happy to look at the full report and the 512D if

8   they are up for that.

9           MR. SWETT:  That's fine, your Honor.  I think what I

10  will do, we can send an e-mail to chambers copying defense

11  counsel, copying DEA counsel, and explain the situation.

12          THE COURT:  Okay.

13          MR. SWETT:  That way they will be able to reach out to

14  the Court directly.

15          THE COURT:  All right.

16          MS. DONNER:  There was a motion to compel that was

17  filed and it should provide your Honor all the information that

18  you need to determine what we are seeking --

19          THE COURT:  Okay.

20          MS. DONNER:  -- including the subpoena.

21          THE COURT:  Okay.  All right.  Thanks.

22          Anything else?

23          MR. ANDREWS:  One last matter, your Honor.  You asked

24  for a draft limiting instruction with regard to the 2015

25  messages.  We sent a draft of the government's proposal to

Naq2Cos7

1    defense counsel on Tuesday morning.  We have yet to receive the

2    defense's edits or counterproposal.  We anticipate that Special

3    Agent Miller is going to be reading those messages -- sorry, it

4    will be Analyst Maj will be reading those tomorrow.  So if the

5    defense has a counterproposal, now would be the time to send it

6    over to us.

7         MR. MUKASEY:  Well, we will get to it as soon as we

8    can.  We are kind of drinking from the fire hose, getting 3500

9    material while a witness is on the stand virtually or at 2 or 3

10   in the morning.  So we are doing the best we can.

11        THE COURT:  Okay.  I'm trying to remember.  Yes, I do

12   remember the proposed language that you provided a couple of

13   days ago which was about you cannot consider it for propensity,

14   basically.  It didn't say that so much.

15        MR. ANDREWS:  You asked for the parties to confer

16   about proposed language, and we had said that the parties will

17   confer.  I think it's probably more fruitful for the defense to

18   confer with us within a reasonable amount of time to avoid sort

19   of the limiting instruction complication we ran into today,

20   understanding that the defense is busy but, you know, it's an

21   important instruction.

22        THE COURT:  Yeah, if you all could confer, I would

23   like to have an agreement or proposals from each side before

24   the witness gets on the stand.

25        MR. MUKASEY:  As soon as we review it we will get it

Naq2Cos7

1    to Mr. Andrews.

2              THE COURT:  Okay.  Great.

3              All right.  Have a good night, everybody.

4              COUNSEL:  Thank you, your Honor.

5              THE COURT:  We are adjourned.

6              (Adjourned to Friday, October 27, 2023, at 9:15 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      INDEX OF EXAMINATION

2    Examination of:                         Page

3     DANIEL ESCOBAR

4    Direct By Mr. Swett  . . . . . . . . . . . . . 127

5    Cross By Mr. Mukasey . . . . . . . . . . . . . 171

6    Cross By Mr. Gainor  . . . . . . . . . . . . . 196

7    Redirect By Mr. Swett  . . . . . . . . . . . . 203

8    Recross By Mr. Mukasey . . . . . . . . . . . . 215

9     STEVEN MILLER

10   Direct By Ms. Deininger  . . . . . . . . . . . 218

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        GOVERNMENT EXHIBITS

 2     Exhibit No.                                  Received

 3     2   . . . . . . . . . . . . . . . . . . . 136

 4     1   . . . . . . . . . . . . . . . . . . . 138

 5     5   . . . . . . . . . . . . . . . . . . . 140

 6     S7   . . . . . . . . . . . . . . . . . . . 148

 7     S2   . . . . . . . . . . . . . . . . . . . 149

 8     310   . . . . . . . . . . . . . . . . . . . 149

 9     S8   . . . . . . . . . . . . . . . . . . . 155

10     364, 384  . . . . . . . . . . . . . . . . 155

11     S4, 101, 104, 106A, 107, 110, 111,  . . . . . 217

12                113A, 113B, 120

13     339, 341, 344, 345, 347, 349, 351, 354, . . . 218

14                396, 1001, 1003, 1020, 1020B,

15                1034, 1034A, 1034B, 1034C

16     117   . . . . . . . . . . . . . . . . . . . 222

17     118   . . . . . . . . . . . . . . . . . . . 225

18     119   . . . . . . . . . . . . . . . . . . . 230

19     102, 103, 114, 115  . . . . . . . . . . . 240

20     704A   . . . . . . . . . . . . . . . . . . 241

21

22

23

24

25
```