

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 26, 2026

**BY ECF**

The Honorable Jennifer H. Rearden
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> Re:    *United States v. Edwin Pagan III*
>           S2 24 Cr. 641 (JHR)

Dear Judge Rearden:

Edwin Pagan III is scheduled to be sentenced on January 29, 2026, having pleaded guilty to misprision of a felony, in violation of Title 18, United States Code, Section 4. The parties and Probation agree that the applicable United States Sentencing Guidelines ("Guidelines") range is 10 to 16 months' imprisonment (the "Stipulated Guidelines Range"). (Final Presentence Investigation Report ("PSR") at 27). For the reasons set forth below, a sentence within the Stipulated Guidelines Range is sufficient but not greater than necessary to satisfy the goals of sentencing.

**A. Offense Conduct**

Pagan, then an active-duty law enforcement officer, knew about, concealed, and purposefully gave misleading trial testimony before a court in this District about a major bribery scheme committed in 2018 and 2019 by two former DEA special agents, John Costanzo and Manuel Recio, who were convicted at trial before Judge Oetken in November 2023. (PSR ¶¶ 4 – 5).

>     1.  The Bribery Scheme

Recio and Costanzo began serving with the DEA beginning approximately 1997 and 2004, respectively. (PSR ¶¶ 8 – 9). During Costanzo's employment with the DEA, and during the entirety of the relevant period for the bribery scheme, Costanzo served in DEA supervisory roles, first as a group supervisor for Group 10 of the Miami Field Division and then as staff coordinator in the Financial Investigations Section at DEA headquarters in Washington DC. (PSR ¶ 9). Recio served, among other things, as an Assistant Special Agent in Charge for the DEA's Miami Field Division. (PSR ¶ 8).

After retiring from the DEA in November 2018, Recio began offering private investigative services to defense attorneys. At that same time, he began paying bribes to Costanzo in exchange for confidential, sensitive information about DEA cases. (PSR ¶¶ 8, 10). Costanzo provided Recio with information regarding indictment dates, arrest dates, cooperating witnesses, and other confidential details about law enforcement targets and actions gleaned from DEA investigations. (PSR ¶¶ 17 – 28). Recio intended to use his improper access to confidential DEA information to get an edge helping defense attorneys land the subjects of DEA investigations as high-paying clients. (*See* PSR ¶¶ 10, 23, 24). The bribery scheme enriched Recio through fees from private attorneys and enriched Costanzo through bribe payments from Recio. (PSR ¶¶ 29, 36).

Costanzo's improper disclosure of confidential information during the bribery scheme jeopardized investigations, arrests, and the safety and lives of others. For example, on July 4, 2019, Costanzo told Recio that the indictment of a high-level individual under investigation for money laundering and foreign corrupt practices in Venezuela was scheduled for July 25, 2019. (PSR ¶ 21). Costanzo suggested Recio use that information to "get a meeting" where Costanzo could "tell you what to say." (*Id.*). This information regarding a planned grand jury presentation and plans to seek an indictment were grand jury secrets that Costanzo was not authorized to disclose. (*Id.*). The target was not in custody and the disclosure could have caused him to flee from arrest or destroy evidence.

### 2. Pagan's Connection to the Bribery Scheme

Pagan was a longtime friend of Recio and Costanzo who worked as an officer in the Coral Gables Police Department since 1997 (and a detective since 2005) and served as a task force officer with the DEA from 2009 to 2020. (PSR ¶ 98). Pagan served as an intermediary for the vast majority—approximately $90,750—of the bribe payments accepted by Costanzo, with the bribe money passing through Pagan in several ways. (PSR ¶¶ 29, 31 – 34).

One of the ways that Recio paid Costanzo bribes was through JEM Solutions ("JEM"), a company Pagan created in January 2019. Although Pagan purported on paper to be the sole owner of JEM, he communicated with Costanzo via text message about creating the company with Costanzo and Recio—the name, "JEM," was an acronym for their first names—and he gave Costanzo the online login information and debit card for the bank account when it was opened. (PSR ¶ 31). The JEM bank account was used to facilitate two payments of bribes from Recio to Costanzo: a $10,000 payment on April 17, 2019 and a $10,750 payment on June 3, 2019. (PSR ¶ 31). According to handwritten invoices from JEM, the $10,000 payment was supposedly an "investment" in JEM from Recio's private investigative company, GLC, and the $10,750 payment was supposedly made by GLC for services JEM provided to one of Recio's clients. (PSR ¶¶ 31 – 32). Neither JEM nor GLC had any other records for this purported investment and services. Costanzo, however, used JEM's debit card to access the bank account and pay for personal first-class flights; in other words, Recio's payments to JEM were available for Costanzo to use as he pleased. (PSR ¶ 33). Indeed, prior to November 18, 2019, when federal investigators first confronted Costanzo and Recio about the bribery scheme, Recio's deposits into JEM and Costanzo's personal use of JEM's debit card represented substantially all of the activity in JEM's

sole bank account.[1]

In addition, Pagan paid $50,000 to Costanzo's father, who then provided the money to Costanzo to be used to fund the purchase of a townhouse. (PSR ¶ 34.). Pagan paid an additional $20,000 to one of Costanzo's girlfriends to repay her for a $20,000 loan she had previously paid to Costanzo. (PSR ¶ 34).

### 3. Pagan's Misleading Trial Testimony and Recio and Costanzo's Conviction

On May 18, 2022, Recio and Costanzo were indicted in this District for bribery and honest services wire fraud offenses, and the case proceeded to trial before Judge J. Paul Oetken on October 23, 2023. Pagan testified at trial as a defense witness on November 6, 2023. When Pagan testified, he was an active member of the Coral Gables Police Department. (PSR ¶ 98).

At the time Pagan testified, he knew that Recio and Costanzo had perpetrated the bribery scheme but gave misleading testimony meant to conceal their guilt and wrongfully procure their acquittal. (PSR ¶ 48). Pagan's testimony about Recio's $20,750 in payments to JEM was intended to conceal their true purpose. Pagan claimed that the $10,000 payment was an investment meant to fund JEM's acquisition of office space, even though JEM never acquired any office space, Pagan had no written communications with Recio about finding office space, and Pagan had no documentation concerning the terms of Recio's supposed investment. (PSR ¶ 31; *U.S. v. Costanzo and Recio*, 22 Cr. 281, Trial Transcript ("Trial Tr.")[2] 1748-1749 (direct); Trial Tr. 1800-1802 (cross)). Regarding Recio's other $10,750 payment to JEM, Pagan claimed that he earned the money by providing 80 hours of private investigatory work for one of Recio's clients, even though he and Recio had no written communications about the project, neither Pagan nor JEM had any records or bills documenting Pagan's work, and Pagan and Recio had not called each other even once using their cell phones during the two to three months during which Pagan claimed to have performed the work. (PSR ¶ 32; Trial Tr. 1750-1752 (direct); Trial Tr. 1787-88 & 1794-1799 (cross)).

Moreover, to conceal the true nature of the $50,000 bribe payment, Pagan testified that the $50,000 payment was a supposed investment in Costanzo's townhouse, not a bribe from Recio, although Pagan could not articulate any basic facts or terms of this purported investment and acknowledged on cross examination that he and Costanzo had never discussed the terms of this purported investment. (PSR ¶¶ 34, 44; Trial Tr. at 1737-1739, 1770-1773). Pagan also testified that his $20,000 payment to one of Costanzo's ex-girlfriends was not a bribe. (PSR ¶¶34, 44; Trial Tr. 1759). Pagan claimed he made the payment because he did not want Costanzo to worry about repaying the $20,000, but Pagan admitted he had no agreement or understanding with Costanzo about when this substantial sum would be repaid. (Trial Tr. 1759-1760).

---

[1] Pagan also deposited approximately $1,600 in cash into JEM's bank account between February 2019, when the account was opened, and November 18, 2019, when law enforcement approached Recio and Costanzo.

[2] An excerpt of the trial transcript containing Pagan's testimony in *U.S. v. Costanzo and Recio*, 22 Cr. 281 (JPO), is attached as Exhibit A.

Judge Oetken and the jury rejected Pagan's testimony. On November 8, 2023, the jury returned a verdict finding Costanzo and Recio guilty of bribery, conspiracy to commit bribery, honest services wire fraud, and conspiracy to commit honest services wire fraud. (PSR ¶¶ 4 – 5). Further, Judge Oetken concluded that all $90,750 paid from Pagan—the $50,000 townhouse payment, the $20,750 JEM payments, and the $20,000 payment to Costanzo's former girlfriend—were proceeds traceable to the bribery offenses, and ordered those funds forfeited in addition to $7,500 in bribes paid to Costanzo through other means. (*United States v. Costanzo*, 22 Cr. 281 (JPO) Sentencing Transcript ("Costanzo Sentencing Transcript"), attached as Exhibit B, 58-59, 62:13-15).

Costanzo and Recio were sentenced to four years and three years' imprisonment by Judge Oetken, respectively. In sentencing Costanzo, Judge Oetken emphasized that the bribery scheme was a harmful crime that warranted significant punishment:

> This conduct causes harm in a couple of ways: First, it compromised DEA investigations and the DEA's mission in ways that could have allowed criminals to evade prosecution and potentially put DEA personnel and witnesses at risk. And apart from that, and more insidious, is that this conduct represents the sort of corruption that undermines the public's faith in our system of justice. It sends the message that federal law enforcement agents, instead of following the rules, are actually on the payroll of private lawyers and investigators who are trying to make a buck. There are a lot of countries around the world where this sort of corruption is routine, it's part of life, everyone expects it. One of the things that sets our country apart, at least in our aspirations and our ideals, is to be free of this sort of corruption.

(Costanzo Sentencing Transcript 54).

## B. Procedural History and Guidelines Calculation

Pagan was indicted on November 14, 2024, and self-surrendered on November 18, 2024. On October 10, 2025, Pagan pleaded guilty to a superseding information charging him with misprision of a felony in violation of 18 U.S.C. § 4 for concealing Recio and Costanzo's bribery scheme through his testimony at their trial. (PSR ¶ 48).

The parties and Probation agree that the applicable Guidelines range is 10 to 16 months' imprisonment.[3] That Guidelines calculation is as follows:

---

[3] The parties' plea agreement stipulated to a Guidelines range of 12 to 18 months' imprisonment. The parties reached this erroneous Guidelines range by mistakenly applying the zero point offender Guideline, U.S.S.G. § 4C1.1, prior to applying the reduction for acceptance of responsibility, U.S.S.G. § 3E1.1, which resulted in only a two point reduction under Section 3E1.1. The Guidelines state, however, that the two point reduction under Section 4C1.1 is to be applied after the adjustment for acceptance of responsibility, and the Government therefore agrees that the

- <u>Base Offense Level</u>: The base offense level is nine levels lower than the level for the "underlying offense." U.S.S.G. § 2X4.1. Here, the "underlying offense" is the crime Pagan concealed, namely, Costanzo and Recio's bribery scheme.

- <u>Calculation of the Level for the Underlying Offense</u>: The offense level for Costanzo's bribery scheme, including only the enhancements known or reasonably foreseeable to Pagan, was 26. This calculation represents (1) a base offense level of 14 because Costanzo was a public official, (2) a two level increase because the offense involved more than one bribe, U.S.S.G. § 2C1.1(b)(2), (3) a six level increase because the value of the bribe payments known to Pagan was more than $40,000, U.S.S.G. § 2C1.1(b)(2) & § 2B1.1(b)(1)(D), and (4) a four level increase because Costanzo was in a high-level decision-making or sensitive position. Since the underlying offense level is 26, Pagan's offense level is 17, nine levels lower.

- <u>Adjustments for Acceptance of Responsibility and Zero-Point Offender</u>: Pagan receives a three level reduction for timely acceptance of responsibility under Sections 3E1.1(a) and (b), and a two level reduction under Section 4C1.1 because he has no criminal history points and otherwise satisfies the conditions in the Zero-Point Offender Guideline. The resulting offense level is 12.

At offense level 12, the Guidelines fine range is $5,000 – $55,000. U.S.S.G. § 5E1.2.

## C. Discussion

### 1. Applicable Law

As the Court knows, the Sentencing Guidelines, while no longer mandatory, still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), courts must treat them as the "starting point and the initial benchmark" for sentencing proceedings, *id.* at 49.

After calculating the Guidelines range, the Court must consider the factors outlined in Title 18, United States Code, Section 3553(a), which include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid

---

applicable Guidelines range is 10 to 16 months' imprisonment. *See* U.S.S.G. § 4C1.1 (when the zero-point offender conditions are met the sentencing court should "decrease the offense level determined under Chapters Two and Three by 2 levels."); *see also* U.S.S.G. § 1B1.1(a) (adjustments from Chapter Four of the Guidelines are applied after adjustments from Chapter Three of the Guidelines).

unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall v. United States*, 552 U.S. 32, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs the Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## 2. A Sentence Within the Stipulated Guidelines Range Is Warranted

A sentence of 10 – 16 months' imprisonment is necessary to reflect the seriousness of Pagan's crime, promote respect for the law, and adequately deter criminal conduct.

### a. The Nature and Seriousness of the Offense

Pagan's crime was particularly serious in light of his role, both at the time of the bribery conduct and his misleading trial testimony, as an active-duty law enforcement officer. Despite being a law enforcement officer, Pagan served as a conduit for bribe payments between a former and active DEA special agent—including payments using a pass-through bank account opened by Pagan that should have, at a minimum, raised red flags to an experienced DEA task force officer—and then appeared at a trial before Judge Oetken to give misleading testimony to cover up Recio and Costanzo's corruption within the DEA. Law enforcement officers like Pagan are entrusted to uphold and enforce the law, not break it, and by committing a serious crime of obstruction and dishonesty, Pagan broke the public's trust. Promoting respect for the law means imposing meaningful punishment on law enforcement officers like Pagan who break the law when they see fit. Serious punishment under these circumstances helps restore faith in honest public service by reinforcing the norms Pagan so gravely violated when he committed the instant offense.

Two further aggravating circumstances make Pagan's crime, serious by its very nature, particularly worthy of a substantial term of imprisonment consistent with a Guidelines sentence. First, Pagan's crime involved an attempt to cover up a crime by another member of law enforcement, namely, Costanzo's bribery scheme at the DEA. By hatching and executing a criminal plan to cover up other serious crimes by Recio and Costanzo, Pagan piled corruption upon corruption and further violated the public's expectation that its sworn law enforcement officers will follow the law and deal honestly. Second, the manner in which Pagan committed the crime was particularly brazen because he committed a fraud on this Court. Pagan, knowing Costanzo and Recio were guilty, appeared as a witness in their trial to conceal facts in an attempt to help them avoid responsibility for their crimes. Pagan's willingness to deceive the Court to place his friends above the law magnifies this already serious offense.

Pagan tries to minimize his crime as a mere "failure of judgment" committed out of a "misguided attempt at loyalty," but this characterization is contrary to the facts. (Defendant's Sentencing Memorandum ("Def. Mem."), Dkt. No. 89, 1, 2). Pagan's crime was not some momentary lapse in judgment, mere failure to report, or a passing lie told in the heat of the moment. Instead, it was the product of deliberate planning and a decision to break the law that Pagan made and executed over weeks and months. Pagan knew of Recio and Costanzo's crimes, but he nonetheless fabricated a cover-up story, traveled to New York, and testified for several hours to help conceal the truth. Pagan's crime was therefore an extended plan to subvert the justice system executed with criminal intent, not some mere passing lapse in judgment. Moreover, the fact that Pagan committed this crime out of "loyalty" to Recio and Costanzo makes the crime more serious, not less. Pagan's crime of attempting to elevate his friends above the law shows arrogance and disdain for this Court and the criminal justice system and therefore exemplifies why the crime is so serious.

Pagan also minimizes his crime by pointing out that Recio and Costanzo were convicted at trial and therefore Pagan did not achieve his criminal purpose of obstructing their prosecution. (Def. Mem. 2). But Pagan should not be rewarded with leniency because his dishonesty was ultimately unsuccessful. Pagan's crime remains a fraud on this Court and a harmful violation of the norms that demand honesty from law enforcement officers even if his crime failed to achieve its goal.[4]

The Court should also reject Pagan's claim that the applicable Guidelines calculation overstates his culpability because it incorporates enhancements that are derived from Costanzo's crime. (Def. Mem. 2). The Guidelines incorporate Costanzo's sentencing enhancements into Pagan's sentencing range because, at the time Pagan committed the instant offense, Pagan was fully aware of the aggravating circumstances that made the bribes to Costanzo such a serious

_____

[4] Pagan also claims in passing that he only learned about Recio and Costanzo's crimes when the two were indicted in this case, (Def. Mem. 2), but the Government's investigation has shown otherwise. As noted above, the use of the JEM bank account that was opened by Pagan should have raised, at a minimum, substantial red flags for Pagan. In addition, evidence of Pagan's interactions with Recio and Costanzo on November 18, 2019, the day law enforcement first confronted Recio and Costanzo about the bribery scheme, strongly indicate that Pagan was or became aware of the bribery offense by at least that date. In particular, toll records show that Recio called Pagan shortly after Recio finished speaking with law enforcement. Then, immediately after Recio and Pagan ended their call, Pagan sent Costanzo a text message stating, "Call me from a clean number. Not work not cell. Important." Pagan's reference to the need to use a "clean number" reflects his knowledge that Recio and Costanzo were under law enforcement scrutiny for the bribery scheme. Flight records, credit card statements, and text messages reflect that the next day Pagan flew to Washington DC—where Costanzo was living at the time—and then rented a car to drive Costanzo back to Miami, where they arranged to meet in person with Recio. The fact that Pagan took such substantial steps to drive Costanzo from Washington DC to Miami for a meeting with Recio the day after Costanzo and Recio were confronted about their bribery scheme, while taking steps to make sure to only speak on a "clean number," is powerful evidence that Pagan knew at least by November 2019 about Recio and Costanzo's scheme.

offense. *See* U.S.S.G. 2X4.1 Application Note 1. Pagan knew Costanzo was a senior DEA officer "in a high-level decision-making and sensitive position." U.S.S.G. § 2C1.1(b)(3). Pagan knew the offense involved at least $40,000 in bribes because he was personally responsible for serving as the conduit for more than $90,000, and he knew that at least four bribes were paid because Pagan himself handled these bribe payments. U.S.S.G. §§ 2C1.1(b)(1)(D), 2C1.1(b)(2). Therefore, Pagan knew Costanzo was committing a serious and harmful crime when Pagan decided to conceal the truth through misleading trial testimony, and the Guidelines calculation appropriately captures Pagan's culpability for attempting to conceal such a crime.[5]

Therefore, a meaningful term of imprisonment consistent with the Guidelines range is an appropriate and warranted sentence given Pagan's serious criminal conduct.

b.  Deterrence

There is also a compelling interest in general deterrence. Witnesses who testify before this Court swear to tell the truth and should expect serious punishment if that oath is broken. A probationary sentence, or the brief period of incarceration recommended by Probation, sends the message that a witness's oath can be broken with minimal punishment. A Guidelines sentence, by contrast, sends the appropriate message that witnesses who come to Court to hide the truth can expect to spend a meaningful amount of time in jail.

The interest in general deterrence is particularly strong because Pagan was a law enforcement officer at the time he testified, and criminal cases before this Court and around the country depend on law enforcement officers testifying truthfully in criminal trials. The public and law enforcement officers should receive a clear message that anything but honesty from law enforcement witnesses will result in meaningful punishment.

Pagan argues that the collateral consequences of his conviction, namely, the loss of his law enforcement career, private investigator license, and ability to carry a gun, are sufficient to satisfy the need for deterrence. (Def. Mem. 4). Those consequences may prevent Pagan from reoffending, but they are not sufficient to serve the broader purposes of general deterrence. Indeed, the collateral consequences Pagan cites are no different than those typically associated with any federal crimes; as a federal law enforcement officer Pagan should have been well aware of these possible consequences and yet Pagan himself was not deterred from attempting to conceal Costanzo and Recio's offense even after seeing them indicted. Any future law enforcement officer contemplating false testimony at a trial should know to expect meaningful time in prison, not merely the need to find new employment, as a consequence of breaking the law.

Moreover, while Pagan complains about the economic consequences of his conviction, the PSR makes clear that he has substantial assets and alternative ways of supporting himself, including a real estate business and a business providing martial arts training to non-law

---

[5] To be sure, there is a difference in relative culpability between concealing a crime and committing it, and Section 2X4.1 represents this difference in relative culpability by setting the base offense level for misprision nine levels lower than the offense level for the underlying crime. U.S.S.G. § 2X4.1.

enforcement personnel. (PSR ¶¶ 97, 101, 102.) His income includes more than $9,000 in monthly rental income and $8,000 in monthly interest income, leading to a combined income that exceeds his expenses—including mortgage payments—by approximately $6,500 each month. (PSR ¶ 101). He is therefore far better suited than many defendants to support himself despite a criminal conviction. Furthermore, the limitations imposed on Pagan's choice of work in the future are themselves appropriate collateral consequences of his crime. Because Pagan showed he is willing to cover up major criminal conduct with misleading testimony in court, he should not be trusted with a gun, should not be training law enforcement officers, and should not be trusted as a private investigator. Therefore, the collateral consequence from this crime are neither inappropriately harsh nor remotely sufficient to satisfy the interest in deterring law enforcement officers like Pagan from concealing criminal activity, and therefore a substantial prison sentence is necessary to deter others tempted to follow Pagan's example.

    c.   Other Sentencing Factors

The seriousness of the offense and need for general deterrence therefore weigh heavily in favor of a Guidelines sentence, and no mitigating circumstances reflect that a below-Guidelines sentence can sufficiently satisfy these interests.

Probation agrees that a prison sentence is necessary and recommends only three months' incarceration, but this recommendation is based on unreasonably weighing the defendant's employment history as a mitigating factor—when in fact, under these circumstances, it should be viewed as an aggravating factor—and double counting the defendant's lack of criminal history as a mitigating circumstance. (PSR 28). First, regarding employment history, the fact that Pagan served decades as a law enforcement officer prior to deceiving this Court about corruption in the DEA in no way mitigates the severity of the crime or lessens the need for general deterrence. While a consistent employment history may sometimes be a mitigating factor in other cases, under the unique facts and circumstances here, Pagan's commission of this crime while serving as a law enforcement officer is undoubtedly an aggravating factor because his job required him to be honest and law-abiding. Indeed, Probation offers no explanation regarding why Pagan's particular work history is a mitigating factor given the unique facts and circumstances of this case. (*See* PSR ¶ 8). Second, Pagan's lack of criminal history provides no basis for a below-Guidelines sentence because it is already reflected in his receipt of a two-point reduction under the zero-point offender Guideline, Section 4C1.1. Without this two-point reduction, Pagan would be facing a sentence of 15 to 21 months. Since the applicable Guidelines range of 10 to 16 months already captures Pagan's lack of criminal history, a further reduction for his lack of criminal history is unwarranted and ignores the basis of the Guidelines calculation in this case.

The defense submission seeks a non-custodial sentence based on comparing Pagan to David Macey, (Def. Mem. 4 – 5), but this comparison ignores obvious differences between the two. Most notably, Pagan has been convicted of a crime based on his attempt to conceal Recio and Costanzo's bribery scheme through false testimony at trial, but Macey did no such thing. Indeed, there are several stark and important differences between Macey and Pagan. Macey did not testify at Recio and Costanzo's trial, Macey was not a law enforcement officer, Macey was not involved with JEM or the JEM bank account, Macey did not handle payments between Recio and Costanzo, and Macey did not attempt to wrongfully cause Recio and Costanzo to be acquitted when he knew

them to be guilty. These differences between Pagan and Macey render Section 3553(a)(6) inapplicable because that statute only counsels against sentencing disparities "among defendants with similar records who have been found guilty of *similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added[6]). There is nothing similar about Pagan and Macey that is relevant to sentencing.

The sentences imposed on Recio and Costanzo offer a better comparison. Fundamentally, Pagan, like Costanzo and Recio, was a law enforcement officer; both Pagan and Costanzo were law enforcement officers when the offense was committed, and Recio was a recently retired law enforcement officer who used his DEA connections and expertise to carry out the scheme. Moreover, Pagan has acknowledged that he attempted to conceal Recio and Costanzo's crimes when he testified about his handling of bribe payments that passed from Recio and Costanzo. Pagan's offense conduct is thus directly tied to Costanzo and Recio's offenses of conviction. The Government acknowledges, however, that Pagan bears less culpability than Recio and Costanzo because his conviction reflects his attempt to conceal their crimes, not the substantive crimes themselves, and that lesser culpability is appropriately reflected in the Guidelines range. Costanzo and Recio were sentenced to 48 and 36 months' imprisonment, respectively, and a sentence within the Guidelines range of 10 to 16 months' imprisonment reasonably imposes a meaningful term of imprisonment that also represents Pagan's comparatively lesser culpability.

Moreover, the statistical data reported by the PSR reflects that the average length of custodial sentences imposed on defendants, like Pagan, with an offense level of 12 computed under Section 2X4.1 and a criminal history category of I is eleven months' imprisonment, a sentence that falls within the Guidelines range in this case. (PSR 25). The Commission's data therefore reflects that where a misprision offense, like Pagan's, is a serious crime worthy of incarceration, a sentence within the Guidelines range in this case is consistent with the custodial sentences imposed on offenders with a comparable Guidelines calculation. A Guidelines sentence is therefore broadly consistent with the types of sentences imposed on offenders with a similar Guidelines calculation to Pagan's.

Finally, Pagan argues that he should receive a lesser sentence in light of the letters of support he received from family and friends. But nothing in these letters justifies or excuses Pagan misleading this Court to cover up Costanzo and Recio's bribery conspiracy. Moreover, while the letters of support speak to a supposedly strong character, this offense shows that Pagan was all too willing to deceive this Court and a jury to get what he wanted. Further, Pagan's large social network and substantial assets and income show that Pagan's crimes were not the product of despair, need, or other desperate circumstances. Instead, despite being a wealthy and well-liked member of law enforcement, Pagan turned his back on the public's trust because he believed that he, Recio, and Costanzo were above the law. Pagan's offense was an arrogant and brazen crime of corruption and dishonesty, and therefore, the Government believes that a meaningful period of incarceration is the appropriate punishment in this case.

---

[6] Indeed, because Macey has not been found guilty of, or admitted to, any offense conduct in connection with his entering into a DPA with the Government, he is not a relevant defendant for considerations under Section 3553(a)(6).

### 3. The Court Should Impose a Substantial Fine

Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a). Such factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment. 18 U.S.C. § 3572(a). The Guidelines provide that a court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a).

In determining the size of any fine, the sentencing court shall consider:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

> (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;

> (4) any restitution or reparation that the defendant has made or is obligated to make;

> (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;

> (6) whether the defendant previously has been fined for a similar offense;

> (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

> (8) any other pertinent equitable considerations.

*Id.* § 5E1.2(d). The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." *Id.* The defendant bears the burden of demonstrating an inability to pay a fine. *See United States v. Camargo*, 393 F. App'x 796, 798 (2d Cir. 2010); *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001).

Pagan has the ability to pay a fine, as the Probation Office has recognized and Pagan does not dispute. (PSR ¶ 106.) Pagan reported to the Probation Office total assets of $3,581,506, a total net worth of $3,575,463, and substantial monthly income. (PSR ¶ 101.)[7] The Probation Office recommends a fine of $25,000 (PSR 27), in the middle of the advisory Guidelines fine range as calculated by the Probation Office and agreed to by the parties (PSR ¶ 117). The Government submits that a higher fine, at the upper end of the Guidelines range, should be ordered in light of the seriousness of the offense and Pagan's substantial resources.

---

[7] While the PSR states that some of the defendant's real estate assets may have been double counted in this analysis by counting both the value of certain real property and the value of the company holding that property, it appears that the result at most overestimated Pagan's net worth by approximately $750,000. (PSR ¶ 102). Accordingly, even if Pagan's net worth as reported in the PSR is overestimated, it is substantial.

### D.    Conclusion

For the foregoing reasons, a sentence within the Stipulated Guidelines Range of 10 to 16 months' imprisonment as well as a substantial Guidelines fine of $55,000 is sufficient but no greater than necessary to accomplish the goals of sentencing.

Very truly yours,

JAY CLAYTON
United States Attorney

by: _____
Christopher D. Brumwell
Emily S. Deininger
Assistant United States Attorneys
(212) 637-2477/2472


cc:    Christopher DeCoste, Esq. (via ECF)